IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CIVIL ACTION NO. 5:22-CV-300-KKC



*Electronically Filed*

| | | |
|---|---|---|
| JOHN NORMAN, as Administrator of | ) | |
| the Estate of DESMAN LADUKE, deceased; | ) | |
| | ) | |
| v. | ) | SECOND AMENDED COMPLAINT |
| | ) | |
| JOSEPH HORTON, individually; and | ) | |
| | ) | |
| JASON FRADDOSIO, individually and in his | ) | |
| official capacity as a Lieutenant | ) | |
| and SRT Commander with the | ) | |
| Nicholasville Police  Department | ) | |

SERVE:
510 N. Main Street
Nicholasville, Kentucky 40356

\*\*\*    \*\*\*    \*\*\*

Comes the Plaintiff, John Norman, as Administrator of the Estate of Desman LaDuke, by counsel, and for his Second Amended Complaint against Defendants Joseph Horton and Jason Fraddosio, states as follows:

## JURISDICTION

1.      Plaintiff brings this action against Defendants, Joseph Horton and Jason Fraddosio, to redress the deprivation of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and the common law.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983.

3.     Plaintiff also invokes the supplemental jurisdiction of this Court over his state law claims against the Defendants for common law violations pursuant to 28 U.S.C. § 1367 as the common law claims form part of the same case or controversy.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 as the cause of action occurred in this District.

## PARTIES

5.     Plaintiff, John Norman, is duly appointed and acting Administrator of the Estate of Desman LaDuke, having been so appointed by Order of the Jessamine District Court entered on November 10, 2022. The Order is attached as **Exhibit A**.

6.     The Decedent, Desman LaDuke, was at all times mentioned herein a citizen and resident of Nicholasville, Jessamine County, Kentucky.

7.     Defendant, Joseph Horton, was, at all relevant times herein, an officer with the Nicholasville Police Department and will be contacted through his counsel, Scott Miller of Sturgill Turner Barker & Maloney, 333 West Main Street, Suite 1500, Lexington, KY 40507.

8.     Defendant, Jason Fraddosio, was, at all relevant times herein, a lieutenant with the Nicholasville Police Department and will be contacted through his counsel, Scott Miller of Sturgill Turner Barker & Maloney, 333 West Main Street, Suite 1500, Lexington, KY 40507.

## FACTUAL ALLEGATIONS

9.     Plaintiff adopts and incorporates by reference each of the previous paragraphs as if set forth fully herein.

10.     Defendant Fraddosio, at all times relevant herein, was the Special Response Team ("SRT") Commander of the Nicholasville Police Department.

11.     In this role, Fraddosio was responsible for directing the efforts of the SRT.

12.     Fraddosio was responsible for ensuring that the personnel under his command abided by all policies, general orders, and special orders which applied to the team.

13.     Fraddosio was responsible for coordinating and supervising training for SRT members.

14.     Fraddosio was responsible for ensuring that SRT received consistent and continuous training in order to maintain a high level of proficiency and state of readiness.

15.     Fraddosio was responsible for assuring that SRT members had requisite training necessary for officers serving on the team, which included but was not limited to de-escalation and crisis intervention training.

16.     In cases of suicidal or barricaded subjects, Fraddosio was responsible for gathering information about the subject and determining if the situation meets criteria before making a team callout.

17.     Fraddosio was responsible for assuring that at least two SRT members were assigned as chemical munitions deployment personnel ("Chemical Officers") and that the Chemical Officers completed an approved training course in the proper use of chemical munitions.

18.     Fraddosio was responsible for assuring compliance with the weapon systems, training, qualification, and operational deployment of the SRT sniper.

3

19.     Fraddosio was responsible for assuring that the team reported to headquarters when activated for call out purposes.

20.     Fraddosio was responsible for assuring that an operations plan was implemented for the team prior to their deployment or, if unfeasible, as soon as practical upon arrival at the location.

21.     Fraddosio was responsible for assuring that, once the team was activated and on scene, that a scene commander was designated and assumed and maintained control of the operation.

22.     Fraddosio was responsible for assuring that team members were given their respective assignments.

23.     Fraddosio was responsible for assuring that team members, prior to or as soon as possible upon arrival to the scene of a barricaded subject, were provided as much information as possible about the ongoing situation and subject(s) involved.

24.     Fraddosio was responsible for ensuring that SRT members attended team training sessions, followed policies/rules/General Orders/standard operating procedures, and adhered to clearly established laws and precedent.

25.     This included, but was not limited to, ensuring that team members adhered to the Department's General Orders relating to dealing with Persons of Diminished Capacity/Mentally Ill.

26.     The General Orders relating to dealing with Persons of Diminished Capacity/Mentally Ill identified the following:

      a.  Control the situation;

4

b. Respect the comfort zone of the subject in order to reduce any unnecessary agitation;

c. Convince the subject that they do not have to move;

d. Reduce elements of agitation, including but not limited to the presence of large groups, emergency vehicle equipment, multiple persons directing communications to the subject, and reducing outside influences and an sources of agitation, generally;

e. Move slowly to avoid agitating the subject further;

f. Limit observable indications of force; if firearms are drawn, maintain in low ready position and not be displayed by officers who are attempting to establish communications with the subject;

g. When a command post and staging area are designated, place them out of sight from the subject;

h. Designate one officer as the command voice while others refrain from becoming involved;

i. Refrain from threats to arrest and use force;

j. Analyze what effects the efforts are having on the subject as it is essential to identify and avoid areas that appear to agitate the subject;

k. Not use family members unless absolutely necessary to establish communications with the subject; and

l. Elongate the encounter.

27. As of October of 2022, the Nicholasville Police Department SRT led by Fraddosio was not in a state of readiness.

5

28. The team experienced problems with turnover.

29. As such, several members of the team had received little to no training.

30. While the team was required to have a schedule of training at least monthly, it had failed to adhere to this training requirement.

31. In fact, some members of the team's training was limited to "a lot of shooting."

32. Several members of the team had limited experience on callouts.

33. Several members of the team had limited experience on simulated incidents with barricaded subjects.

34. Several members of the team did not understand the distinction between a hostage situation versus a single barricaded subject.

35. Several members of the team lacked experience in responding to suicidal subjects.

36. There were members of the team who had never even seen the Standard Operating Procedures which were specific to the SRT.

37. The SRT did not consistently adhere to its requirements of after-action briefings, despite the same being critical for a team feedback and opportunity to identify what took place, whether policy was properly followed, process clarification, training gaps, and how to improve performance in the future.

38. Upon information and belief, the SRT was composed of approximately 10 members in October of 2022.

39. According to statements made by Nicholasville Police Department patrol officers, several of the SRT members were together socially on October 21, 2022.

6

40.     The SRT members consumed enough alcohol on that date for at least one of the patrol officers to indicate on October 22, 2022, that the SRT members "are probably all hung over."

41.     Meanwhile, on that same morning, Desman LaDuke was in the midst of a mental health crisis.

42.     Desman was 22 years old.

43.     He had attended West Jessamine High School, where he was a star athlete on the football team and garnered the love and admiration of several teachers.

44.     After graduating high school, Desman attended Job Corps, where he graduated in 2019.

45.     After graduation, Desman remained well-liked throughout Jessamine County and the surrounding area.

46.     Desman had no criminal history.

47.     Desman's story was especially impressive in light of the adversity he faced growing up.

48.     Desman's mother died in a car accident when he was ten.

49.     Desman did not learn who his father was until he was nearly 16 years old.

50.     Desman lost his cousin, with whom he was very close, in a tragic drowning accident shortly after Desman graduated high school.

51.     Understandably, Desman went through mental health struggles.

52.     Desman never resorted to violence or harming others when coping with mental health struggles.

53.     On the morning in question, he and his girlfriend were on the verge of splitting up.

54.     She gathered her things and expressed her intent to move out of their home at 233 Green Street, Nicholasville, Kentucky 40356 ("the residence").

55.     Desman indicated that he was going to harm himself.

56.     Desman's girlfriend advised Desman's aunt, who had raised Desman since his mother's death and whom Desman often looked to for support, that Desman was expressing thoughts of self-harm.

57.     Desman's aunt lived in Nicholasville, but at the time was approximately 45 minutes away.

58.     She called the police and asked them to make a welfare check on Desman while she rushed back to Nicholasville to see him.

59.     Nicholasville patrol officers were dispatched to the residence.

60.     Multiple officers calmly approached the residence, with each having conversations with Desman through the closed front door.

61.     Desman calmly identified himself and complied with multiple requests from officers.

62.     When Desman was asked if his girlfriend could come outside, he immediately had her exit the residence.

63.     When Desman was asked if his girlfriend could have her cell phone, he obtained it, opened the door, and tossed it in an area where it would not be damaged and officers could retrieve it for Desman's girlfriend.

64.    Desman repeatedly expressed that he did not, however, want to have face to face interactions with the officers.

65.    He declined their requests to exit the residence and advised officers that they could leave.

66.    At this point, officers had no probable cause to believe Desman had committed any crimes at this point, no reason to believe anyone other than Desman was in the residence, and no reason to believe that Desman was going to comply with their directives to exit.

67.    Despite this, officers remained on scene and informed command staff of the situation.

68.    Command staff members made the decision to activate the negotiations team and SRT and for both to respond to the residence.

69.    Fraddosio was responsible for gathering the SRT and deploying them to the scene.

70.    Fraddosio sent a group message to SRT members at approximately 11:03 am seeking members to respond as soon as possible.

71.    Fraddosio then advised responding members to bring gas masks.

72.    The SRT members were slow to respond to Fraddosio's request for member availability, thus prompting the officers on scene of the residence to discuss the member whereabouts the previous day and the statement that "they're probably all hung over."

73.    One of the SRT members who ultimately responded was the Defendant Horton.

74.    Horton indicated that he had just "woke up."

9

75.     At the time of the SRT activation, Horton was less than five hours removed from working a 12-hour shift.

76.     Horton, along with multiple other SRT members, proceeded to respond to the residence.

77.     Each was wearing a ballistic vest, tactical gear, and was equipped with a rifle.

78.     The SRT members did not first gather at headquarters.

79.     Fraddosio did not gather or disseminate intelligence with relation to Desman's background.

80.     SRT members did not pull Desman's background, despite radio communications confirming the dispatcher obtaining Desman's license number and placement of the same into the computer-aided dispatch, thereby allowing SRT members to run a background on their mobile data terminals with a simple click of a button.

81.     Fraddosio did not devise an operations plan for SRT's response to the residence.

82.     SRT members proceeded to form an inner perimeter around the residence.

83.     Several members took positions of cover, where they aimed their rifles at Desman's windows and doors.

84.     Desman had a phone conversation with family shortly after SRT's arrival, advising that he was not coming out of the residence and that he did not want anyone coming in.

85.     A large group of bystanders began to form across the street from the residence.

86.     One bystander advised officers that the scene, presumably due to the presence of SRT members in green tactical uniforms with rifles pointed at Desman's residence, reminded him of his time serving in Vietnam.

87.     Fraddosio arrived on scene, where he quickly learned that SRT's presence was increasing Desman's agitation.

88.     Fraddosio was present when Desman, while on the phone with family on a video call, began crying and tensing up when making statements regarding the presence of SRT officers surrounding his home and pointing guns in his direction.

89.     Fraddosio, who was visibly sweating with a mouthful of chewing tobacco that was almost too large for his mouth to handle, remained across the street in the area of the neighbors.

90.     Fraddosio did not indicate the need for sniper deployment to SRT members, let alone analyze and disseminate operational deployment considerations.

91.     Less than an hour after SRT members arrived on scene and set up a perimeter, Fraddosio appeared to get anxious and impatient.

92.     Intermittent video footage depicts Fraddosio checking his watch more than a dozen times.

93.     Desman repeatedly requested for the SRT members to stand down and leave.

94.     In response, Fraddosio amplified SRT's presence further agitating Desman.

95.     Fraddosio deployed a sniper (Defendant Horton) to the rear of the residence and had him stage in a position which was within plain view to Desman from the vantage point of the rear window.

96.    At the time Fraddosio deployed a sniper to the rear of the residence, there was no justification for the same under SRT policies.

97.    Shortly after 1 pm and less than two hours following SRT's arrival to the scene, Fraddosio escalated the situation further.

98.    Horton, positioned with cover behind a storage shed, began calling out to Desman with relation to Desman's gun.

99.    Horton requested Desman "drop the gun," stating that nobody wanted to hurt him.

100.    Other officers in the area then also began calling out for Desman to drop the gun.

101.    Desman asked for an officer's name.

102.    The officer was Jeremy Balltrip, who provided Desman with his first name.

103.    Horton and other officers perceived that Desman, while holding a gun, was a threat to himself only.

104.    This is evidenced by the fact that neither Horton nor other officers ever gave Desman a verbal warning indicating their intention to use deadly force upon him.

105.    This is also evidenced by the fact that the officers did not communicate to each other, to dispatch, or to others on the radio that Desman was pointing a gun at them or otherwise threatening to harm them.

106.    Desman had one gun at the time.

107.    This is evidenced by the fact that all of the officers' statements to Desman were for him to drop the "gun"; at no time did any request for him to drop the "guns."

108.    This is also evidenced by the observations of several officers that Desman extended his middle finger to one of the officers during this period.

109.    All officers who observed Desman's gun recalled that it was silver.

110.    None indicated that it was the color of the other gun identified later within the residence.

111.    Over a period of over four minutes, officers asked Desman to put down the gun a minimum of 29 times.

112.    Horton indicated that Desman had pointed his gun at his own head multiple times in the sequence and then had dropped it to his side each time.

113.    At no point during this sequence did any officer indicate that he was going to shoot Desman if he did not put down the gun.

114.    At this point, Fraddosio left his position of cover beside Horton and went into the grass, where he laid prone and pointed his rifle at Desman.

115.    The negotiator on scene was then handed a cell phone and attempted to call Desman.

116.    The negotiator looked towards Desman's rear window while attempting to call and began to gesture towards Desman with his left hand to answer the call.

117.    Both Fraddosio and Horton were in close proximity to the negotiator and could hear him calling out to Desman to answer the call.

118.    According to Horton and Fraddosio, Fraddosio directed Horton to shoot Desman the next time he dropped the gun down from his own head.

119.    As Desman dropped the gun from his head while his phone was ringing with a call from the negotiator, Fraddosio ordered Horton to shoot Desman.

13

120.   Horton shot Desman square in the chest.

121.   Horton knew or should have known at the time he fatally shot Desman that Desman did not present an imminent threat of serious injury or death to others.

122.   Horton knew or should have known at the time he fatally shot Desman that his actions of using deadly force, regardless of whether or not it was at the command of a supervisor, was unconstitutional.

123.   Horton and Fraddosio each knew or should have known of his requirements to give a verbal warning, when feasible, prior to using deadly force.

124.   While Desman was pointing a gun at his own head and Fraddosio ordered Horton to shoot him when he dropped the gun, both knew that it was feasible and thus constitutionally required at that point to verbally warn Desman of their intent to shoot him when he brought the gun down from that position.

125.   Fraddosio knew or should have known at the time he ordered Horton to fatally shoot Desman that Desman did not present an imminent threat of serious injury or death to others.

126.   Fraddosio, when ordering Horton to fatally shoot Desman while the negotiator was attempting to call Desman's phone, knew or should have known that it was inevitable that Desman would need to drop the gun down from his head in order to answer the call.

127.   Fraddosio, when ordering Horton to fatally shoot Desman when Desman dropped the gun down from his head, knew or should have known that Desman was not going to hold the gun to his own head forever and thus the order Fraddosio was giving was not a matter of if, but rather when, to shoot Desman.

14

128.    Following the shooting, a sweep of the residence revealed the presence of a silver gun, a detached magazine for the gun, and a black gun.

129.    After suffering for several hours, Desman died from the gunshot wound to his chest.

130.    Meanwhile, both Fraddosio and Horton fabricated post-shooting statements in an apparent effort to justify their respective actions.

131.    Both indicated that Desman was holding two guns, despite no officer indicating the same prior to the shooting.

132.    Both indicated that Desman was repeatedly pointing guns at other officers, despite no officer indicating the same prior to the shooting.

133.    Fraddosio, knowing that there were surveillance cameras on the premises and body cameras equipped on patrol officers, and after two guns had been identified in the residence, yelled at Desman while Desman was dying on the ground, demanding that Desman tell him why he kept pointing "guns" at them.

134.    Fraddosio then began advising the other officers on scene that Desman was holding two guns and pointing them at the officers as if he was preparing to shoot them.

135.    Ultimately, when these officers were interviewed, they incorporated these statements into their interviews.

136.    Those interviewed officers who were asked to clarify whether the knowledge was first-hand or not, conceded that it was based on things they had been told.

137.    At all times relevant herein, Defendants Fraddosio and Horton were aware that Desman LaDuke was alone in his residence and posed only a potential threat to himself.

138.    Defendant Fraddosio was aware that Desman LaDuke had a history of severe mental health issues yet chose to disregard his command obligations in handling situations of individuals in mental distress.

139.    The acts and omissions of Horton and other SRT members also evince a failure by Fraddosio in acting in accordance with these policies, and instead implementing a custom and practice of treating a mental health call as if it were a hostage rescue.

140.    At all times relevant herein, Fraddosio knew or should have known that his failure to order his team to follow policy was resulting in increased agitation with Desman and causing increasing tension in an already suicidal and mentally distressed young man.

141.    At all times relevant herein, Fraddosio knew or should have known that his deployment of a sniper was not indicated or warranted by policy.

142.    At all times relevant herein, Fraddosio knew or should have known that the patrol officers' adherence to policy caused Desman to remain calm and cooperative with the officers, and that SRT officers' ignorance of the policy resulted in surrounding Desman LaDuke's residence with assault rifles aimed at all points of exit and entry significantly and unreasonably escalated the situation.

143.    Defendant Fraddosio's failure to consistently and properly train the SRT unit amounted to a deliberate indifference to the rights of Desman and those with whom his officers come into contact.

144.   The SRT unit's custom and practice of responding and acting without an Operations Plan in its encounters with mentally distressed subjects amounted to a deliberate indifference to the rights of Desman and those others with whom the officers come into contact.

145.   Defendant Fraddosio's encouragement and order to Defendant Horton to shoot Desman LaDuke evinced a failure to properly supervise with a deliberate indifference to the rights of Desman.

146.   Simply put, both individual and institutional failures resulted in the unconstitutional shooting and death of Desman LaDuke, who was alone in his home and not an imminent threat to any person other than himself.

## COUNT I – Violation of 42 USC § 1983 - Excessive Force

147.   Plaintiff adopts and incorporates by reference each of the previous paragraphs as if set forth fully herein.

148.   Defendants Joseph Horton and Jason Fraddosio, under the color of law, deprived Desman LaDuke of rights, privileges, and immunities secured to him by the Fourth and Fourteenth Amendments to the United States Constitution, including the right to be free of excessive force.

149.   The force used by Defendants Joseph Horton and Jason Fraddosio was objectively unreasonable.

150.   At the time Defendant Joseph Horton shot Desman LaDuke as ordered by Defendant Jason Fraddosio, Desman was not committing a crime, there was no threat of danger to Horton or Fraddosio, nor to any other person.

151.   Defendants Joseph Horton and Jason Fraddosio's use of force against Desman violated his rights secured by the United States Constitution by depriving him of the right to be free from excessive force and unreasonable seizures as guaranteed by the Fourth Amendment and the right to be free from the deprivation of life and liberty without due process of law as guaranteed by the Fourteenth Amendment.

152.   Defendants Joseph Horton and Jason Fraddosio's conduct violates clearly established constitutional rights of which a reasonable officer would have known.

153.   Defendants Joseph Horton and Jason Fraddosio's use of excessive force against Desman constituted a reckless and/or callous indifference to Desman's federally protected rights.

154.   As a direct and proximate cause of the foregoing actions, Desman LaDuke suffered actual and consequential damages, deprivation of liberty, indignity, mental and physical pain and suffering, emotional distress and anguish, medical expenses, funeral bills, loss of power to earn money in the future, and death.

## COUNT II – Assault and Battery

155.   Plaintiff adopts and incorporates by reference each of the previous paragraphs as if set forth fully herein.

156.   Defendants Joseph Horton and Jason Fraddosio intentionally, maliciously, and in bad faith applied and threatened to apply unlawful and unnecessary force against Desman LaDuke.

157.   Said physical contact was unnecessary and excessive, and the physical contact was without cause or any legal justification.

158.   As a direct and proximate cause of the assault and battery inflicted upon Desman LaDuke by the Defendants, Desman sustained injuries and damages, suffered actual and consequential damages, deprivation of liberty, indignity, mental and physical pain and suffering, emotional distress and anguish, medical expenses, funeral bills, loss of power to earn in the future, and death.

<u>**COUNT III – Negligence and Gross Negligence**</u>

159.   Plaintiff adopts and incorporates by reference each of the previous paragraphs as if set forth fully herein.

160.   Defendants Joseph Horton and Jason Fraddosio owed a duty to Desman LaDuke to act as a reasonably prudent police officer in his interactions with him.

161.   Defendants Joseph Horton and Jason Fraddosio breached said duty of care by utilizing unauthorized and unnecessary deadly force against Desman without legal right or justification.

162.   Defendant Joseph Horton and Jason Fraddosio's breach of the duty of care caused Desman to suffer injury and ultimately death.

163.   The aforementioned conduct was negligent, grossly negligent, and exhibited a reckless and/or callous indifference to Desman's rights and safety.

164.   Defendants Joseph Horton and Jason Fraddosio were not justified in their actions, nor were said actions permitted under Kentucky or federal law.

165.   Defendants Joseph Horton and Jason Fraddosio's conduct violated Desman's clearly established constitutional rights of which a reasonable officer would have known.

166.   As a direct and proximate cause of the foregoing negligence, Desman LaDuke suffered actual and consequential damages, deprivation of liberty, indignity, mental and physical pain and suffering, emotional distress and anguish, medical expenses, funeral bills, loss of power to earn in the future, and death.

## COUNT IV – Wrongful Death and Survival Action

167.   Plaintiff adopts and incorporates by reference each of the previous paragraphs as if set forth fully herein.

168.   Defendants, Joseph Horton and Jason Fraddosio, caused the wrongful death of Desman LaDuke, resulting in damages recoverable under KRS 411.130 and KRS 411.133.

169.   Plaintiff's damages include the deceased's physical and mental injuries, destruction of earning capacity, pain and suffering, as well as the medical and other funeral expenses incurred as a result of the Defendants' actions.

## COUNT V— Violation of 42 USC § 1983 – Unlawful Governmental Policy or Custom

170.   Plaintiff adopts and incorporates by reference each of the previous paragraphs as if set forth fully herein.

171.   Defendant Fraddosio, in his official capacity as Commander of the SRT unit promulgated standard operating procedures pursuant to Nicholasville Police Department policy.

172.   Defendant Fraddosio developed and endorsed a policy and practice whereby it was customary for SRT members under his command to be deployed into the field without adequate training.

20

173.    This policy and practice of deploying untrained SRT members is evidence of a policy to deprive citizens, including Desman LaDuke, of their constitutional rights.

174.    Further, Defendant Fraddosio implemented a custom and practice of treating mental health crisis calls and/or barricaded subjects as if it were a hostage rescue.

175.    This policy and practice of treating mental health crises and/or barricaded subjects as a hostage situation is evidence of a policy to deprive citizens, including Desman LaDuke, of their constitutional rights.

176.    Defendant implemented a custom and practice within the SRT of responding and acting without an Operations Plan in its encounters with mentally distressed subjects.

177.    This policy and practice of the SRT acting without an Operations Plan in its encounters with mentally distressed subjects is evidence of a policy to deprive citizens, including Desman LaDuke, of their constitutional rights.

178.    Defendant Fraddosio's development, endorsement, and implementation of these policies, customs, and practices was a substantial and contributing factor in the death of Desman LaDuke.

## COUNT VI – Punitive Damages

179.    Plaintiff adopts and incorporates by reference each of the previous paragraphs as if set forth fully herein.

180.    The aforesaid wrongful acts of Defendants Joseph Horton and Jason Fraddosio were committed with actual malice toward Desman LaDuke and with willful and wanton indifference to and deliberate disregard for human life and the rights of Desman

as a civilian in the public population; therefore, Plaintiff is entitled to exemplary and punitive damages.

**WHEREFORE**, the Plaintiff respectfully demands judgment against the Defendants as follows:

1. For judgment entered against Defendants Joseph Horton and Jason Fraddosio;

2. For actual, special, punitive, statutory, and compensatory damages, in an amount greater than the jurisdictional minimum;

3. Costs of this action, including reasonable attorney's fees to the Plaintiff pursuant to The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988 (1976);

4. Such injunctive relief regarding future police training and policy implementation or enforcement as may be determined by the Court to be appropriate;

5. Trial by jury; and,

6. For any other relief to which the Plaintiff may be entitled.

**RESPECTFULLY** submitted this 17th day of October, 2023.

/s/ Jonathan B. Fannin
MATTHEW C. MINNER
JONATHAN B. FANNIN
*Counsel for Plaintiff*
MINNER VINES MONCUS
INJURY LAWYERS, PLLC
325 W. Main St., Suite 210
Lexington, KY 40507
Phone:  (859) 550-2900
Fax:      (859) 550-2902
Email:   matt@mvmlaw.com
            jonathan@mvmlaw.com

**PLAINTIFF DEMANDS TRIAL BY STRUCK JURY**

| AOC-840      Doc. Code: OFID<br>Rev. 12-03<br>Page 1 of 1<br><br>Commonwealth of Kentucky<br>Court of Justice    www.kycourts.gov<br>KRS 395.105; 395.110 | <br>**ORDER APPOINTING FIDUCIARY** | Case No. 22-P-00339<br>Court      District<br>County   Jessamine<br>Division   Probate |

**IN RE: Estate of** DESMAN CHA'MELL LADUKE

Upon hearing the Petition of Jessie White _____, the Court appoints

John E. Norman _____ to act as Administrator _____ of said

estate and fixes bond in the sum of $ PA Bond _____ ☑ **with approved Surety OR** ☐ **with Surety having been waived.**

_____ 11-10 ___, 2022           _____
Date                                                   Judge's Signature

**ENTERED**

NOV 1 0 2022

DOUG GAIN, JESSAMINE CIRCUIT CLERK
BY: _____ D.C.

---

**To be completed on copies only:**

### CERTIFICATE OF QUALIFICATION

I, _____, Clerk of the Jessamine _____ District Court,

certify this is a true and correct copy of the Order Appointing Fiduciary as recorded in my office. This Order and
Qualification is in full force and effect.

Date: Nov 10th ___, 2022         _____, Clerk

                                      By: Stephanie Walters _____, D.C.

**EXHIBIT**

**A**