1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE EASTERN DISTRICT OF KENTUCKY

3           CENTRAL DIVISION AT LEXINGTON

4           CASE NO. 5:22-CV-0300-KKC-MAS

5

6          JOHN NORMAN, AS ADMINISTRATOR

7     OF THE ESTATE OF DESMAN LADUKE, DECEASED,

8               Plaintiff

9

10                  V.

11

12        JOSEPH HORTON, INDIVIDUALLY; AND

13       JASON FRADDOSIO, INDIVIDUALLY; AND

14    IN HIS OFFICIAL CAPACITY AS A LIEUTENANT

15       AND SRT COMMANDER WITH THE

16      NICHOLASVILLE POLICE DEPARTMENT,

17             Defendants

18

19

20

21

22

23  DEPONENT:  BRIAN BATTERTON

24  DATE:      NOVEMBER 26, 2024

25  REPORTER:  KELLY ZUFAN



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1                              APPEARANCES

2

3    ON BEHALF OF THE PLAINTIFF, JOHN NORMAN, AS

4    ADMINISTRATOR OF THE ESTATE OF DESMAN LADUKE, DECEASED:

5    Jonathan B. Fannin, Esquire

6    Carl W. Walter II, Esquire

7    Minner Vines Injury Lawyers, PLLC

8    325 West Main Street

9    Suite 210

10   Lexington, Kentucky 40507

11   Telephone No.: (859) 349-1244

12   E-mail: jonathan@mvmlaw.com

13   E-mail: carl@mvmlaw.com

14   (Appeared via videoconference)

15

16

17

18

19

20

21

22

23

24

25

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
 1                    APPEARANCES (CONTINUED)

 2

 3   ON BEHALF OF THE DEFENDANTS, JOSEPH HORTON,

 4   INDIVIDUALLY; AND JASON FRADDOSIO, INDIVIDUALLY; AND IN

 5   HIS OFFICIAL CAPACITY AS A LIEUTENANT AND SRT COMMANDER

 6   WITH THE NICHOLASVILLE POLICE DEPARTMENT:

 7   J. Tyler Chelf, Esquire

 8   Sturgill, Turner, Barker & Moloney PLLC

 9   333 West Vine Street

10   Suite 1500

11   Lexington, Kentucky 40507

12   Telephone No.: (859) 255-8581

13   E-mail: tchelf@sturgillturner.com

14   (Appeared via videoconference)

15

16   Also Present:

17   Mary Bradshaw, Jonathan B. Fannin's Paralegal

18

19

20

21

22

23

24

25
```

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1                        INDEX

2                                        Page

3    PROCEEDINGS                          6

4    DIRECT EXAMINATION BY MR. FANNIN     8

5    CROSS-EXAMINATION BY MR. CHELF       136

6    REDIRECT EXAMINATION BY MR. FANNIN   139

7

8                       EXHIBITS

9    Exhibit                             Page

10   1 - Notice of Deposition            27

11   2 - List Provided of Prior Testimony  32

12   3 - Report for Case                 38

13   4 - Mental Health Policy            95

14   5 - Body Camera Footage Outside     94

15       Desman Laduke's House

16       [Will forward exhibits upon receipt.]

17

18

19

20

21

22

23

24

25

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1                        STIPULATION

2

3    The deposition of BRIAN BATTERTON was taken at KENTUCKY

4    COURT REPORTERS, 175 EAST MAIN STREET, SUITE 105,

5    LEXINGTON, KENTUCKY 40507, via videoconference in which

6    all participants attended remotely, on TUESDAY the 26th

7    day of NOVEMBER 2024 at 10:01 a.m. (ET); said deposition

8    was taken pursuant to the KENTUCKY Rules of Civil

9    Procedure. The oath in this matter was sworn remotely

10   pursuant to FRCP 30.

11

12   It is agreed that KELLY ZUFAN, being a Notary Public and

13   Court Reporter, may swear the witness.

14

15

16

17

18

19

20

21

22

23

24

25

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1              PROCEEDINGS

2        THE REPORTER:  We are now on the record.  The

3   time is 10:01 a.m.  My name is Kelly Zufan.  I'm

4   the online video technician and court reporter

5   today, representing Kentucky Court Reporters,

6   located at 175 East Main Street, Suite 105,

7   Lexington, Kentucky, 40507. Today is the 26th day

8   of November 2024.  The time is 10:01 a.m.

9        We are convened by video conference to take

10  the deposition of Brian Batterton in the matter of

11  John Norman as administrator of the state of Desman

12  Laduke, deceased, vs. Joseph Horton, individually;

13  and Jason Fraddosio, individually, and in his

14  official capacity as a lieutenant and SRT commander

15  with the Nicholasville Police Department, pending

16  in the United States District Court, Eastern

17  District of Kentucky, case number

18  5:22-CV-0300-KKC-MAS.

19        Will everyone but the witness please state

20  your appearance, how you are attending, and the

21  location you are attending from?

22        THE WITNESS:  I'm Brian Batterton.  I'm being

23  deposed.  And I'm in Marietta, Georgia.

24        MR. FANNIN:  Jonathan Fannin here on behalf of

25  the estate of Desman Laduke.  I'm joined by my

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
 1   paralegal, Mary Bradshaw.  And I may be joined
 2   later by my law partner, Carl Walter.
 3        MR. CHELF:  Tyler Chelf.  Sturgill, Turner,
 4   Barker & Moloney in Lexington, Kentucky.  On behalf
 5   of Defendants Officer Horton, Commander Fraddosio,
 6   Nicholasville Police Department.  I may be joined
 7   later by my law partner, Scott Miller.
 8        THE REPORTER:  All right.  Mr. Batterton, will
 9   you please state your full name for the record, and
10   then if you could just hold that ID up to the
11   camera for me?
12        THE WITNESS:  My name is Brian Scott
13   Batterton.
14        THE REPORTER:  That's perfect.  Thank you.  Do
15   all parties agree that the witness is in fact Mr.
16   Batterton?
17        MR. FANNIN:  Yes.
18        MR. CHELF:  Yes.
19        THE REPORTER:  All right.  Mr. Batterton, will
20   you raise your right hand for me?  Do you solemnly
21   swear or affirm that the testimony you're about to
22   give will be the truth, the whole truth, and
23   nothing but the truth?
24        THE WITNESS:  I swear.
25        THE REPORTER:  Okay.  We may begin.
```

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
 1                    DIRECT EXAMINATION
 2   BY MR. FANNIN:
 3        Q.   Mr. Batterton, just for the record once again,
 4   do you mind stating your full name?
 5        A.   Brian Scott Batterton.
 6        Q.   All right.  And I understand that you've been
 7   retained as an expert in this case.  Who have you been
 8   retained by?
 9        A.   Scott Miller and Tyler Chelf.
10        Q.   Okay.  And who do they represent in this case?
11        A.   The estate of Desman Laduke.
12        Q.   Okay.
13        A.   I'm sorry.  I'm sorry.  They represent --
14   that's the case.  They represent the officers that are
15   being sued in this case, so Horton, Fraddosio, Balltrip,
16   and Sponsel (phonetic), I believe.
17        Q.   Okay.  And sir, you've given many depositions
18   over the course of your career; am I correct?
19        A.   Yes, I have.
20        Q.   So you and I don't need to go over all those
21   rules that we typically go over in depositions; is that
22   fair?
23        A.   That's fair.
24        Q.   Okay.  Can you hear me okay?  We're on Zoom.
25   Is my connection all right?  Can you hear and see me
```



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    well?

2       A.   As of right now.

3       Q.   Okay.  If that changes, will you please just

4    hold your hand up and say, hey, hold on one second, I

5    need you to repeat that?

6       A.   Yes, sir.

7       Q.   All right.  Fair for me to assume, though, if

8    you answer my question, you understood it?

9       A.   Yes, sir.

10       Q.   All right.  Are you prepared to testify today?

11       A.   Yes, sir.

12       Q.   Do you need any additional information to

13    complete your review of this case?

14       A.   No, sir.

15       Q.   Have you asked the lawyers for the

16    Nicholasville Police Department and its officers for any

17    materials that they were not able to provide you with?

18       A.   Not that I can think of, no, sir.

19       Q.   Okay.  In other words, the defense lawyers

20    have provided you with everything you would need to come

21    to an informed opinion in this case, correct?

22       A.   Yes, sir.

23       Q.   When you set out to evaluate a case, do you

24    come in trying to reach a certain conclusion?

25       A.   No, sir.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      Q.   Do you set out to be as objective as possible

2  to both sides?

3      A.   Yes, sir.

4      Q.   Did you set out in this case to consider only

5  facts that are favorable to the defendants?

6      A.   No, sir.

7      Q.   Agree that you set out to consider all

8  relevant facts in coming to your conclusion?

9      A.   Correct.

10      Q.   Agree that you set out to consider not just

11  standards that may help the defense, but also standards

12  that may not help the defense?

13      A.   Yes, I considered everything.

14      Q.   Okay.  Do you agree today to be as fair to my

15  client as you are to the Nicholasville Police Department

16  and its officers?

17      A.   Yes.

18      Q.   Okay.  I want you to understand how we're

19  going to proceed today.  Today is my opportunity, as you

20  know, to get to know the basis for all of your opinions.

21  And today is the only day I get to do that.  You

22  understand that?

23      A.   I do.

24      Q.   Okay.  If you say that somebody testified to

25  something and that that forms a basis of your opinion,



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  is it fair for me to ask you for an actual citation to

2  where that testimony would be?

3      A.   Yes, it is.  And it should also be included in

4  the report.

5      Q.   I do see many citations in your report and I

6  do appreciate that.  I do also appreciate the way that

7  you've laid out your report.  I do think while we may

8  have some disagreements on it, it's clear to me what

9  your opinions are at least as they sit in the report. So

10 I appreciate that, sir.

11          And same thing with body-worn camera footage,

12 if you say that a statement was made on body-worn camera

13 footage or in a recording, is it fair for me to ask you

14 for the citation to that?

15     A.   It is.

16     Q.   Okay.  Give me a little bit -- I've got your

17 report.  And as I said, I think it's very thorough, so

18 I'm not going to belabor too much of this.  But I see

19 that you are wearing a police uniform as we sit here

20 today.  What is your current position, sir?

21     A.   Currently, I am a major with the Cobb County

22 Police Department, which is a precinct commander.

23     Q.   And what is your jurisdiction there?  Is it

24 all of Cobb County?

25     A.   It is.  It's all of Cobb County.  There's

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    municipalities within Cobb, but we also have

2    jurisdiction within the municipalities.  That --

3        Q.   What is -- I'm sorry.  I will try not to talk

4    over you.  Zoom is difficult for that.  Sometimes I'll

5    think you're done and then I'll start talking.  I

6    promise I'm not trying to be rude, okay?

7        A.   Yes, sir.

8        Q.   What is the population of Cobb County, sir?

9        A.   Approximately 750,000, 800,000 people.

10        Q.   Okay.  How many sworn officers are there in

11    the Cobb County Police Department?

12        A.   Approximately 660.  We're budgeted for 709, I

13    believe.

14        Q.   What does a major do with the Cobb County

15    Police Department?

16        A.   A major who's a precinct commander is the

17    commander of a group of officers that conduct uniformed

18    patrol 24/7.  Also have a detective unit and an

19    administrative staff.  I have about 75 sworn officers

20    under me with one captain, four lieutenants, and 12

21    sergeants.

22        Q.   So you are the precinct commander.  So you're

23    a major who is a precinct commander, correct?

24        A.   Correct.  And so part of the duties are

25    reviewing uses of force, reviewing pursuits, reviewing

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  complaints, and then a whole bunch of other

2  administrative work.

3        Q.    So you review -- I guess you do kind of the

4  after-action reports.  If things happen, you will then

5  evaluate whether your officers acted within your

6  generally accepted practices there within the

7  department; is that fair?

8        A.    Yes.  And then additionally, precinct

9  commanders also act -- we rotate through a position

10  called incident command.  And when you're rotating

11  through that, you are the on-call incident commander. So

12  if any large incident happens that involves multiple

13  units such as SWAT and CNT, the -- the crisis

14  negotiation team, or the dive team going out on a

15  search, or the bomb team going out on a -- a large scale

16  incident, we would go out and be the commander over that

17  incident.

18        Q.    Okay.  And you guys have a SWAT team and a CNT

19  team that are separate, correct?

20        A.    Yes.

21        Q.    I know there are some departments where that's

22  unified.  But your department, they are separated,

23  correct?

24        A.    That's correct.

25        Q.    Okay.  And so even as we sit here today, you

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    still get called out as, what I'll call, the lead for

2    the SWAT team if they have to respond to a situation?

3         A.   Correct.

4         Q.   Okay.  When is the last time you did that?

5         A.   I'm trying to think.  I mean, I -- I rotate

6    through being on call every six weeks, seven weeks.  The

7    last call-out I had was -- might have been the -- the

8    last time I was on call.  Happens fairly frequently, but

9    sometimes it's -- it's a minimal scale.  So it's not

10   like a full scale call-out.

11        Q.   So there are different degrees of call-outs

12   for the SWAT team?

13        A.   No, there's different degrees of call-outs for

14   incident command.  So for example, a warrant service,

15   I'll get called on a warrant service for a -- a person

16   who is in a residence barricaded for a warrant.  And if

17   it's purely a warrant service, it doesn't require full

18   call-out of incident command until it reaches a certain

19   point.

20        So a lot of those incidents can be resolved by

21   a show of force, such as the SWAT team gets into

22   position and then they get on their extremely loud

23   loudspeaker on the personnel carrier and start making

24   announcements to come out.  And then the person comes

25   out.  If it progresses past that, where they're going to

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  have to actually make entry into the house with

2  mechanical means, then we would typically go out for

3  that.

4      Q.   Got you.  So it sounds like the two levels

5  that you've got there in Marietta, Georgia is -- and you

6  gave the example of a warrant.  You will go out.  You'll

7  have -- your folks will go out and essentially take

8  position, get on the loudspeaker, say, get out of the

9  house.  And if they don't get it out and it's going to

10 take some more, what I'll call tactics, you show up on

11 the scene?

12     A.   Yes.  Most of the time.

13     Q.   And you are the one -- if you're the one --

14 incident commander on call, correct?

15     A.   That's correct.

16     Q.   Okay.  And you are the one that would dictate

17 the tactics that would be used to execute basically the

18 retrieval of that person from the residence.  Am I

19 understanding that correctly?

20     A.   So we confer with the SWAT team commander.  We

21 get recommendations from them.  And then based on

22 recommendations and -- and our opinion and training, we

23 would either approve it or not approve it or talk to

24 them and modify it.

25     Q.   Okay.  So you are not the SWAT team commander.



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  You are my step above that?

2      A.   Correct.

3      Q.   Okay.  How many times in your career have you

4  been called out to a suicidal subject?

5      A.   I -- I have no idea how many, but many.

6      Q.   Hundreds?

7      A.   I don't know that I would say hundreds.  Well,

8  maybe a few hundred.

9      Q.   Okay.

10     A.   Over a full career?  Over 29-and-a-half years

11  or so?

12     Q.   Yep.

13     A.   Okay.  Probably a hundred --

14     Q.   Between 100 and 500?

15     A.   Probably closer to the 100 mark than the 500

16  mark, but it would be between there.

17     Q.   Okay.  And how many years have you been doing

18  this?

19     A.   29-and-a-half, I believe.

20     Q.   So over three times a year, average, course of

21  your career?

22     A.   Probably so.  That would -- that would be

23  pretty good.

24     Q.   How many times have you --

25     A.   Approximate.  I'm sorry.  As an approximate.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1        Q.    That's fair.  I don't expect you to know the

2   exact.  How many times of those well over 100 have you

3   been called out to a suicidal subject where -- that you

4   knew they had access to a firearm?

5        A.    Many times.

6        Q.    Would you say more than half?

7        A.    Yes, sir.  It's Georgia.  There's a lot of

8   firearms.  And most of them, that's the -- the method of

9   choice.  We wouldn't really be called out if there

10  wasn't a -- a weapon involved.  Now as a patrol officer,

11  I've been called out many times where a person is

12  threatening to take pills.  But that's a -- that's a

13  totally different response than when you have an

14  incident like what involved Mr. Laduke, where there's a

15  weapon involved and he's in a residence.

16       Q.    You would agree with me that more than half of

17  the suicides in the United States actually involve a

18  firearm?

19       A.    I don't -- I'm not sure on that number.

20       Q.    Does that sound right to you?  Do you have any

21  reason to dispute it?

22       A.    I don't have any reason to dispute it.

23       Q.    Okay.  Would you agree with me that more than

24  50 percent of the households in Kentucky, which is much

25  like Georgia, have a firearm in it?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

 1        A.    I would imagine so.

 2        Q.    Okay.  So it's not unusual in your career that

 3   you would be called out to a subject's house where they

 4   are suicidal and have access to a firearm?

 5        A.    Correct.

 6        Q.    Okay.  So you said you've had probably over

 7   100 instances where you've been called out for a

 8   suicidal subject.  And I assume -- and let me make sure

 9   I'm clear.  And this is where they won't leave their

10   house, that's why you've been called out.  If they would

11   just leave their house, then you wouldn't need to be

12   there, right?

13        A.    What do you mean by leave their house?

14        Q.    Hey, please come out.  Talk to us.  We're just

15   checking on you.  And they don't leave the house.

16        A.    Well, I mean, it -- it goes many different

17   ways.  And I'll -- I'll just tell you what I mean.  When

18   you say, how many times have I been called out?  Many of

19   the times you go there, there's somebody inside with

20   them, a spouse.  You knock on the door.  The spouse lets

21   you in.  They say, he's sitting here on the couch.  You

22   sit down.  You talk with them.  So there's -- that's

23   within the number of times I'm talking to you about

24   having been called to that --

25        Q.    Got you.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    A.    -- situation.  So there are some like this one

2  that I have been called to.  And then there are some

3  that are much more controlled situation.  Where -- and a

4  situation like I just gave you, that person may have

5  access to firearms, but he has -- he doesn't have them

6  within arm's reach or nearby.  He hasn't threatened --

7  made any threats with the firearm.  It's just when the

8  dispatcher takes the call, they say, are there any

9  firearms in the house?  And yes, the answer is.  But the

10  person hasn't really indicated that they were going to

11  use a gun.

12    Q.    They've said they're suicidal, but haven't

13  said, I'm going to blow my brains out or anything like

14  that?

15    A.    Right.

16    Q.    I'm not trying to be coarse.  I'm just --

17  that's what you hear, I guess.  So of the call-outs,

18  you've had for a suicidal person, how many have you been

19  to where the person will not come out of their house and

20  there's a firearm in the house?

21    A.    Quite a few.

22    Q.    Okay.

23    A.    Not 100, but quite a few.

24    Q.    How many of those instances ended with the

25  police shooting and killing the suicidal subject?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      A.   I -- I can't say completely.  I have been to

2   instances where there were what you would call suicide-

3   by-cop style endings.  But I don't know exactly.  But as

4   you start, you know, drilling down to -- closer and

5   closer to this scenario, it obviously becomes the --

6   less and less frequent.

7      **Q.   But you have had instances where the police**

8   **have been called out to help someone who is suicidal and**

9   **end up having to shoot that person?**

10      A.   There has been instances like that, yes.

11      **Q.   How many?**

12      A.   I don't know.

13      **Q.   Too many for you to count?**

14      A.   No.  Just that's -- it's been a long time

15   since I was on one of those.  So I just don't know how

16   many.

17      **Q.   When's the last time you were out to one of**

18   **those?**

19      A.   Where the police ended up shooting them?  I

20   don't know.  It's got to be more than -- than ten or 15

21   years.

22      **Q.   Would you agree that our understanding of**

23   **mental health has come a long way in the last ten or 15**

24   **years?**

25      A.   I think there's more emphasis on it.  I don't

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  know that it's our understanding of mental health.  I

2  can remember getting training on this for -- for many,

3  many years.

4       **Q.    Were you in charge?  And by that, do -- I**

5  **mean, were you the SWAT commander or the incident**

6  **commander or on-scene incident commander before any of**

7  **the instances where the subject ended up being shot by**

8  **the police?**

9       A.    I don't believe so.

10      **Q.    So to the best of your knowledge, that's never**

11 **happened under your watch?**

12      A.    Where the officers have shot the suicidal

13 suspect?

14      **Q.    That's correct.**

15      A.    Subject?  I don't believe so.

16      **Q.    Okay.  And specifically, I'm talking about**

17 **somebody who's suicidal in their house and won't come**

18 **out.**

19      A.    Yeah.  Not that I recall having it since I've

20 been incident command.

21      **Q.    Okay.  And you've been called out to 50 of**

22 **those?**

23      A.    As incident command?

24      **Q.    Yes.**

25      A.    No, not as incident command.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Q.    How many?

2    A.    Maybe ten to 20, approximate.

3    Q.    And of those ten to 20, it -- I take it then

4  that all of them were successful in that the person was

5  taken out of their home alive?

6    A.    No.  Many of them, the person had committed

7  suicide.

8    Q.    Okay.  Okay.  But not suicide by cop?

9    A.    No.  They did it on their own accord.

10    Q.    What percentage of them were successful in

11  that the person was taken out alive?

12    A.    It'll be a guess.  Want a guess?  Half.

13    Q.    Okay.  Fair enough.  I'll take what I can get

14  on that.

15    A.    It -- it's a guess.  I mean, it's not the kind

16  of stats that we track, you got to understand.

17    Q.    I understand.  I understand.  Well, when I

18  asked you if it was successful, you hesitated and said,

19  well, no, not when they took their own life.  And I

20  think everyone would agree that's not a successful

21  outcome, correct?

22    A.    No, sir.  No, sir.

23    Q.    And you would agree with me, it's not a

24  successful outcome when the police shoot the person who

25  called for help?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
 1        A.   Well -- well, no, because we would prefer to -
 2   - we're there to help them at that stage and -- and well
 3   as keep the community safe.  So while it may be
 4   successful from the standpoint of keeping the community
 5   safe or protecting officers at that point, that wasn't
 6   our goal.  Our goal was to get them out safely and get
 7   them help.
 8        Q.   Was this operation involving Desman Laduke a
 9   successful operation?
10        A.   Well, not from the standpoint of the goal is
11   to get a person help.  From the standpoint of the
12   officers protecting themselves and protecting the
13   community, it was.  But ultimately, the goal on this is
14   to help Mr. Laduke.
15        Q.   Okay.  So I've got kind of three categories
16   for your answer.  I ask you, is this a successful
17   operation?  There's yes, sort of, and no.  I understand
18   your testimony to be it was sort of a successful
19   operation.
20        A.   No.  There's -- there's different -- I guess
21   you'd say there's multiple potential objectives on an
22   operation like this.  The first and foremost being the
23   reason you're called.  And that is to successfully
24   convince Mr. Laduke to put the guns down and come out
25   and get the treatment that he needs.  That's the
```

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

 1  foremost mission.

 2          And then secondary missions are to keep the

 3  officers that are negotiating with him and other

 4  officers in the area safe, as well as keep the community

 5  safe.  So from that standpoint, the officers didn't get

 6  injured and the community didn't get injured.  So that

 7  portion you could say was successful.  But the ultimate

 8  mission was to help Mr. Laduke and -- and that did not

 9  work out.

10      Q.   I think you and I will have a more detailed

11  discussion of that later, so we'll table that for now. I

12  want to share my screen with you, what I'll show you as

13  the first exhibit to your deposition.  Sir, have you

14  seen this document before?

15      A.   Is that your subpoena?

16      Q.   Yeah.  Yes.

17      A.   Yes.

18      Q.   Well, it's my notice to you and then --

19      A.   Yes.

20      Q.   -- got a duces tecum.

21      A.   Yes.

22      Q.   I don't think I ever got a Dropbox link with

23  any of these items.

24      A.   Oh, I apologize.  The -- the only items that

25  are in the file are the items that were provided to me

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    and listed on the report.  There were no other items

2    that were responsive to the duces tecum.  So I -- I have

3    no -- didn't have notes and didn't have -- all the

4    documents that I referred to are listed and cited in the

5    report.  And many are screenshot included, pasted in the

6    report, so you have them.

7        Q.   Okay.  So if there are portions of policies

8    that are not included in your report, you didn't

9    consider those policies?

10       A.   No.  I considered them, but I just put the

11   basis for my opinion in the report.

12       Q.   Okay.  I mean, you would agree that you cite

13   policies in your report, but don't provide me with the

14   full policy, correct?

15       A.   Well, correct.  Because the -- but I have

16   cited them.  And I know plaintiff's expert cited many of

17   the same documents.

18       Q.   That's correct.  You guys seem to have some of

19   the same sources, which is helpful.  But my question to

20   you is, I'm -- so you understand, today is my day to

21   understand the -- all of your basis for your opinions,

22   correct?

23       A.   Correct.

24       Q.   And you cite two different policies in your

25   report, but only portions thereof, correct?



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      A.    Correct.

2      Q.    My question and what I'm seeking in this duces

3  tecum is: Are there portions of those policies that you

4  relied upon, but did not provide to me in your report?

5  That was the purpose for the Dropbox.

6      A.    No.

7      Q.    Okay.  All right.  Do you have a contract with

8  the defense lawyers in this case?

9      A.    Yes, we do.

10     Q.    Okay.  I don't believe I've got that.  So I

11 would ask that that be provided.

12     A.    Yes.  I'll e-mail that to you.

13     Q.    Okay.  Great.

14     A.    And I'll also send you an updated deposition

15 history.  There's one more I have to add on there.

16     Q.    That was -- I appreciate that.  That was going

17 to be another question that I had, was have you given

18 any depositions.  I'll make that an exhibit here coming

19 up.  Did you send any open records requests of your own

20 in preparing for your opinions in this case?

21     A.    No, sir.

22     Q.    Have you received any materials from any other

23 defense experts?

24     A.    For this case?  No, sir.

25     Q.    Yeah.  Let me ask a better question.  Like,

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
 1  does -- do -- are you receiving any materials -- let's
 2  say that the defense has a consulting expert and they've
 3  sent you things.  Anything like that in this case, like,
 4  that Mr. Chelf or that Mr. Miller has as a consulting
 5  expert, they've sent you stuff?
 6       A.   No, sir.
 7            MR. FANNIN:  We will mark that as Exhibit 1.
 8                 (EXHIBIT 1 MARKED FOR IDENTIFICATION)
 9  BY MR. FANNIN:
10       Q.   Did you take any notes in preparing your
11  report?
12       A.   No, sir.
13       Q.   No notes in the margins of depositions,
14  anything like that?
15       A.   No, sir.  I read them on the computer.
16       Q.   Okay.  Outside of the documents that you
17  listed that you had reviewed in your report, have the
18  attorneys for the other side provided you with any facts
19  or data that you considered in forming your opinions?
20       A.   No, sir.
21       Q.   For example, have they told you a fact that
22  you did not glean from any other source that supports
23  your opinion in this case?
24       A.   No, sir.
25       Q.   Okay.  What assumptions did you make in
```

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    reaching your opinions in this case?

2        A.    Let's see.  What do you mean by what

3    assumptions did I make?  I -- I don't -- I mean,

4    everything that I based my opinion on was some record in

5    evidence, so I'm not quite tracking the question.

6        Q.    Well, it's a typical question that I -- if

7    you've not been asked it, maybe I got trained

8    differently than all the lawyers who've asked you

9    questions.  Assumption would be something that you don't

10   have necessarily the factual basis for it, but you are

11   assuming it.  And I want to know if there are any

12   assumptions that you have that you're basing your

13   opinions on.

14       A.    I don't believe -- I don't believe so.

15       Q.    What is the Legal and Liability Risk

16   Institute?

17       A.    It's a company that provides training to law

18   enforcement, as well as consulting services and expert

19   witness services.  And we're -- the people that work

20   with them are independent contractors.  So I'll teach a

21   class for them.  I will -- I write legal articles for

22   them that are -- they are about cases that could be

23   interesting to law enforcement officers and have some

24   training value to them.  And then I reviewed some expert

25   witness cases for them.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Q.    Is that a for-profit company?

2    A.    I believe it is, yes.

3    Q.    Okay.  What is the mission of the Legal and

4    Liability Risk Institute?

5    A.    Well, it's to train officers and help agencies

6    minimize their liability, their risk, to -- by doing a

7    better job.

8    Q.    Is that what you're doing today?

9    A.    No.  Today, I reviewed a case --

10    Q.    What are you doing today?

11    A.    Today, I reviewed a case and provided my

12    opinion based on the materials that I received.

13    Q.    Are you fulfilling part of the mission of the

14    Legal and Liability Risk Institute by being here today?

15    A.    Not the training mission.

16    Q.    Well, which mission then are you fulfilling?

17    A.    Well, I'm providing expert witness services.

18    Q.    Okay.  So that's a separate mission that

19    they've got?

20    A.    I guess.  I guess.  I -- it's a separate

21    service that's provided.  I don't know if it's, you

22    know, in a mission statement or anything to that effect.

23    Q.    I see from your report that you conduct

24    training sessions for other departments throughout the

25    country; is that correct?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    A.    Yes.

2    Q.    Have you ever done that for any departments in

3    Kentucky?

4    A.    I don't believe so.

5    Q.    Okay.

6    A.    Now, someone from Kentucky may have come to a

7    class that I taught, but I don't believe I have

8    specifically taught a class in Kentucky.

9    Q.    Okay.  As part of those sessions -- and could

10    I -- is it fair to also call it consultation?

11    A.    For?

12    Q.    With departments.  You consult with

13    departments about their policies and training?

14    A.    Some do, I believe, with --

15    Q.    Well, do you?

16    A.    -- LMI.  I have, yes, but it's not as

17    frequent.  It's mostly --

18    Q.    Have you ever --

19    A.    -- the training aspect and expert witness

20    services.

21    Q.    Have you ever assisted a department in the

22    development or revision of its policies?

23    A.    Yes.

24    Q.    Have you ever recommended the changing of any

25    policies at any department regarding how to handle a

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  person of diminished capacity?

2      A.    I believe, yes.

3      Q.    **What department?**

4      A.    Well, the one that I'm at.  My department.

5      Q.    **Okay.  Talk to me about that.  How did you do**

6  **that?**

7      A.    Many years ago, we updated that policy to

8  include, you know, the more, I guess, generally accepted

9  language and principles at the time.  So it was -- and

10  when I say many years ago, I want to say it was probably

11  back in around '07 or -- or maybe even earlier than

12  that.

13     Q.    **What was wrong with the policy before?**

14     A.    I don't remember.  I just know that we updated

15  it to make it more in line with current generally

16  accepted police practice.  I think what was more wrong

17  with it before was it was just it -- it had less

18  guidance, less material in it, like the indicators of

19  what may indicate that a person could be experiencing a

20  crisis, that kind of thing.  So we included that.  But I

21  don't remember a whole lot more than that, because we're

22  talking almost 20 years ago.

23     Q.    **Would you have an old version of that policy?**

24     A.    I would not.

25     Q.    **Who would?**

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      A.   That old?  I don't know.  You could probably

2  do an open records request and see if they had it.  And

3  I can tell you the e-mail for that --

4      **Q.   Please do.**

5      A.   -- to do it on records request, but --

6      **Q.   Yeah, please do.**

7      A.   Okay.

8      **Q.   I am going to take what I'll mark as Exhibit**

9  **number 2 to your deposition.  This is the list that I**

10 **was provided of your prior testimony.  Aside from the**

11 **one that you need to add, that I guess happened since**

12 **you disclosed your opinion, is this complete?**

13              (EXHIBIT 2 MARKED FOR IDENTIFICATION)

14     A.   Yeah, that's the last four years.  And

15 actually, that may have one more than four years.  It

16 may go back one additional year.  Just because I didn't

17 delete that 2018.

18 BY MR. FANNIN:

19     **Q.   2018.  I do see that.  Yeah.**

20     A.   Yeah.

21     **Q.   How many of these did you testify on behalf of**

22 **the plaintiff?**

23     A.   Those were all defense.

24     **Q.   Okay.  Have you ever written a report on**

25 **behalf of a plaintiff?**

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    A.    I have not written a report.  I have had a --

2    a plaintiff's case where I provided an opinion.  It --

3    it actually turned out to be more consultation with

4    them, and -- which helped them get a settlement.

5        Q.    Is that the one where you were involved on

6    behalf of the plaintiff in an unlawful eviction case?

7        A.    Yes.

8        Q.    Is that what you're referring to?

9        A.    Yes.

10       Q.    Aside from an unlawful eviction case, every

11   other case that you've testified in has been for the

12   defendant?

13       A.    Correct.  I'll testify -- well, I will review

14   any case that's sent to me, and if -- it's up to the

15   attorney to decide whether or not they wish to retain

16   me.

17       Q.    Is that the same approach held by your

18   colleagues there at the -- what's your organization

19   called?

20       A.    Legal Liability Risk Management Institute.  I

21   -- I can't testify as to what their approach is.

22       Q.    If I call Jack Ryan and ask him to review a

23   case for me, will he do -- even do that for a plaintiff?

24       A.    I believe he will.  I believe he's done

25   plaintiff's cases.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Q.   You should tell his assistant that.  Will you
2    agree to provide me with an updated list here, including
3    that extra -- that other case that you mentioned
4    earlier?
5    A.   Yes.  If you give me -- when we take a break,
6    if you give me an extra five minutes on the break, I can
7    probably shoot these e-mail to Tyler and he can shoot
8    them over to you.
9    Q.   Okay, great.  Okay.  And that's all right if
10   it's after the deposition, that's okay.  I'm sure you'll
11   get a little bit of extra time here today as well if you
12   want to do that.  Of these cases that I've got listed
13   here, did any of these involve a case similar to ours?
14   And by that, I mean, where you had someone who was
15   suicidal and the police responded?
16   A.   No.
17   Q.   Okay.  Have you ever testified in a case
18   similar to ours?  And if you needed what I mean by
19   similar to ours, let me know.  I'm happy to explain what
20   I mean.
21   A.   I don't think I've testified in one.  I
22   believe I've probably done a report or so on them, but I
23   can't remember the names.
24   Q.   Okay.  Fair enough.  There's a distinction
25   between testifying and being retained?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1        A.    Correct.

2        Q.    Okay.  You've written a report in a case

3   involving a subject who was suicidal where the police

4   responded, and I guess there was some contention about

5   whether the police response was proper.  Am I

6   understanding that correct?

7        A.    I believe -- I believe that was a -- a case

8   that I had, but it was -- it's a long time ago.  So I'd

9   have to actually try to find it and -- and look at it to

10  see if that was the facts or not.

11       Q.    But you could find --

12       A.    I know it was a shooting.  It was a lady they

13  were there for.  I don't remember why they were there.

14  And it turned into a shooting.  I -- I don't know if it

15  was originally because she was suicidal or if she went

16  rogue after the police got there.

17       Q.    But you could find that report that you wrote?

18       A.    I -- I don't know.  It would be -- it would be

19  from quite a while ago.  I don't know if I would still

20  even have them.

21       Q.    Are you willing to look for that?

22       A.    I will look for it.

23       Q.    Okay.  Are you willing to provide it to

24  defense counsel if you find it?

25       A.    If I find it, yes.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Q.    What's the most recent time you testified at

2    trial?

3    A.    Within the last two months.

4    Q.    Was that the case in Indianapolis?

5    A.    Correct.

6    Q.    What was the verdict there?

7    A.    I -- I heard it was a plaintiff's verdict.  I

8    did not hear the -- the details.

9    Q.    What was that case about?

10   A.    That was a vehicle pursuit.

11   Q.    I don't think we need to make this an exhibit,

12   but did the CV gave me, is that an updated CV, the CV

13   you provided to counsel?

14   A.    Yes.

15   Q.    Do you intend to utilize any exhibits at

16   trial?

17   A.    Not at this time.

18   Q.    Do you intend to use anything to summarize

19   your opinions?

20   A.    Do you mean like a chart or a graph?

21   Q.    Demonstratives, yeah.

22   A.    Not at this time.

23   Q.    When you say, "Not at this time," I mean, I

24   guess I -- what I would ask is that if you're going to

25   do that, that I receive it in advance of trial.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

 1        A.    Absolutely.

 2        Q.    Do you have any intention of supplementing

 3   your report?

 4        A.    If I receive any information to review, you

 5   know, going forward and it changes my opinion, then yes,

 6   I would.

 7        Q.    That's fair.  But as we've discussed, you're

 8   not waiting on any different -- additional information

 9   that you've requested but not received, correct?

10        A.    Correct.

11        Q.    What did you do to prepare for the deposition

12   today?

13        A.    Looked at the report and looked at the

14   plaintiff's expert's opinion.

15        Q.    Did you get a transcript of his deposition?

16        A.    I'm sorry.  I looked at his report.  Not his

17   deposition.

18        Q.    Yeah, I understand, but did you get, like, a -

19   - did you get a transcript of his -- or his -- I'm

20   sorry.  Did you get a transcript of his deposition?

21        A.    No.

22        Q.    Did you talk with defense counsel about his

23   deposition?

24        A.    Very briefly.

25        Q.    What did -- what was discussed?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

KENTUCKY
COURT REPORTERS

1       A.   I don't even recall.  It --

2       Q.   **When did that discussion happen?**

3       A.   We spoke on the phone a couple of days ago --

4   or yesterday, rather.

5       Q.   **And you can't remember what was said**

6   **yesterday?**

7       A.   We had a conversation about my opinions, and

8   they said that they deposed the plaintiff's expert.  And

9   that was about it.

10      Q.   **Okay.  How long did you speak with opposing**

11  **counsel in preparation for this deposition?**

12      A.   Somewhere between 30 minutes and 45 minutes.

13      Q.   **Okay.  And that was yesterday?**

14      A.   Yes.

15      Q.   **Is that all that you've spoken with them to**

16  **prepare for this deposition?**

17      A.   Correct.  Spoke to them about my opinions.

18      Q.   **Did they provide you with any additional**

19  **information at that time?**

20      A.   No.

21      Q.   **I want to go ahead and mark what we will**

22  **include as Exhibit number 3 to your deposition.  Do you**

23  **see this document, sir?**

24               (EXHIBIT 3 MARKED FOR IDENTIFICATION)

25      A.   I do.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  BY MR. FANNIN:

2       Q.    Okay.  Is this your report that you prepared

3  for this case?

4       A.    It appears to be.

5       Q.    Okay.  Do you have a copy of that in front of

6  you?

7       A.    I do.

8       Q.    Okay.  I'm going to stop sharing my screen so

9  that -- I don't need to just have this up.  But if at

10  any time you need to refer to that, please do so.  And I

11  guess, let me also say this: Do you have access to your

12  file as we sit here today?

13       A.    I can pull it up.

14       Q.    I'm not asking to see it.  I don't -- I'm not

15  asking that, but the reason I -- for my question is, you

16  have everything in front of you today to answer my

17  questions.  You're not going to say to me, oh, I don't

18  have that deposition, or, I don't have that piece of

19  information.  I don't have that in front of me.  You've

20  got everything you need to talk to me about this case

21  today, correct?

22       A.    I hope so.

23       Q.    Okay.

24       A.    I hope I have it all in my report.

25       Q.    Yeah, that's correct.  Yeah.  And the report,



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    I'm sure helps you as much as it helps me to understand

2    your opinions.  You give a pretty extensive detailed

3    list of the things that you reviewed on Pages 4 and 5,

4    6, 7, 8, 9 of your report.  Aside from those items

5    listed in your report, have you relied on anything else

6    in forming your opinions?

7         A.   The -- the Police Executive Research Forum

8    material that I listed in my report, the ICP material

9    that I listed in my report, the Kentucky statute that I

10   listed in my report.

11        Q.   I think that's included in the items listed of

12   your materials.

13        A.   Okay.  Okay.

14        Q.   But I appreciate you being thorough on that.

15        A.   Okay.

16        Q.   Anything besides those items mentioned in your

17   report that you relied on in forming your opinion?

18        A.   No, sir.

19        Q.   In your report, you didn't cite to any

20   Kentucky Chiefs of Police Standards, did you?

21        A.   No, sir.

22        Q.   Okay.  You didn't cite to any model policies

23   from Kentucky Law Enforcement Associations such as the

24   Kentucky League of Cities, Kentucky Association of

25   Counties, or the Kentucky Tactical Officers Association,

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    correct?

2        A.    No, sir.

3        Q.    Okay.  So if you didn't cite to them, and you

4    didn't mention them now, you're not relying on those?

5        A.    I'm not.  No.

6        Q.    Did you talk to anyone else besides defense

7    counsel in forming your opinions?

8        A.    I did not.

9        Q.    Did you interview Horton?

10       A.    No.

11       Q.    Did you interview for Fraddosio?

12       A.    No.

13       Q.    Did you interview anyone else at the Kentucky

14   -- or I'm sorry, at the Nicholasville Police Department?

15       A.    No.

16       Q.    Did you phone a friend or talk to any

17   colleagues about this case?

18       A.    No.

19       Q.    Did anyone assist you in preparing your

20   report?

21       A.    No.

22       Q.    Okay.  Would you agree that officers should

23   make every effort not to increase the anxiety of a

24   potentially suicidal person?

25       A.    Every effort within proper tactics, yes.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Q.    Okay.  So you won't agree with that statement.
2  You have to put in within proper tactics?

3    A.    Correct.

4    Q.    Okay.  Would you agree that officers should
5  make every effort not to exacerbate a situation
6  involving a potentially suicidal person?

7    A.    With the same caveat within proper tactics,
8  yes.

9    Q.    You cited to several different -- I think you
10 even mentioned it recently, per IACP, the NTOA, you
11 mentioned those publications, correct, sir?

12   A.    Yes.

13   Q.    Or I'm sorry, associations that have
14 publications, I guess?

15   A.    Yes.

16   Q.    Okay.  And would you agree those are
17 authoritative organizations and they set forward
18 authoritative standards for police conduct in the United
19 States of America?

20   A.    Standards or recommendations, yes.

21   Q.    What's the difference between a standard and a
22 recommendation in your mind?

23   A.    Well, a standard would be something that an
24 officer or an agency is required to follow, and a
25 recommendation is something that the -- the organization

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    recommends, but an agency is not required to follow it.

2        Q.    Why is that distinction important?

3        A.    I'm just being detailed for you.

4        Q.    I appreciate that.  In your report, when you

5    cited to PERF, or NTOA, or IACP, did you delineate, hey,

6    this is a standard or, hey, this is a recommendation?

7    Did you do anything to indicate which of those tags

8    applies?

9        A.    No.

10        Q.    Why not?

11        A.    Because we're talking generally accepted

12    police practice and that comes from a variety of

13    professional organizations, such as the ones cited.

14        Q.    So can a recommendation be a generally

15    accepted police practice?

16        A.    It could be, yes.

17        Q.    When could it not be?

18        A.    I -- well, there could be multiple

19    recommendations.  There could be recommendations that

20    are made for agencies of various sizes, or agencies that

21    have a -- a different scope of service.  So that's what

22    I mean by that.

23        Q.    If you cite to it in your report though, is it

24    something that you believe is a generally accepted

25    police practice for this case?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1          A.    Yes.

2          Q.    Okay.  You would not cite to a standard in

3    your report from one of these organizations that you did

4    not think demonstrated what the generally accepted

5    police practice was for the Nicholasville Police

6    Department?

7          A.    Correct.

8          Q.    Would you agree that communication is the most

9    effective tool that police have in encountering a person

10   who is potentially suicidal?

11         A.    Yes.

12         Q.    Would you agree or disagree that officers

13   should be aware that pointing a gun at a potentially

14   suicidal person will increase his or her anxiety and

15   exacerbate the situation?

16         A.    Yes.  However, when the person who is suicidal

17   is barricaded and has a firearm, the officers should

18   have their firearms at the ready.  And that's something

19   -- I don't know if you want to get into it now, but

20   that's something in the -- the Police Executive Research

21   Forum Suicide by Cop guidelines or recommendations,

22   whatever they were called.

23              Procedure that is mentioned as step one, you

24   got to ensure safety.  And if the person is armed with a

25   firearm or they -- they have a firearm, then it should

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  be treated like other incidents where there's a

2  barricaded subject with a firearm.

3      Q.    Yeah.  We're going to talk about that.  I'm

4  just asking if you agree with these statements.

5      A.    Okay.

6      Q.    And I'm not sure I got if you agreed or

7  disagreed that officer --

8      A.    I said, I -- I said I agreed, but with that

9  additional information.  So you -- you asked if pointing

10  a firearm could exacerbate a situation.  And I said,

11  yes, but sometimes it's appropriate because of the PERF

12  information.

13      Q.    You agree, but it depends.  And you might

14  disagree.

15      A.    Not that wishy-washy about it.  I'm -- I'm

16  pretty solid about it.

17      Q.    Are there any changes that you'd like to make

18  to your report before we get started?

19      A.    No, sir.

20      Q.    Okay.  I want to take your opinions kind of

21  one at a time, just going through your report.  I'll

22  tell you what page I'm on.  And at some points, I may

23  bring up the report so that you can see it, but I only

24  have so much room on my screen.  It's just easier for me

25  not to do that; is that okay?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    A.    Understood.

2    Q.    All right.  So I believe that the very first

3 opinion that you've got could be fairly characterized as

4 -- I'm sorry, I got an ambulance going by.  Can you hear

5 me okay?

6    A.    I can.

7    Q.    That the officers who responded, Sponsel and

8 Balltrip, could not leave the Laduke residence because

9 they were required to perform a welfare check.  Is that

10 a fair characterization of your opinion?

11    A.    Yes, sir.

12    Q.    Okay.  And the reason for that is you cite

13 2202A?

14    A.    Yes, sir.

15    Q.    Okay.  And that statute says, "Any peace

16 officer who has reasonable grounds to believe that an

17 individual is mentally ill and presents a danger or

18 threat to -- or threat of danger to self, family, or

19 others, if not, restrained shall take the individual

20 into custody and transport the individual without

21 unnecessary delay to a hospital or psychiatric

22 facility."  I'm going to cut it off there.  But is that

23 your understanding of 202A?

24    A.    Yes, sir.

25    Q.    All right.  And because of the use of the

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    word, "Shall", which you mentioned on several occasions

2    around Page 14, you say there's no discretion.  These

3    officers must stay there, correct?

4        A.   Yes, sir.

5        Q.   Do you read into that statute by any means

6    necessary in that they shall take them into custody by

7    any means necessary?

8        A.   No, I would -- I would say they have to do it

9    within the bounds of the law and policy, generally

10   accepted police practice.  But that's -- that -- that is

11   a given with anything that we do.

12       Q.   Correct.  People have Fourth Amendment rights,

13   correct?

14       A.   Yes, sir.  That's what I'm looking at now.

15       Q.   United States citizens have Fourth Amendment

16   rights.  Is that correct, sir?

17       A.   Yes, sir.

18       Q.   Do you believe it was the intention of the

19   Kentucky legislature that officers are to, if needed,

20   execute a person who is suicidal in order to take them

21   into custody?

22            MR. CHELF:  Object to form.

23            THE WITNESS:  No.

24   BY MR. FANNIN:

25       Q.   Do you believe the purpose of this statute or



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    the intent of this statute was carried out with Desman

2    Laduke?

3        A.    I believe that they attempted to carry it out

4    with Mr. Laduke.

5        Q.    I understand you -- that they attempted.  Was

6    the mission of this statute carried out for Desman

7    Laduke?

8        A.    No, because of his intervening conduct.

9        Q.    It's his fault that he's dead?

10       A.    Well, in -- in a sense, yes.

11       Q.    Okay.  Your next opinion is that essentially

12   it was proper for SRT to be activated and create a

13   perimeter wherein they pointed rifles at the doors and

14   windows of the Laduke residence.  This is on Page 15; is

15   that correct?

16       A.    Yes, sir.

17       Q.    You have a couple of opinions wrapped up.

18   There's more opinions there.  We're going to get to

19   those.  But that is the basic nebulous of your opinion

20   regarding SRT and their actions upon deployment; is that

21   correct?

22       A.    That's correct.

23       Q.    Okay.  Prior to the deployment of SRT, did any

24   officer witness Desman Laduke with a gun in his hand?

25       A.    No, but they couldn't because he was behind a

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    closed door and peeking through a blind.

2        Q.    Was he behind a closed door the entire time

3    before SRT arrived?

4        A.    After he had the officers step back, I believe

5    he tossed her phone out once and then one time he had

6    them step back and he allowed her to leave.

7        Q.    Do you recall testimony from both Balltrip and

8    Sponsel wherein they said they did not see any guns in

9    his hands?

10       A.    I do.

11       Q.    Okay.  So you would agree that at least at one

12   point prior to SRT arrival, they had an opportunity to

13   see Desman Laduke, see his hands, and said he didn't

14   have any guns?

15       A.    Correct.

16       Q.    Okay.  Would you describe the situation prior

17   to SRT's arrival as violent and dynamic?

18       A.    Not at that moment, no.  If I could clarify

19   though, it was a situation that could become violent or

20   dynamic because as the IACP policy or model policy

21   states on persons in crisis, that just because a person

22   is initially calm and hasn't exhibited any kind of

23   violent behavior doesn't mean that their demeanor will

24   not change.

25       Q.    I appreciate that clarification.  But you and

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    I can agree that before SRT arrived on the scene and

2    created the perimeter, it was not a violent and dynamic

3    situation?

4        A.    Correct.  Early in the incident, it was not.

5        Q.    Would you agree -- well, you cite to several

6    different policies throughout your report, Nicholasville

7    Police Department policies.  Do you recall that?

8        A.    I do.

9        Q.    Okay.  I actually think that this may be

10   skipping forward a bit.  On Page 41 you list on -- I

11   think it's Paragraph 66, you list the Nicholasville

12   Police Department policies, several of them, and

13   basically say those policies were in accordance with the

14   generally accepted police practices and standards in the

15   field of law enforcement.

16       A.    Correct.

17       Q.    Is that correct?  Okay.

18       A.    That's correct.

19       Q.    And the very first policy that you list is

20   persons of diminished capacity, correct?

21       A.    Correct.

22       Q.    Okay.  You would agree with me that the

23   persons of diminished capacity policy governed the

24   conduct of the officers on scene at the Laduke

25   residence?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1       A.    To the extent that the perimeter was needed to

2   be formed and that the officers had to take safety

3   precautions based on Laduke being armed.

4       Q.    **To what extent did it not apply?**

5       A.    Well, the -- the policy for persons with

6   diminished capacities, and it's in the report here, the

7   exact quote, but it talks about when a person poses a

8   threat that the response to resistance policy will

9   apply.  So -- and then in this situation, the inner

10  perimeter was necessary for containment, which is one of

11  the -- the priorities in handling a person in crisis.

12  You've got communication and containment.  So when you

13  combine that, they had to implement the -- the SRT into

14  this in order to properly contain an inner perimeter.

15          So those officers were allowed to respond in a

16  manner consistent with generally accepted police

17  practice, which is -- and that's one of the things I'm

18  reviewing for in this.  I'm not just reviewing if they

19  violate their very own policy.  And when you look at

20  that, the PERF guidelines say that officers should

21  respond as they would any other situation with a person

22  with a firearm.  And that would involve the inner

23  perimeter in covering the -- the exits, the threat areas

24  with firearms.

25      Q.    **So my question to you was at what -- to what**

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    extent does the persons of diminished capacity policy

2    not apply to this, and then I got that answer.

3        A.    You did.

4        Q.    Yeah.  So I'm --

5        A.    You want me to go ahead?

6        Q.    Well, I'm just trying to understand.  I mean,

7    are you saying -- does it apply or does it not?

8        A.    It applies, but then there are certain

9    circumstances where officers know, based on training and

10   experience, that there could be multiple policies that

11   apply in a situation.  So typically, in my experience

12   with persons of diminished capacity policies is those

13   are guidelines or policies that should be -- that are

14   followed in the -- I -- I want to use the term normal

15   situation involving a person of diminished capacity.

16            And when I say the -- the normal situation, I

17   mean, one where -- one that doesn't involve someone

18   who's barricaded with a firearm, one that may involve

19   someone where you go to the residence and they're in the

20   house, or they come out to the yard and they're upset.

21   But there's no immediate access to firearms where

22   they're not barricaded, for example.

23       Q.    Where in --

24       A.    When you start throwing in --

25       Q.    I'm sorry.  Where in this policy does it say

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    this does not apply if a -- if there is a firearm in the

2    residence of the diminished -- the person with

3    diminished capacity for mental illness?

4        A.   Well, there's the section that I talked about

5    where when they pose a threat.

6        Q.   Okay.  By --

7        A.   I'm sorry, I just can't read it on that

8    screen.  It's so small on that screen.  I can't read it.

9        Q.   Sure.  We'll get to it.  You've talked --

10   yeah, you mentioned this.  I want to show this to you.

11   And we'll get this up.  I think that -- and this is what

12   you say in your report, "Officers should utilize all

13   available tactics to de-escalate the situation where

14   possible.  However, if an officer is faced with a

15   dynamic and violent situation, which poses a threat to

16   the officer or other persons present, then officer --

17   when officers should utilize their law enforcement

18   control tactics to gain control as outlined in this

19   department's policy."  Is that what you're talking

20   about?

21       A.   Correct.

22       Q.   Okay.  And you and I agree, we just talked

23   about this, the situation prior to SRT coming on the

24   scene was not violent and dynamic, correct?  You and I

25   just agreed on that moments ago.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    A.   Correct.  But it could become so.  And they --

2    Q.   I understand that.  Would you agree with me

3   that the chances of it becoming so increase when you get

4   eight SRT officers with AR-15s pointed at the house?

5    A.   I would say that it's a catch-22 situation. If

6   you don't have that and something goes awry, then you

7   have an issue there.  So that's why you have tactics.

8    Q.   So let me pitch you a hypothetical.  Let me

9   make sure I understand this.  Your position -- this is

10            Officer and Attorney Batterton's policy and

11   understanding of national policy: If I am suicidal --

12   I'm a gun owner.  If I'm suicidal and my wife calls the

13   police and says, I'm concerned about my husband. There's

14   nobody in the house.  Will you please go check on him?

15   The police show up at my house and I say, I'm not coming

16   out.  Please go away, I should expect, as a general

17   police practice in the United States of America, to have

18   SRT or SWAT officers show up at my house with AR-15s

19   pointed at every door and every window?  That is

20   generally the accepted police practice according to you?

21            MR. CHELF:  Object to form.

22            THE WITNESS:  In this situation --

23   BY MR. FANNIN:

24    Q.   I'm not asking -- I'm asking about the

25   hypothetical I just asked you.  Can you give me a

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    straight answer to that?

2         A.    In Kentucky, at the time when this law

3    applies?  Is that part of your fact pattern, where

4    officers were --

5         Q.    202A.  202A requires -- that's what -- yeah.

6    Whatever you want to throw in there.  I should expect a

7    SWAT team to show up with guns pointed at my doors and

8    my windows?

9         A.    If your wife included the information that was

10   in this fact -- in Laduke's fact pattern that he is

11   drinking -- you're -- you're drinking, you had a firearm

12   in your hand, and then your girlfriend or your wife took

13   it away from you, and then you got a knife and you were

14   going to slit your wrists, but you convinced your wife

15   to -- you'd give her the knife if she'd tell you where

16   she hid the gun, and your mother or aunt who raised you

17   said that you were having problems with people trying to

18   -- you thought that people were trying to get you, all

19   of these factors, the totality of these circumstances

20   raises the level of concern.  And when you raise that

21   level of concern, then yes.

22        Q.    Yes?  A citizen of the United States can

23   expect, in that situation, to have a SWAT team show up

24   with AR-15s pointed at their house?

25        A.    In a situation like Mr. Laduke's, they can

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    expect an inner perimeter to be set.  And I don't see

2    anything where the patrol officers on duty had the

3    resources to set up an inner perimeter and then still be

4    able to be available for any other incident that

5    happened within the city.  So there are times when an

6    SRT or a SWAT team is called because they're additional

7    resources more so than they're being called for their

8    special tactics or -- or special weapons.

9           And an inner perimeter is not a complex

10   tactical situation.  It -- it's one where you're

11   positioned in a manner that you can contain somebody and

12   maintain some cover, so -- and surveil the residence to

13   watch for movements of the -- the subject inside.  So it

14   doesn't necessarily have to be special response team

15   that does this.  It could be patrol officers if there

16   were enough and if they were so equipped.

17       Q.    Would you agree with me that a SWAT team is a

18   greater show of force than just uniformed patrol

19   officers?

20       A.    Yes.

21       Q.    And you have no problem with the show of force

22   in this case?  You think it was completely appropriate?

23       A.    Yes.

24       Q.    And you think that complied -- as an attorney

25   and an officer, you think that was compliant with the

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Fourth Amendment to the Constitution?

2        A.    Yes.

3        Q.    Okay.

4        A.    Can I clarify that answer?  I --

5        Q.    I can't stop you from doing it.

6        A.    Well, I -- I just wanted to say that I'm not

7    here to offer legal opinions.  I'm here to explain why I

8    think a reasonable, well-trained officer on the scene

9    would believe he was complying with generally accepted

10   police practice, and they are required to follow the

11   Constitution.  I just want to be clear that I'm not

12   trying to offer legal opinions.  That's all.

13       Q.    Can you see my screen?

14       A.    Yes, sir.

15       Q.    Okay.  You and I -- do you understand -- well,

16   have you watched the body-worn camera footage in this

17   case?

18       A.    Yes, sir.

19       Q.    All right.  And do you recall seeing officers

20   from SRT being deployed to create what you called an

21   inner perimeter?

22       A.    Yes, sir.

23       Q.    Would you agree that these officers in this

24   photograph are pointing their weapons at the door of

25   Desman Laduke's house?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

 1     A.   I see -- I can see one.  Oh, yes, I do.  I see

 2  them.  I agree.

 3     Q.   Okay.  And would you agree -- I mean, are you

 4  familiar with the time, in this case, this would've

 5  been?  And have you come to realize that this is about

 6  an hour -- this is an hour behind?  This would've been

 7  at about 11:30?

 8     A.   Yes, sir.

 9     Q.   Do you know what time that the patrol officers

10  first responded to the call at the Laduke residence?

11     A.   Was it about 10:30 a.m., roughly?  I believe.

12     Q.   I'm just asking if you know.

13     A.   I -- I believe so.  I believe it was around --

14  I want to say I -- around 10:00, 10:30 a.m., I believe.

15     Q.   And you would agree that this still shows when

16  SRT was first deployed to the Laduke residence, correct?

17     A.   Correct.

18     Q.   And you and I have already agreed that, prior

19  to this time, this was not a violent and dynamic

20  situation, correct?

21     A.   Correct.

22     Q.   Okay.

23     THE REPORTER:  I hate to interrupt.  A Carl

24     Walter has joined.

25     MR. FANNIN:  Yeah.  He can come in.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
 1              THE REPORTER:  Okay.  Okay.
 2   BY MR. FANNIN:
 3        Q.   I want to show you again -- you've mentioned
 4   PERF a couple times.  Is that something that you cite
 5   typically in your cases?  You're familiar with PERF?
 6        A.   Yes.  I go to them when it's relevant.
 7        Q.   Yeah.  And you included in your report all of
 8   the guidance and policies from PERF that you found to be
 9   relevant, correct?
10        A.   I did.  All that I needed in my opinion.
11        Q.   All that you needed.  Okay.  Here, this is
12   following -- you and I have talked about this.  This was
13   the portion you and I have spent some time on, that SRT
14   acted in accordance with generally accepted police
15   practice when they had the rifles pointed at the doors
16   and windows of Laduke's residence, correct?  You and I
17   have been discussing that point?
18        A.   Correct.
19        Q.   And as support for that, you cite to PERF,
20   that is the Police Executive Research Forum Suicide by
21   Cop, correct?
22        A.   Yes.
23        Q.   All right.  And you've got Step 1 here,
24   "First, ensure your own safety and public safety."  And
25   it says, "If the subject has a firearm, the high-risk
```

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    situation should be handled like other situations

2    involving a subject with a firearm." And then it has

3    some things to do to increase safety, correct?

4        A.    Yes.

5        Q.    Okay. All right. I got curious. Because

6    you've got Step 1 here, I asked myself, what is Step 2?

7    Do you know what Step 2 is, sir?

8        A.    I do.

9        Q.    Okay. Did you include Step 2 anywhere in your

10   report?

11       A.    I did not, because Step 1 comes before Step 2,

12   and it says if there's a gun involved, treat it as a

13   situation of a -- a person with a firearm.

14       Q.    And so if it -- I did not read in Step 1 that

15   it says anything about, if it -- they have a firearm or

16   if they have access to a firearm, just stop here. Don't

17   even go to Steps 2 and 3. Is that somewhere in the

18   policy and I've missed it?

19       A.    No, but Step 2 also talks about, if a -- if a

20   suicidal person has a firearm, that that limits the

21   officer's options and that they have to focus on

22   protecting the public and their own safety. So that's

23   also included in Step 2, so I guess I should have

24   included that line because that would clarify some of my

25   opinion, but --

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      Q.   Well, what about this line: "Officers should

2   be aware that pointing a gun at a potentially suicidal

3   person will increase his or her anxiety and exacerbate

4   the situation."  Does that have any bearing on any of

5   your opinions in this case?

6      A.   It does, but as I stated right underneath

7   that, I believe it talked about, if the person has a

8   firearm, that officers don't have a lot of options and

9   that they have to make sure that they protect public

10  safety and their own safety.  That's in that same --

11  that same section, Step 2.

12      Q.   I understand that, but you and I talked about

13          -- earlier today, I asked you if you're going

14  to be as fair to my client as you are to the defendants.

15  And I'm asking you: Why would you not include a section,

16  number -- Step number 2, following Step number 1 that's

17  included in your report, that says that officers should

18  be aware that pointing guns at a potentially suicidal

19  person will increase their anxiety and exacerbate the

20  situation?  Would you agree that's relevant to this

21  case?

22      A.   Well, it's not relevant to my opinion of

23  whether the officers were correct in how they responded.

24  It --

25      Q.   So it does not matter?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    A.    -- relevant.  It is relevant, but Step 1
2  covers my opinion.  And furthermore, Step 2 does include
3  the language that is supportive of Step 1.  So I could
4  have included it along with that additional language
5  that says officers have fewer options or few options,
6  but I didn't because I didn't believe that it was
7  necessary, but I could have.

8    Q.    You just didn't think it was necessary?  You
9  didn't not include it because you thought it actually
10  supported the plaintiff's case, correct?

11    A.    No, I -- I don't think that it supports the
12  plaintiff's case, actually, because of the -- the
13  information that's right underneath it.

14

15

16

17

18    Q.    Okay.  Well, let's talk about that.  "Pointing
19  firearm elevates the subject's level of anxiety and can
20  make it impossible to communicate with the person.  If
21  an officer says, I'm here to help you, but is pointing a
22  firearm at the suicidal person, it's conflicting
23  messages, and people will always believe the nonverbal
24  message, said police psychologist, Dr. John Nicoletti";
25  is that correct?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

KENTUCKY
COURT REPORTERS

1      A.   That -- that's what it says.

2      Q.   Okay.  And then it says, "If the potential

3  suicidal person is unarmed or is armed with a knife,

4  blunt object, or other weapon but not a firearm,

5  officers should place themselves at great enough

6  distance that they can engage the person in

7  conversation, while still allowing time to react without

8  the need for deadly force"; is that correct?

9      A.   You said, "But not a firearm."

10     Q.   I did say, "But not a firearm."  I'm not

11 cherry-picking when I read this to you.  I'm telling you

12 what it is right here, correct?

13     A.   Correct.

14     Q.   Okay.  That's saying that you can stand at a

15 certain distance from somebody if they don't have a

16 firearm because they can't shoot you with a knife,

17 right?

18     A.   Correct.

19     Q.   Okay.  Does it say anywhere in Step 2, please

20 disregard if they have a firearm.  Don't be aware that

21 pointing a firearm at somebody can exacerbate their

22 anxiety or exacerbate the situation?

23     A.   Can you repeat that question?  It kind of --

24 it glitched for one sec there.

25     Q.   I'm sorry.  Where in Step number 2 does it say

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  that you can disregard the fact that pointing a firearm

2  at a suicidal person can increase their anxiety and

3  exacerbate the situation if they have a firearm in the

4  household?

5          MR. CHELF:  Let me just real quick enter an

6      objection.  And it may not even be an objection,

7      but just for clarity, there's two versions of this

8      Step 2 in this document, correct?  And I think he's

9      talked about, in his answer, one of the lines

10     that's not included in the top but is in the

11     bottom.

12         MR. FANNIN:  Yeah.  Yeah.

13         MR. CHELF:  I just want to be --

14         MR. FANNIN:  Yeah.  And we're going to get to

15     that.

16         MR. CHELF:  All right.

17         THE WITNESS:  So --

18  BY MR. FANNIN:

19      Q.   My question is, is there anything in here, in

20  the top or in the bottom -- I'll show you the whole

21  thing.  I'm not trying to hide anything from you.  Is

22  there anything that says that you ignore Step 2 if a

23  firearm is in the house?

24      A.   No, but I wasn't ignoring Step 2.  I was

25  including things that were relevant to my opinion.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Q.    Okay.  And it wasn't included in your report,

2    correct?

3    A.    I did not include it in my report, but there -

4    - there is information in there supportive to my

5    opinion.

6    Q.    **Then why didn't you include it in your report?**

7    A.    Because I try to include information in my

8    report that's relevant and not make my report 100 pages

9    long.  I contend -- I contend.  I can tend to be

10    verbose, and I have been told over the years at work

11    that I need to boil things down a bit.  And so I try to

12    keep things as concise as I can while being thorough. So

13    that's why I did what I did.

14    Q.    **So in leaving out Step 2, you were just being**

15    **concise?**

16    A.    And as I said, I don't believe that it -- it

17    doesn't change my opinion.

18    Q.    **I'm not asking if it changes your opinion.**

19    A.    Changed my opinion.

20    Q.    **I'm asking why you left it out, and you're**

21    **telling me it's because you're being concise; is that**

22    **correct?**

23    A.    Yes, and it doesn't change my opinion.

24    Q.    **Okay.**

25    A.    I'm not hiding anything, if that's what you're



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  insinuating.

2      Q.   Is it your expert opinion that, if a gun is

3  present in the home of a citizen, the citizen should be

4  treated as if they are armed by the police?

5      A.   No.

6      Q.   Would you agree that Desman Laduke was a

7  person of diminished capacity?

8      A.   I would agree that he was a -- a person in

9  crisis.  When I -- when I --

10      Q.   What's the difference between those two

11  things?  Why --

12      A.   Okay.

13      Q.   -- can't you agree that he's a person of

14  diminished capacity?

15      A.   Okay.  Because when -- when we look at persons

16  of diminished capacity, often to police, that could mean

17  someone who is -- may not be -- have the intelligence

18  related to their age, someone who -- you know, it could

19  be somebody who is autistic, for example, or it could be

20  somebody who is 20-years-old and has the -- the mental

21  age of 10, whatever that would be called.  So that's how

22  we tend to look at diminished capacity.  It can also be

23  an emotionally disturbed person or a person in crisis.

24          So while they're fairly synonymous, when --

25  when I say a person of diminished capacity, I'm

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    generally implying that it would be someone who may not

2    be -- may have some kind of mental disorder that

3    diminishes their capacity, rather than someone who is of

4    full capacity who happens to have a crisis going on in

5    their life.  That's my distinction.

6        Q.    Okay.  In --

7        A.    But I can agree that the policies all speak of

8    them similarly but yet give multiple different symptoms

9    or characteristics of a person with diminished capacity.

10       Q.    On Page 47 of your report, you said, "It is my

11   opinion that Lieutenant Fraddosio and the NPD SRT

12   officers complied with the NPD persons in crisis policy

13   and generally accepted police practice regarding persons

14   in crisis/suicide by cop."  Did I read that correct?

15       A.    Yes.

16       Q.    When you said persons in crisis policy, are

17   you referring to this, persons of diminished

18   capacity/mentally ill?

19       A.    Yes, sir.

20       Q.    Okay.  All right.  And it's your testimony

21   that the officers, including Lieutenant Fraddosio and

22   the NPD SRT officers, complied with this policy?  That's

23   how I read your opinion, correct?  Page 47, black and

24   white, right there it says it, right?

25       A.    Yes.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1          Q.    Okay.  I noticed, though, you went through and

2     discussed several other policies and how they complied.

3     I did not quite see as much about this, so I want to go

4     through this policy with you and discuss exactly what

5     you mean by compliance, okay?

6          A.    Okay.

7          Q.    All right.  Obviously, you and I talked about

8     this.  I asked you earlier if this governed the conduct

9     of officers on the scene.  You kind of said, to some

10    extent.  I mean, obviously, it would not be important to

11    your opinion if it didn't govern their conduct, correct?

12         A.    Right.

13         Q.    Okay.  This document says that it's a general

14    order; is that correct?

15         A.    Yes.

16         Q.    Okay.  Says, "By order of the chief of

17    police," correct?

18         A.    Yes.

19         Q.    This document is not a suggestion.  It is a

20    policy.  This is compulsory for Nicholasville police

21    officers, correct?

22         A.    Yes.

23         Q.    Okay.  Do police officers have the discretion

24    to just ignore this policy?

25         A.    No.  I will say that I believe, in Captain

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Marshall's deposition, he said that he contacted the

2    assistant chief, the assistant chief contacted the

3    chief, and they concurred on the deployment of the SRT

4    and CNT.

5         Q.    Okay.  Does the policy state that officers can

6    pick and choose which ones of these policies that they

7    adhere to?

8         A.    It doesn't say that specifically, no.

9         Q.    Okay.  And it's your opinion, based on your

10   report, that this is an appropriate policy that follows

11   with generally accepted police practices, correct?

12        A.    It is, but there does come a point when other

13   policies also -- and other tactics and guidelines also

14   come into play.

15        Q.    I promise you you're going to get a chance to

16   talk about that.

17        A.    Okay.

18        Q.    I'm just asking you these questions.  This

19   will go a lot quicker.

20        A.    Okay.

21        Q.    I get what you're getting at.

22        A.    Okay.

23        Q.    I know you're going to get there.  I promise

24   I'm going to give you the chance.  I've got your, you

25   know, 50-page report right here.  It's got your

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    opinions.  I just want to take you one by one through

2    this, if you don't mind, okay?

3         A.   Clear.

4         Q.   And you agree that people with diminished

5    capacity may display conduct that is bizarre,

6    irrational, unpredictable, and/or threatening?

7         A.   Yes.

8         Q.   You agree that persons who fought -- well,

9    first off, you would agree -- I think all the experts in

10   this case agree that Desman Laduke falls under this

11   policy, correct, sir?

12        A.   Yes.

13        Q.   Otherwise, your opinion about 202A would not

14   make sense, correct?  I mean, he would have to be

15   somebody who's mentally ill or a threat to himself for

16   this policy to apply, correct?

17        A.   Yes.

18        Q.   Okay.  And you would agree that people like

19   Desman Laduke may not receive or comprehend commands or

20   other forms of communication that the officer would

21   expect, correct?

22        A.   Correct.

23        Q.   You would agree that persons like Desman

24   Laduke often do not respond to authoritative persons or

25   the display of force, correct?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1       A.   Correct.

2       Q.   **What is a display of force?**

3       A.   A display of force can be pointing guns at a

4  house.  It could be threatening someone with any weapon,

5  a taser, et cetera.

6       Q.   **This policy talks about in segments four**

7  **distinct categories of ways to deal with a person of**

8  **diminished capacity or a mentally ill person like Desman**

9  **Laduke, correct?**

10      A.   Yes.

11      Q.   **It says -- and the very first of those is**

12 **containment.  Let's go through the four first.  You've**

13 **got containment, you've got coordination communication,**

14 **and time; is that correct?**

15      A.   That is correct.

16      Q.   **All right.  Under containment, it says,**

17 **"Responding officers should avoid the use of emergency**

18 **lights and sirens when responding to this type of call**

19 **for service.  Experiences demonstrated that this may**

20 **agitate the subject's response."  Would you agree that**

21 **officers of the Nicholasville Police Department violated**

22 **this policy?**

23      A.   I don't know that I saw their response when

24 they were pulling up to the call.

25      Q.   **Did you review the Ring camera footage that we**

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    provided?

2        A.   Yes, I did.

3        Q.   Okay.  Do you recall in that Ring camera

4    footage that sirens were utilized when officers came to

5    the scene?

6        A.   I don't recall that.  I don't --

7        Q.   Would you agree --

8        A.   -- but I don't recall it.

9        Q.   Would you agree with me that, if that

10   happened, that would be a violation of this policy?

11       A.   Well, of that provision.

12       Q.   Okay.  Would you agree that this also says

13   under number three, "The officer shall devise a plan

14   that separates this subject from other civilians.  The

15   containment should respect the comfort zone of the

16   subject in order to reduce any unnecessary agitation.

17   Officers should convince the subject they do not have to

18   move.  Officers should continuously evaluate this

19   comfort zone and not compress it unless absolutely

20   necessary."  Did I read that correctly, sir?

21       A.   You did.  And I would say that the, "Unless

22   absolutely necessary," when you -- when you get into how

23   close the inner perimeter was in this situation, when

24   you look at the need to contain him, it's a tight area.

25   It's -- there's cars right near the house.  You don't

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    want him to be able to jump out and hop in a car and

2    become mobile in a vehicle.  You don't want him to be

3    able to jump out and run in a neighboring residence.

4           So the -- the closer inner perimeter that may,

5    you know, be on the cusp of his comfort zone is really

6    necessary in this situation.  Additionally, I noted

7    that, I believe, in plaintiff's expert report, they even

8    -- your expert even spoke of Horton's position at the

9    corner of the neighboring house was a good position.

10        Q.    I think my question was: Did I read that

11   correctly?  And your answer is yes, correct?

12        A.    Yes.

13        Q.    Okay.  So --

14        A.    But I don't know if I'm going to get an

15   opportunity to explain.

16        Q.    I'm just here to ask you some questions today,

17   and I'm sure that if you -- if -- I'm sure you'll be

18   able to work in your explanation.  And again, I've got

19   your report in front of me.  I just want to get your

20   answers to these questions.

21        A.    Okay.

22        Q.    So can you cite for me one place -- a single

23   place in the record where Desman Laduke was ever told

24   that he did not have to leave his house?

25        A.    I don't think that that was an option for him

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  because --

2       Q.   I'm just asking, is there anywhere in the

3  record?  I didn't ask if it's an option.  I'm trying to

4  streamline your deposition so we're not here all day. My

5  question to you is, did anybody ever ask -- or I'm

6  sorry.  Did anybody ever tell Desman Laduke that he did

7  not need to leave his house?

8       A.   No.

9       Q.   Okay.  Can you cite for me one place in the

10  record where there's any evidence that anyone ever

11  evaluated whether or not they were compressing Desman

12  Laduke's comfort zone?

13       A.   I don't know of any specific place in the

14  record.

15       Q.   It also says on number four, "It is important

16  to ensure that onlookers and family members are not in a

17  position to become either verbally or physically

18  involved in the control methods."  Would you agree with

19  me that officers directly involve Desman Laduke's

20  girlfriend and aunt?

21       A.   The -- I don't -- I don't think they directly

22  involved the girlfriend, that -- that comes to mind, but

23  I do know that they directly involved the aunt.

24       Q.   Okay.  They specifically, actually put her on

25  the phone with Desman Laduke, correct?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      A.    The aunt?

2      **Q.    Yes.**

3      A.    Correct.

4      **Q.    Okay.  And you would agree that's a violation**
5  **of this policy?**

6           MR. CHELF:  Objection.

7           THE WITNESS:  I would not.

8  BY MR. FANNIN:

9      **Q.    Why?**

10     A.    I would not in this situation because I
11  believe -- and at this -- I've got it listed in my
12  report, but I don't know if it's this policy, I think it
13  is, where it talks about, make every reasonable effort
14  to de-escalate or -- or bring the situation to a safe
15  resolution, something to that effect.  I'll find it in
16  my report for you if you give me a second, but where it
17  says that -- I know that Captain Marshall attempted
18  several times to speak to Laduke, and Laduke would not
19  speak to him.

20          So in a situation like that, sometimes you got
21  to do what you can.  If the option is not speak to him
22  or allow someone who's probably the closest person to
23  him in his life to speak to him within some -- within
24  supervision of the two trained CNT people, I think that
25  they would be derelict in their duties of not attempting

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  to use her to try to deescalate him and talk some sense

2  into him.

3          I understand what that portion of the policy

4  says, but I do believe there's another section that I

5  would have to look for, that addresses, do everything

6  within reason, or something to that effect.  I'm

7  looking.

8          Q.   Well, you don't disagree that Desman Laduke's

9  aunt was verbally involved in this?

10         A.   I do not disagree with that.

11         Q.   Okay.  It also says under number five,

12  "Effective containment reduces elements of agitation,

13  such as large groupings of persons, including officers,

14  emergency vehicle equipment, loud police transmissions,

15  and multiple persons directing communications to the

16  subject.  Containment is meant to reduce outside

17  influences and sources of agitation."  Did I read that

18  correctly, sir?

19         A.   Could you scroll up just a little bit?  You're

20  --

21         Q.   Absolutely.

22         A.   The top of my screen says number seven.

23         Q.   Okay.

24         A.   Okay, great.

25         Q.   Is that good?  Did I read that correctly?



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      A.   You did.

2      Q.   All right.  You had an opportunity to review

3 the body-worn camera footage in this case, correct?

4      A.   Yes.

5      Q.   As well as the Facebook Live video that was

6 taken by an onlooker, correct?

7      A.   Yes.

8      Q.   Okay.  Would you agree with me that there was

9 a large grouping of people right across the street from

10 Desman Laduke's house?

11      A.   It appeared to be, yes.

12      Q.   Okay.  Would you agree with me that that would

13 be a violation of this policy?

14      A.   Possibly, yes.

15      Q.   Do you know how many different officers

16 directed communication to Desman Laduke throughout the -

17 - this whole incident?

18      A.   Well, I believe Captain Marshall.  And then

19 the last six minutes of the incident, it would've been

20 the officers that were in the backyard.  So you got

21 Horton, Fraddosio, and Balltrip, probably.  And then --

22 well, initially Horton and Balltrip, and then Fraddosio

23 and Marshall came up, and I believe Brewer came up.  I

24 don't recall if Brewer gave any verbal commands or not,

25 but I believe Fraddosio tried to -- or Horton gave

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  verbal commands, and Balltrip spoke to him.  So we're

2  looking at maybe, in addition to Captain Marshall,

3  three, approximately.

4      **Q.   And you would agree that is multiple persons,**

5  **correct?**

6      A.   I would.  However, I would also agree that

7  that's when it had become dynamic.  And that's when the

8  response to resistance policy would clearly be kicked

9  in.

10     **Q.   What about prior to the last six minutes?**

11 **Would you agree that Marshall and his aunt, and I**

12 **believe also his brother, were all directing**

13 **communications to Desman Laduke?**

14     A.   Marshall tried to communicate with Laduke.  And

15 I don't think he was successful, which is why he

16 resorted to the aunt and the -- the brother, or the

17 other male that was -- that came on scene.  So again,

18 they were --

19     **Q.   Would you agree that's multiple persons?  Just**

20 **agree -- would you agree that's multiple persons?**

21     A.   Yes, I would.

22     **Q.   That are directing communications?**

23     A.   Yes.

24     **Q.   And that's not consistent with this policy?**

25     A.   I -- I don't think that that's the intent of

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    the policy.  I think the intent of the policy is to not

2    have a bunch of people filling the person's head with --

3    with talk.  And this was a situation where they were not

4    directly face-to-face with him until the last six

5    minutes.  And so Captain Marshall, the aunt, and the

6    brother were over the phone, and he had the option of

7    whether or not to answer the phone, and he often elected

8    not to answer the phone.

9         Q.    Is that unusual?

10        A.    For a person to not answer the phone?

11        Q.    Yeah.

12        A.    It's -- it's not unusual.

13        Q.    Have you ever talked to Todd Justice?

14        A.    No.

15        Q.    You ever talked to him about his intent behind

16   this policy?

17        A.    No.

18        Q.    Under coordination, it says, "One officer at

19   the scene shall be designated or assume the position of

20   lead officer on the scene."  Who was the lead officer on

21   the scene?

22        A.    Captain Marshall.

23        Q.    Okay.  And it's your opinion that he was the

24   lead officer throughout the course of the interaction?

25        A.    Yes.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      Q.    On number two, it says, "A perimeter shall be
2    determined to ensure that outside persons and/or family
3    members don't become involved."  You and I have already
4    talked about that.  That was not done in this case, was
5    it?
6      A.    Well, they weren't physically involved.  They
7    did not let them go in, because I think the brother
8    wanted to physically go into the -- the residence, and
9    they wouldn't let him.  But they did do the phone. Could
10   you scroll down just a hair?  I see number five. There
11   we go.
12     Q.    Okay.  I don't know why yours is not lining up
13   with mine.
14     A.    Yeah, I don't know.  My -- my screen -- my
15   screen is just a little bit smaller.
16     Q.    That's okay.  It makes it where I can't see
17   it, but that's okay.  I think I'm -- I remember what it
18   says.  Well, the policy doesn't say physically involved,
19   it just says involved, correct?
20     A.    Could you go back down for me?
21     Q.    Yeah, I'm trying.  Is this better?  When you
22   say down, do you mean up?
23     A.    I guess I mean up.
24     Q.    Okay.
25     A.    There you go.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      Q.    Okay.

2      A.    What number did you read?  I'm sorry.

3      Q.    Two.  "A perimeter shall be determined to

4   ensure that the outside person and/or family members

5   don't become involved."

6      A.    Yes.

7      Q.    Do you know if Desman Laduke could see this

8   large grouping of people right across the street, if he

9   just looked out his window?

10     A.    I don't know.

11     Q.    Okay.  Do you have any reason to dispute that

12  he could?

13     A.    I don't, not one way or the other.

14     Q.    Okay.  So the way that it was set up, he could

15  have looked out his window and actually seen his aunt

16  there talking to him, correct?

17            MR. CHELF:  Object to form.

18            THE WITNESS:  I don't know.

19  BY MR. FANNIN:

20     Q.    Would that be a proper police practice?

21     A.    Well, it's my opinion that they did not

22  violate generally accepted police practice in allowing

23  the aunt to speak to him.  So I don't think that him

24  being able to see her would have been an issue under

25  generally accepted police practice.  The policy isn't as

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    clear.

2        Q.    Okay.

3        A.    And I found what I was looking for earlier, if

4    you would like me to tell you, but --

5        Q.    Sure.

6        A.    It's the IACP Response to Barricaded

7    Individuals, Concepts & Issues paper.  And it said,

8    "While the barricaded individual's behavior ultimately

9    determines the outcome of the incident, agencies should

10   make all reasonable efforts to obtain a nonviolent

11   resolution."

12           And that's what I was -- was getting at with

13   allowing the aunt and the brother to speak on the phone

14   with him falls under the all reasonable efforts.  When

15   the officer who's trained in crisis negotiation and --

16   and has CIT training, when they're unable to make

17   contact with him, the option is either nobody makes

18   contact with him, or they attempt something else.  So we

19   would consider that a reasonable effort.

20           If I was an incident commander on the scene

21   and had this very policy, and I was given the choice,

22   hey, we can have, you know, the -- the most important

23   person in his life try to talk to him, because he won't

24   talk to any of the police, I would go with let's have

25   the most important person in his life talk to him.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Q.    On number three here, it said, "Officers

2   should attempt to limit observable indications of

3   force."  Do you see that right here?

4    A.    You said number three?

5    Q.    Yeah.

6    A.    Can you scroll for me just a tiny bit?  That's

7   good.

8    Q.    "If firearms are drawn, they should be

9   maintained at the low ready position, and not displayed

10  by officers who are attempting to establish

11  communications with this subject."  Do you see that?

12   A.    I do.

13   Q.    Okay.  I showed you that photograph earlier of

14  SRT members deploying to create that inner perimeter.

15  Would you agree that they were not limiting observable

16  show of force in that photograph?

17   A.    In -- in that photo, which is a -- a snapshot

18  of a moment in time, no, they were not.

19   Q.    Okay.

20   A.    But for an --

21   Q.    And you and I would agree that an AR-15

22  pointed at the door is a show of force?

23   A.    It is.  Now, we don't know that he even saw

24  it, because the blinds were drawn, and they couldn't see

25  him until that last six minutes.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Q.    Well, and he can't testify because he's dead,

2  right?

3    A.    That is correct.

4    Q.    Yeah.

5    A.    I don't mean to be that callous, but you're

6  correct.

7    Q.    And you would agree with me that those

8  officers who were creating that inner perimeter were not

9  limiting observable indications of force when they

10  descended on Desman Laduke's house, correct?

11    A.    Not in the pictures, and some of the times

12  shown in the body camera, but not every single time.

13    Q.    Okay.  And you would agree that is in direct

14  contravention of this policy?

15    A.    That provision of the policy, correct.  But

16  for the reasons I've stated in my report, for the sake

17  of time, I believe they were within generally accepted

18  police practice, even if not this policy.

19    Q.    But they were violating Nicholasville Police

20  Department's policy?

21    A.    That provision.

22         MR. FANNIN:  We've been going about an hour --

23     or two hours.  Gosh, time flies.  Let's take a

24     bathroom break, if that's all right.

25         THE WITNESS:  Sounds good.  What time do you

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
 1        want us back?
 2              MR. FANNIN:  How about ten minutes?  Is that
 3        all right with you, Tyler?
 4              MR. CHELF:  Yeah, that works.  Thanks.
 5              MR. FANNIN:  All right.  All right.
 6              THE REPORTER:  Would you all like to waive the
 7        lengthy read-on, and instead just have me say, "We
 8        are back on record," instead of giving that whole
 9        spiel?
10              MR. FANNIN:  Please.
11              THE REPORTER:  Okay.
12              MR. CHELF:  Yes.
13              THE REPORTER:  Okay.  We are going off record.
14                  (OFF THE RECORD)
15              THE REPORTER:  We are back on record.  The
16        time is 12:09 p.m.
17   BY MR. FANNIN:
18        Q.  We'll come back to that policy we were
19   discussing a moment ago, but I want to play something
20   for you from body-cam footage.  I just want you to
21   listen to this, and let me know if you can't hear it or
22   are having trouble hearing it, okay?  Sometimes sharing
23   this stuff on Zoom can get a little tricky, okay?
24        A.  Okay.
25                  (AUDIO RECORDING PLAYED)
```



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

 1              LT. FRADDOSIO:  It's probably going to happen

 2       today, boys.  He ain't coming out, and if he does,

 3       he's going to force us to do this.  So remember --

 4              OFFICER BALLTRIP:  Liberty Green?

 5              LT. FRADDOSIO:  Yeah.  He's already been

 6       committed once before, so -- he's got a 9-

 7       millimeter pistol.

 8              OFFICER BALLTRIP:  We going to try gas or

 9       anything?

10              LT. FRADDOSIO:  Later.  Right now we're just

11       talking.

12              OFFICER BALLTRIP:  Okay.

13              LT. FRADDOSIO:  All it's going to do is piss

14       him off and force him out.  So we got to do our due

15       diligence, especially remember there's a camera

16       everywhere around here.

17              (AUDIO RECORDING STOPPED)

18   BY MR. FANNIN:

19       Q.    Did you hear that okay?

20       A.    I did.

21       Q.    Okay.  Have you heard that before when you

22   were reviewing your case?

23       A.    I did.

24       Q.    Okay.  Do you know who that was?

25       A.    I believe it was Fraddosio, right?  Lieutenant

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Fraddosio.

2        Q.    Yes.  Did you know who he was talking to?

3        A.    I -- I don't.  I -- members of the SRT, but I

4    don't know specifically who.

5        Q.    You have any reason to dispute that that -- he

6    was talking to Balltrip?

7        A.    I don't.

8        Q.    Okay.  Do you know how long he had been on the

9    scene when he said that?

10       A.    I don't recall.

11       Q.    Do you have any reason to dispute it was

12   approximately 20 minutes on the scene?

13       A.    I don't.

14       Q.    What was he communicating to Officer Balltrip

15   there?

16           MR. CHELF:  Object to form.

17           THE WITNESS:  Well, really you'd have to ask

18       him that, and -- but the way I would take it is, he

19       was just letting them know that this may be a -- a

20       situation where they end up in a -- in a conflict

21       with him, with Mr. Laduke, and to be careful.  So

22       that's how I would take it.

23   BY MR. FANNIN:

24       Q.    As part of your job, you supervise commanders

25   of SRT teams, correct?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      A.   At times, on call-outs, yes.

2      Q.   Okay.  And I mean, you would have an after-

3  action report where you would review how they handled a

4  certain call-out, correct?

5      A.   Correct.

6      Q.   Is that a way that you would want one of your

7  commanders to communicate with his SRT team?

8      A.   Not that verbiage.

9      Q.   What's wrong with that verbiage?

10     A.   The same thing could have been accomplished by

11  saying that -- to be careful, because he may force -- he

12  may force the issue.  He may pose a threat.  That

13  language didn't sound professional on tape.  However,

14  every officer is trained that the decision to use force

15  is their own personal decision that they have to make.

16  So I don't believe that those words would influence an

17  officer into using force.

18     Q.   If those words did influence an officer into

19  using force, that would be a bad thing, wouldn't it?

20     A.   If force wasn't justified.  Excuse me.  Got a

21  frog in my throat.

22     Q.   That's all right.  You take your time.

23     A.   If force wasn't just justified, it would be a

24  bad thing.

25     Q.   That is not the type of messaging that a

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  leader of an SRT team should use, is it?

2       A.   That verbiage.  The -- the underlying message,

3  which would be, be careful, is a suitable message.  But

4  that verbiage wouldn't be my preferred verbiage.

5       Q.   **Does it concern you that, after 20 minutes on**

6  **the scene, it sounds like that Commander Fraddosio is**

7  **telling his folks, we're going to have to shoot this**

8  **guy?**

9            MR. CHELF:  Object to form.

10           THE WITNESS:  It doesn't -- it doesn't concern

11       me that he's telling them to be careful, but I --

12       like I said, I don't like that verbiage.  His job

13       is to tell them to be careful, and to tell them

14       what -- what the possibilities are.  That's what he

15       should be doing.

16  BY MR. FANNIN:

17       Q.   **That's not what he said though, is it?**

18       A.   That -- that was the implication, but what he

19  said specifically was something about --

20       Q.   **Today's the day?**

21       A.   -- this may be the day, boys, or something

22  like that.

23       Q.   **Today's the day, boys.  That sounds more like**

24  **a line out of a Clint Eastwood movie than a directive**

25  **from a police leader, doesn't it?**

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1          MR. CHELF:  Object to form.

2          THE WITNESS:  It didn't sound professional,

3      no.

4    BY MR. FANNIN:

5      Q.    Okay.  And then he's telling them that they've

6    got to do their due diligence, because there are cameras

7    everywhere?

8          MR. CHELF:  Object to form.

9    BY MR. FANNIN:

10     Q.    Did you hear that?

11     A.    Well, cameras everywhere, we know there's

12   cameras everywhere.  And there's always -- that's a --

13   that goes without saying.  That's why there's no need to

14   even say it.

15     Q.    So in the same conversation where Commander

16   Fraddosio is telling his officers, today is the day,

17   boys, he's also saying, make sure you do your due

18   diligence because there's a lot of cameras around.  Am I

19   correct about that?

20         MR. CHELF:  Object to form.

21         THE WITNESS:  Yes, but a reminder to -- to do

22      their due diligence is -- is a good thing.

23   BY MR. FANNIN:

24     Q.    That was a good message from Commander

25   Fraddosio?  That's your opinion?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1          A.    Reminding them to -- to do the right thing is
2     a good thing.
3          Q.    **The clip I just played in its entirety.  You**
4     **talked earlier about totality --**
5          A.    Well, I said it -- I said that the -- the part
6     about today's the day, boys, didn't sound
7     unprofessional, and that wouldn't have been my choice of
8     verbiage.  But reminding them that there's cameras and
9     to do their due diligence, if -- if that's the way you
10    want to paraphrase it, that is -- that's a healthy
11    reminder for everyone.
12         Q.    **Would you agree that it is typical within**
13    **police departments, in police departments throughout the**
14    **country, that officers are trained to show deference and**
15    **respect to their commanders?**
16         A.    Yes.
17         Q.    **And that the type of messaging that Commander**
18    **Fraddosio used is dangerous?**
19              MR. CHELF:  Object to form.
20              THE WITNESS:  No, I would not call it
21         dangerous, because --
22    BY MR. FANNIN:
23         Q.    **That's not dangerous?  What you've just heard**
24    **is not dangerous in your expert opinion?**
25              MR. CHELF:  Same objection.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

 1              THE WITNESS:  No.

 2    BY MR. FANNIN:

 3         Q.    Okay.

 4         A.    As I said, it was unprofessional, but officers

 5    know that they personally are responsible for their use

 6    of force decisions, and that they also are trained that,

 7    if they were ordered to do something that was unlawful,

 8    they should not follow an unlawful order.

 9              So based on that -- that's why I say that --

10    that comment would not influence an officer to use

11    force, that the officer did not believe was not

12    justified for law and training at the time.  In my

13    opinion, the statement sounded unprofessional, but it

14    would not or should not influence an officer to use

15    force that wasn't justified, because --

16         Q.    Would you --

17         A.    -- we're trained that unlawful orders don't

18    get followed.

19         Q.    Would you tolerate that type of messaging from

20    a commander in your unit?

21         A.    No.

22         Q.    Speaking of the totality of the circumstances,

23    did you read testimony and hear statements at the scene

24    about half of the SRT team being hung over?

25         A.    I read something about that, but I didn't see

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    anything that indicated that they were hungover.  I -- I

2    read questions about that, I guess you or your partner

3    asked them about during depositions.

4        **Q.   Well, we didn't just make that up.  I mean,**

5    **you know that there was a Halloween party and half the**

6    **SRT team attended it that night, right?  The night**

7    **before?**

8        A.   I know that's what they were asked about, yes.

9    But I didn't see any specific evidence from the

10   Halloween party, if that's what you're getting at, so...

11       **Q.   You didn't see confirmation that a Halloween**

12   **party happened the night before this, where they were**

13   **taking shots of some kind of liquor, I think it was**

14   **tequila, the night before this?**

15       A.   I heard -- I read that there was in fact a

16   Halloween party, but I didn't see any specific evidence

17   that they showed up intoxicated.

18       **Q.   I'm not still sharing my screen, am I?**

19       A.   No.

20       **Q.   Would you agree with me that numerous officers**

21   **were on the scene without wearing body camera?**

22       A.   I don't know if it was numerous, but I know

23   one body camera was borrowed, correct?  I believe.  And

24   I can remember, I think one other did not have a body

25   camera, but -- so maybe two.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1   Q. Did Horton have a body camera?

2   A. I don't believe so.

3   Q. Did Fraddosio have a body camera?

4   A. You know what?  Maybe -- maybe I did see that

5 -- at the time, SRT didn't have them, right?  And -- and

6 they got them later.

7   Q. Did Detective Courtney have a body camera?

8   A. I don't believe so.  So yeah, that came back

9 to me.  I don't think SRT, that wasn't patrol officers,

10 had body cameras.

11   Q. Have you had an opportunity to review the

12 body-worn camera policy from the Nicholasville Police

13 Department?

14   A. I don't know.  Is that one that I listed --

15 let me see.

16    MR. FANNIN:  While you're looking at that,

17   Madam Court Reporter, did I mark the diminished

18   capacity, mentally ill policy as an exhibit to the

19   deposition?

20    THE REPORTER:  I don't believe so.  I do not

21   have that on here.

22    MR. FANNIN:  What exhibit are we on?

23    THE REPORTER:  I currently have exhibit -- I'm

24   on Exhibit 4, unless you are wanting to use that

25   body camera footage, then I would be on Exhibit 5,

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
1        or the body camera audio.
2             MR. FANNIN:  I don't need to make that an
3        exhibit, but I do need to make the diminished
4        capacity person's policy an exhibit, and we'll make
5        that Exhibit
6   4.
7                  (EXHIBIT 4 MARKED FOR IDENTIFICATION)
8             THE REPORTER:  Okay.
9             MR. FANNIN:  I will make this body cam footage
10       policy Exhibit 5.
11                 (EXHIBIT 5 MARKED FOR IDENTIFICATION)
12            THE REPORTER:  Okay.
13  BY MR. FANNIN:
14       Q.   And Mr. Batterton, have you had an opportunity
15  now to see -- did you get a chance to review the body-
16  worn camera policy?
17       A.   I did not.
18       Q.   Okay, I've got it up here for you.  Do you
19  know if that was provided to you by counsel?
20       A.   I -- I don't -- I don't believe so.  So some
21  of -- some of the policies, it was like an index and
22  when I would click on them, they wouldn't open, so...
23       Q.   Okay.  Did you ever talk with counsel about,
24  hey, I can't access some of these policies?
25       A.   No, I don't believe that I looked at that --
```



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    at that policy.

2        Q.    Okay.  So you have no opinions about body-worn

3    camera policy?

4        A.    I don't.  But I do -- I do have an opinion or

5    knowledge that not all SRTs wear body cameras when they

6    respond.  Typically, because it doesn't work out with

7    their equipment.  And not all detectives have body

8    cameras.  For a long time, ours did not.

9        Q.    And I appreciate that.  I know you've got

10   background experience training, all those things.  But

11   you don't have an opinion on whether or not the

12   Nicholasville Police Department and its officers

13   complied with their own body cam policy because you've

14   not reviewed that policy, correct sir?

15       A.    I have not reviewed that policy.

16       Q.    Okay.  So you're not going to opine that they

17   followed their own body camera policy because you don't

18   have it, correct?

19       A.    I don't not, unless it's provided to me after

20   the fact.  And if I change -- if I have an opinion on

21   it, I'll let you know.

22       Q.    Excellent.  Please do that.  Were you

23   concerned about any of the testimony from officers

24   regarding their training on how to respond to crisis

25   intervention, training and their lack -- the lack of

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1   that training?  Were concerned by that at all in your

2   review of this case?

3       A.   Well, it sounded like they did not have a

4   training specifically to the -- responding to the

5   suicide by cop type of scenarios.  However, in this

6   incident, their -- their duty or their job assignment

7   was to establish an inner perimeter.  And as I stated

8   earlier, I don't want to repeat myself, but since I said

9   that I believe the inner perimeter was proper and it was

10  properly positioned, then I think they were trained

11  sufficiently to respond to the incident with Laduke.

12       But I do recall what you're talking about in

13  deposition, where they said they didn't have a lot of

14  training or training related to suicide by cop scenarios

15  or crisis intervention.

16      Q.   Would you agree with me that suicide by cop

17  training would likely include things like limiting shows

18  of force?

19      A.   It could, except in a situation with a firearm

20  and a person in a house and they can't see them, and

21  then they could see him and he had a gun -- gun and then

22  guns in his hands.  It wouldn't alter my opinion on

23  this.

24      Q.   So their lack of training in showing up to a

25  suicidal -- let me strike that.  You and I agree, there

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    is plenty of testimony from officers that arrived on

2    this scene and that created this perimeter had no

3    training on how to respond to a suicidal subject,

4    correct?

5        A.   I don't believe there was specific training on

6    that, but there was on setting up perimeters and that --

7        Q.   I understand that.  I'm asking you about

8    specifically with suicidal subjects.  You and I --

9        A.   I don't believe so.  There may have been one

10   that mentioned having training in it, and I don't recall

11   who it was, but it seems --

12       Q.   I think that was Officer Warren.  And I'll

13   give you that, you're right.

14       A.   Okay.

15       Q.   One.

16       A.   Okay.

17       Q.   Okay.  The others did not, correct?

18       A.   I believe you're correct.

19       Q.   Okay.  So we've got one of eight.  And it's

20   your opinion that it did not matter that they did not

21   have this type of training?

22       A.   Well, it's my opinion that in this instance,

23   their job was to set up an inner perimeter and they did

24   so in accordance with generally accepted police

25   practice.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      Q.   But in violation of their own diminished

2   person's capacity policy with regard to show of force,

3   as you and I have already discussed?  The Nicholasville

4   Police Department's policy that we just went through?

5      A.   Well, some of the policy, where it talks about

6   officers should do this and should do that, that

7   language is more of a -- I mean, it leaves some -- it

8   leaves some open for the officers, their shoulds and

9   their shalls.  And when we talk about how officers are

10  responding to certain situations, like I was saying,

11  there are multiple policies that can apply in a certain

12  situation.  And when a situation warrants a tactical

13  response, that tactical response may be somewhat in

14  conflict with certain provisions of the person in crisis

15  policy or -- or diminished capacity policy.  So that's -

16  - that's what I was getting at.

17     Q.   Do you recall that when I showed you the

18  persons of diminished capacity policy, I asked you about

19  it being a general order, do you recall how I introduced

20  that policy to you?

21     A.   I do.

22     Q.   And I asked you if it's a suggestion and you

23  agreed with me that it's not.

24     A.   Well, the policy is not a suggestion.

25     Q.   The record will show that --

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1          A.    The policy is not a suggestion.

2          Q.    Okay.

3          A.    But there are times when the -- when policies

4    have to be read together, because it's hard to mesh a

5    tactical response with not showing force because --

6          Q.    So this is --

7          A.    -- I also agreed with you, a tactical response

8    is a show of force.

9          Q.    Yeah, I want to get into this because you keep

10   saying there's a time for this.  And I think this is on

11   Page 45 of your report, and I want to make sure that you

12   and I are on the same page on this.  On Page 45 you say,

13            "MPD persons of diminished capacity, mentally

14   ill policy states the following: That they should use

15   all available tactics to de-escalate the situation where

16   possible," correct?

17         A.    Correct.

18         Q.    Okay.  "If an officer is faced with that

19   dynamic and violent situation, which poses a threat to

20   the officer or other person's present, officers should

21   utilize their law enforcement control tactics to gain

22   control as outlined under this department's policy." And

23   then it refers to the levels of resistance policy,

24   correct?

25         A.    Yes, sir.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Q.   Okay.  And so my understanding of your

2    testimony is that at that time, when it's time to start

3    looking at different policies other than the diminished

4    capacity policy, is when you have a dynamic and violent

5    situation, correct?

6    A.   Correct.

7    Q.   Okay.  And you and I talked about this earlier

8    in your deposition, that at the time SRT was deployed,

9    when they set up the perimeter around the house, it was

10   not a dynamic and violent situation.  You've already

11   agreed to that in your deposition, correct?

12   A.   I have, but I've -- but I've also said that

13   when you look at generally accepted police practice and

14   we've agreed that PERF is a -- is a professional

15   organization.  And when you look at that, they've said

16   that these types of situations are considered high risk.

17   And in a high-risk situation, deploying SRT and SRT

18   pointing weapons at a house -- they -- they don't even

19   know if they're pointing them at Laduke because they

20   don't know where Laduke is.  They can't see them.  He

21   may be peeking out the blinds.  He may be sitting on a

22   sofa.  He may be in a bedroom.  We don't know.  But what

23   we do know is that they had an obligation to secure an

24   inner perimeter and they also needed to protect their

25   own safety.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1          And so I'm also looking at this from a

2    standpoint of if they were conforming with generally

3    accepted police practice.  A department can have a

4    policy that is what you might consider more strict than

5    what is required in generally accepted police policy. Or

6    the policy doesn't contemplate a situation just like

7    this, which is why there are some shoulds in the policy.

8    And it's why we look at generally accepted police

9    practice, as opposed to just evaluating them on their

10   very own department policy.  And that is how I have

11   formed the basis of my opinion.

12       **Q.   I understand that.  But you would agree with**

13   **me, the very first place that we should look in**

14   **determining whether these officers acted appropriately,**

15   **is their own policies that they were trained on,**

16   **correct?**

17       A.   I don't think that's the first place.  I think

18   that's a place.  And I think that you look at the -- the

19   totality, not only or not first, their own department

20   policy.  You look at all of it.

21       **Q.   You and I just talked about how seven out of**

22   **eight of these SRT members were not even trained on how**

23   **to handle a suicidal subject.  Yet, you're telling me**

24   **that somehow they were considering these generally**

25   **accepted police practices on that subject and in favor**

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    of those generally accepted police practices, just

2    ignoring their own policies; that's your opinion?

3        A.   My opinion is that they were conforming to

4    generally accepted police practice, or they were in

5    compliance generally accepted police practice.

6        Q.   Okay.  But they're not complying with the

7    Nicholasville Police Department policy, we've already

8    established that?

9            MR. CHELF:  Object to form.

10   BY MR. FANNIN:

11       Q.   Correct?

12       A.   Oh, that was a question.  It would appear some

13   provisions, but would also appear where the provisions

14   say should, that there's some discretion there.

15       Q.   Well, and that opinion from you came out, I

16   guess, after we went through the violations.  When I

17   asked you about it beforehand, you said it was not

18   discretionary, but the record will speak for itself on

19   that.

20           MR. CHELF:  Object to form.

21           MR. FANNIN:  I've got emojis popping up

22       apparently.

23           THE WITNESS:  What is that?

24           MR. FANNIN:  I don't know.

25           THE WITNESS:  I've never seen those before.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1          MR. FANNIN:  I don't know.  I don't know why

2      that's happening.

3          THE WITNESS:  I like it, though.

4          MR. FANNIN:  As long as I don't turn into a

5      cat or whatever that one lawyer had happened to

6      them.

7          THE WITNESS:  That was great.

8  BY MR. FANNIN:

9      Q.   Okay.  What was the -- oh, do you recall when

10  Commander Fraddosio said in his deposition that he began

11  -- I'm doing a really bad job asking questions.  Let me

12  back up.  Are you trained in firearms?

13      A.   Yes.

14      Q.   Have you shot the type of firearms that the

15  SRT team was deployed with this day?

16      A.   AR-15?

17      Q.   Yeah.  Colt AR-15s, have you ever shot those

18  before?

19      A.   We have Smiths, not Colts.

20      Q.   Okay.  You got Smith & Wessons, but you --

21  you're familiar with an AR-15?

22      A.   Yes, sir.

23      Q.   Okay.  Fraddosio testified that he got close

24  to using deadly force and that he began pulling the

25  trigger and pulled the trigger a quarter of the way, but

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    then stopped.  Is that plausible to you as somebody who

2    has trained in firearms?

3         A.   Yes.

4         Q.   Okay.  Your report talks about stray shots and

5    you spend some time on that in your report.  Can you

6    point to me anywhere in the record where -- that Joseph

7    Horton says that he took a shot at Desman Laduke to

8    prevent a stray shot from hitting a community member?

9         A.   No, but when we evaluate these -- when I

10   evaluate them, I'm looking at it from the perspective of

11   a reasonable and well-trained officer on the scene.  So

12   that objective reasonableness analysis encompasses

13   things that that officer may not have thought of.  And

14   that is a very real possibility.

15        Q.   So the fact that -- you would agree with me

16   though, that Joseph Horton never talked about firing

17   that shot to protect anybody from stray bullets,

18   correct?

19        A.   No.

20        Q.   That was no part of the equation in his

21   consideration.  You would agree with that, correct?

22             MR. CHELF:  Object to form.

23             THE WITNESS:  I did not see that he mentioned

24        stray bullets in the community.

25   BY MR. FANNIN:

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      Q.    What was the operational plan that day?

2      A.    Like specifically, the plan?

3      Q.    Yeah.  What operational plan did Commander

4    Fraddosio devise upon the deployment of SRT?

5      A.    So I didn't read a specific written plan. What

6    I -- what I read -- what I gained from the whole record

7    was the SRT was there to establish that inner perimeter.

8    CNT was there to establish communications, to bring it

9    to a safe resolution.  They had talked that there was

10   plenty of time and it was good weather and they could be

11   out there a while with -- with no problem.

12          And Fraddosio and Marshall appeared to stay

13   together so they could have information sharing.  And

14   that was -- that was the plan, which is sound.  It -- I

15   didn't see it written in any particular space, but

16   that's -- that's a sound plan, is that the CNT leader

17   and the SWAT leader are together so that they can share

18   information and each share it with their respective

19   troops.

20     Q.    Okay.  Would you agree that there was no

21   operational plan from Commander Fraddosio?

22     A.    No, that -- that's a plan.

23     Q.    Okay.  Well when --

24     A.    There -- there was --

25     Q.    -- do you -- would you defer to Commander

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

KENTUCKY
COURT REPORTERS

1    **Fraddosio as to whether or not there was an operational**

2    **plan, to his testimony on that point?**

3    A.    But when -- regardless of -- of the verbiage

4    that he was considering at the time, setting up an inner

5    perimeter is a plan and it's not an operation from the

6    standpoint of they were ever going to make entry into

7    that residence in order to take him into custody.  So

8    there wasn't a -- that type of plan wasn't necessary

9    because they were simply setting up a perimeter and

10   here, we're setting up a perimeter to contain him is a

11   plan.  It's not a hard, fast, written ops plan, like you

12   might do if you were going to be doing a hostage rescue

13   type of scenario, for example, but this was no hostage.

14   **Q.    So when the jury is considering whether or not**

15   **an operational plan was in place this day, they should**

16   **defer to Brian Batterton instead of Commander Fraddosio?**

17        MR. CHELF:  Object to form.

18        THE WITNESS:  I'm saying that what they had in

19        place was sufficient and it was not --

20   BY MR. FANNIN:

21   **Q.    Okay.  Do you know why that he said -- do you**

22   **know why that Commander Fraddosio said he didn't have an**

23   **operations plan in place?  Do you recall why?**

24   A.    No.

25   **Q.    He said that it was a fast or dynamic**

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  situation.  Do you recall that now?  Does that jogged

2  your memory?

3       A.   I -- I don't recall that portion.  I don't

4  dispute it, but I don't recall that portion.

5       Q.   Do you know how long SRT was on the scene

6  until what we'll call the six minutes as you've

7  described it?

8       A.   Almost two hours.

9       Q.   Okay.  Does that sound like a fast and dynamic

10 situation to you?

11      A.   At -- at that point?  No, not until that last

12 six minutes.

13      Q.   Would you agree that the operations plan that

14 Lieutenant -- or Commander Fraddosio articulated that

15 his team was, today's the day, boys?

16      A.   I -- I would not agree that that was a plan.

17      Q.   On Page 29, your discussion, Graham v. Connor,

18 you're familiar with that, correct?

19      A.   I am.

20      Q.   You agree that a use of force in order to be

21 justified must be reasonable under the Fourth Amendment,

22 correct?

23      A.   Correct.

24      Q.   And you agree that the Supreme Court has

25 articulated three factors to consider on that point, in

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Graham v. Connor?

2        A.    Yes.

3        Q.    Okay.  And you've touched on this, are you

4    going to come to trial and offer legal opinions?

5        A.    No.

6        Q.    The fact that you are an attorney, does that

7    in any way enable you to make those types of

8    determinations?

9        A.    No, that's not my job.

10       Q.    You would agree that it is the judge's and the

11   court's job to instruct the jury on the law?

12       A.    I agree.

13       Q.    Okay.  In your report on Page 29, you say, "In

14   the incident, Laduke -- with Laduke, the first and third

15   factors of the Graham v. Connor test are not fully

16   applicable as Laduke was not a criminal suspect."  Can

17   you recite those factors for me?

18       A.    The -- the first and third factor?

19       Q.    Yeah.

20       A.    Yeah.  The seriousness of the offense is the

21   first factor, and the third factor is whether the

22   suspect was actively resisting or attempting to evade

23   arrest by flight.

24       Q.    Okay.  And you say, "Not fully applicable," I

25   mean, really, would you agree with me that should say

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    not applicable at all?

2         A.    Well, the reason I said not fully applicable

3    is one could argue, and I'm not even making the

4    argument, but one could argue that at the point when he

5    was lowering the guns and it placed the officers in fear

6    of being shot, that that could be some form of an

7    assault with a gun.  But I'm not going there because

8    that isn't what this was about, but that's what I mean

9    --

10        Q.    That's not your --

11        A.    -- that -- that's what I mean by not fully

12   applicable.

13        Q.    I think I understand what you're saying and --

14   but you're not going there.  You're not going to say at

15   trial, the reason that they had to take him into custody

16   now is because he had committed a crime?

17        A.    No, I -- I'm -- I'm going with the -- the

18   threat which I discussed in the report.  I think

19   plaintiff's expert even mentioned similar language, that

20   the first and third factors were not in play.

21        Q.    I agree.  I just wanted to see what the reason

22   was for not fully versus not applicable.  If there was

23   something I -- you know, you -- you're a lawyer, you

24   know that we're stickler for this stuff, right?

25        A.    I do, I understand --

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      Q.   We're really annoying about this stuff, yeah.

2  And so it's your opinion that Horton was justified and

3  that his shooting of Desman Laduke was reasonable under

4  the Fourth Amendment because Desman Laduke posed an

5  immediate threat to officers or others?

6      A.   Yes, but I avoid the -- the -- it sounded like

7  a conclusion of law, because -- here -- here's -- here's

8  what I'm getting at.  Officers are actually trained

9  about Graham v. Connor and the three factors to

10 consider.  So it's law, but it's part of our training.

11 And so if part of what an expert does is help a jury

12 understand what -- what or why an officer did what he

13 did or believed what he believed, then understanding how

14 officers are -- are trained, is part of that.  And when

15 they get trained on this, that training becomes part of

16 what our generally accepted police practice is.

17      So if an officer has complied with his

18 training and that training would lead a reasonable

19 officer to believe he posed a threat, that's what I'm

20 getting at, based on the conduct.  But the legal

21 conclusion of whether he did or did not pose a threat

22 that's up to a judge or a jury.

23      Q.   How many times did Desman Laduke point guns at

24 his head or a gun at his head and lower them, prior to

25 being shot?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1     A.    I believe two prior to being shot.

2     Q.    **What's your basis for that number of two?**

3     A.    That's what Balltrip said, and -- and he was

4  the closest person, although -- and I think if I

5  remember correctly, Horton said he did it multiple times

6  and two would be multiple.  So at -- at least two, we

7  could say.

8     Q.    **You would agree that the analysis that we have**

9  **has to be from the point of view of Joseph Horton,**

10  **correct?**

11     A.    Correct.

12     Q.    **Do you have his deposition handy?**

13     A.    I don't.

14     Q.    **Okay.**

15     A.    And it has to come from the point of view of a

16  reasonable officer on scene in Horton's position.

17     Q.    **You said it better than I could.  Yeah, you're**

18  **right.  Do you recall a point in Joseph Horton's**

19  **deposition where he says that at the time -- I asked him**

20  **about -- and this is on Page 115.**

21          Basically, I discussed with him -- he said,

22  you know, he's pointing guns at officers.  And I said,

23  well, there are officers in different positions.  You

24  have Balltrip, who's -- who would be over on Laduke's

25  left.  And then you've got you, who would be more to his

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  right, kind of in front.  Do you recall that?

2       A.   I do.

3       Q.   And do you recall that he wasn't able to tell

4  me which way that Desman was lowering the guns at the

5  time of the shot?

6       A.   No because the -- the screen captures that I

7  have included after that -- so those are from around

8  Page 117, I believe?

9       Q.   Yeah.  He did later on say something

10  different.  But the point I want to ask you about is, I

11  said, okay, so he's pointing the guns which way?  And I

12  think this goes on to Page 116.

13           And he said, at the time of him leveling them

14  towards officers, he was coming down in the motion of

15  where he hadn't actually established the guns.  I mean,

16  I can't say, I don't know where he was going to level

17  his guns.  Does that sound familiar now or were you

18  provided with that deposition testimony?

19       A.   Yes, I was provided with it.

20       Q.   Okay.  Are you familiar with the way that the

21  officers were arranged in the backyard that day?

22       A.   I am.

23       Q.   You would agree with me that Balltrip and

24  Horton had significant distance between the two of them,

25  correct?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1          A.    Yes.

2          Q.    I mean, where was Balltrip located?

3          A.    Balltrip, there was like a -- a shed in the

4     backyard.  So he was at the -- the furthest left front

5     corner of the shed, and Horton was at the two, three

6     corner 229 Green Street, which is the residence next

7     door.

8          **Q.    Do you know the distance between those two**

9     **areas?  Do you know how far they are away?**

10         A.    Only from what I could surmise from looking at

11    the pictures.  If -- if the distance from Horton to the

12    house was approximately 55 feet, the distance to Horton

13    to Balltrip seems similar to that.

14         **Q.    Okay.  Is it of any significance to you that**

15    **Joseph Horton, at this point in his deposition, said**

16    **that he wasn't sure where Laduke was going to level his**

17    **handguns as between him and Balltrip?**

18         A.    No, because at the point that he took -- that

19    -- that he fired the shot, he was more specific.  And,

20    you know, I did factor in that he's looking through a --

21    a magnified optic on his rifle, and so he had a -- a

22    better view of the details, I guess you would call them,

23    of what Laduke was doing.  So at --

24         **Q.    When you say the details, are you saying he**

25    **can't see the guns?**

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

     1        A.    Who can't see the guns?

     2        **Q.    Horton.**

     3        A.    Horton?  Yeah, no, Horton can see the guns.

     4        **Q.    Okay.  So my question to you is: Do you assign**

     5  **any significance to the fact that on Page 115 to 116 of**

     6  **his deposition, he says he doesn't even know where**

     7  **Laduke is going to level the handguns --**

     8        A.    Well --

     9        **Q.    -- when you have officers at such different**

    10  **places in the yard?**

    11        A.    -- he clarifies that when he is talking about

    12  when he actually fired the shot.  And officers, I mean,

    13  they're trained that you don't have to wait until a

    14  person draws a bead on an officer in order to perceive

    15  that that's a -- a threat and the officer to be able to

    16  use deadly force, so...

    17        **Q.    So you assign no significance to that portion**

    18  **of his deposition?**

    19        A.    I don't assign no -- I don't assign no

    20  significance, but I assign significance to the

    21  clarification, just all within that same conversation.

    22  And that's when he's clarifying what he observed at the

    23  -- the point where he fired the shot.  And that is on

    24  Page 28 at the top where it says, "He then gets a

    25  serious look on his face.  That's when he started

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1   lowering, leveling the guns in a -- in a -- almost a

2   slower fashion down toward the window toward the

3   officers.  And that's when I shot."  So --

4        Q.   The officers being the key.  And I think

5   that's what got me started with him on that.  But I

6   think I've got your opinion on it, I think.

7        A.   Yes, sir.

8        Q.   You don't assign much weight to that.  It

9   gives you no pause is my understanding.

10            MR. CHELF:  Object to form.

11   BY MR. FANNIN:

12       Q.   Is that right?

13       A.   Oh.  As I said, I -- I weigh in the totality

14   of that conversation, and he clarified it, so -- and he

15   was looking through an optic.

16       Q.   What is the first moment, in your opinion,

17   that Joseph Horton would've been justified in shooting

18   Desman Laduke?

19       A.   Well --

20       Q.   Was it the moment he shot?  Was it before

21   that?  When?  Was it after?  I assume it's not after it.

22       A.   It possibly could have been before that, in

23   that --

24       Q.   When?

25       A.   -- when he -- when they were articulating --

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    and I don't have the full deposition in front of me. But

2    when he was articulating that he was waving the gun, he

3    was -- he was sweeping the guns, essentially, from his

4    head and then down toward his side, when that -- when

5    those guns would sweep so that the barrels were pointed

6    in the direction of the officers, at any one of those

7    times, an officer could perceive that based on how

8    officers are trained as posing a threat of serious

9    bodily harm or death to the officer or others.

10            And so it is possible that any one of those

11   times when the weapons were either raising from the

12   waist to the head, if they swept the officers, or going

13   from the head to the waist when they swept the officers.

14   And they -- they chose not to take those shots, I would

15   imagine because they weren't there to shoot him.  They

16   were there to help him.  But I don't know exactly why

17   they specifically didn't take the shots.  I think one of

18   them even mentioned that he didn't want to shoot him.  I

19   just can't remember which one that was.

20       Q.   Would you agree with me that by the time of

21   everything that you're talking about, the -- this, as

22   you call, sweeping, that by that time, SRT had been on

23   the scene and pointing AR-15s, at least eight of them,

24   at the house for almost two hours?

25       A.   I would agree they were there almost two

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    hours.  I can't -- I can't say for certain that they

2    were constantly pointing the guns directly at the house,

3    but in the direction of the house.

4        **Q.   Well, there's testimony that at least from**

5    **some of the SRT members, they were doing it for a**

6    **majority of the time.**

7        A.   Okay.

8        **Q.   Do you recall that?**

9        A.   I recall that they were covering the house.  I

10   -- I don't recall that they had weapons shouldered,

11   pointed directly at windows, but that's semantics,

12   honestly.  So I -- I do agree that they were there for

13   two hours and they had their weapons and they were

14   pointed in the direction of the house or the -- the

15   doors and windows as part of their perimeter and

16   containing him, and they couldn't see him.

17       **Q.   And you would agree with me, as someone who is**

18   **an expert in law enforcement and an expert in how to**

19   **deal with persons who are mentally ill or having a**

20   **suicidal crisis, that having guns pointed at you for**

21   **that long increases the risk of something just like this**

22   **happening?**

23           MR. CHELF:  Object to form.

24           THE WITNESS:  Well, there's -- I mean, part of

25       what you read earlier to me in the -- the suicide

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

 1          by cop scenario speaks to that, so I agree with a

 2          statement. However, I also agree with what I have

 3          said before, which is when you're dealing with a

 4          subject with a firearm, where he has actually

 5          threatened himself with the firearm -- there was

 6          also a point, you know, where on the 911 call with

 7          Ms. Marks (phonetics), they -- the dispatcher said,

 8          would he hurt her, meaning the girlfriend, and Ms.

 9          Marks said, uh-huh.

10     BY MR. FANNIN:

11          Q.    Yeah, I'm glad you brought that up because it

12     -- and do you recall that there's actually two questions

13     before that comes up?  I've got it teed up ready to

14     play.  I'm not sure that Melissa Marks even heard the

15     last part of that, but I'll play it for you because I

16     think that's actually important.

17               There are two questions that get asked right

18     there.  I want to make sure this is what you're

19     referring to.  I thought I had that tab.  It might take

20     me a minute.  And you know what?  I cut you off and I

21     didn't mean to.  I apologize.

22          A.    I -- I don't -- I didn't think you cut me off.

23          Q.    Okay.

24          A.    I think we're good.  I think I was stopping.

25          Q.    So I guess what I would say is, it -- I think

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1   I know where you're going.  You were saying that he

2   hadn't threatened somebody, but I guess his aunt, you

3   thought, from what you heard on that 911 call, may have

4   indicated that he might hurt Cassidy Marksbury

5   (phonetic); is that correct?

6       A.   That's correct.  And the only reason I

7   mentioned it as -- as being relevant is that if that

8   were the case, that would indicate that he could be a

9   threat to other people.  So it just goes to show it's --

10  it's the -- the factors that are discussed with the IACP

11  where you assess the risk of the person in crisis.

12  That's what I was --

13      Q.   And you would agree, though, that by the time

14  that we're talking about -- because we're talking about

15  the moments of the shot or around the moments of the

16  shot, two hours ago, he let Cassidy Marksbury just walk

17  out of the house, correct?

18      A.   That is correct.

19      Q.   If he wanted to do something with her, he had

20  the opportunity to do that, didn't he?

21      A.   That is correct.

22      Q.   Are you aware that at any point prior to SRT's

23  arrival, that Desman Laduke ever threatened anyone other

24  than himself?

25      A.   No, I don't believe that he did.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      Q.    Did he ever make any direct threats at any

2  officers after that?

3      A.    No.   The only time I would say that he

4  threatened officers was during that last six minutes.

5      Q.    And again, that was after two hours of having

6  AR-15s pointed at his residence?

7           MR. CHELF:  Object to form.

8           THE WITNESS:  Yes.

9  BY MR. FANNIN:

10      Q.    How far would Joseph Horton have had to have

11  moved over to his left to be in cover at the time of the

12  shot?

13      A.    Well, it's hard to tell from the -- from the

14  photos, but he was using the side of the house as cover

15  and as a brace, so probably the equivalent of half of

16  his body.

17      Q.    You would agree he had the ability to do that?

18      A.    Yes, but I don't believe that that would've

19  been the proper tactic.

20      Q.    And that's -- you -- for all the reasons you

21  said in your report.  We don't have to go back over it,

22  right?

23      A.    Correct.  Correct.

24      Q.    Could a 9-mm pistol have shot through that

25  house that he could have taken cover behind?

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      A.    Through the bricks?  Probably not.

2      Q.    Yes, sir.  Yeah.

3      A.    Probably not.

4      Q.    And you heard Fraddosio actually tell his SRT

5 officers that it was a 9 mm, correct?

6      A.    I believe I did.

7      Q.    Yeah.

8      A.    I just don't remember at what point that was.

9      Q.    It was around the point of, today's the day,

10 boys.  Do you recall that?

11     A.    I do.

12     Q.    Would you agree that a post-incident

13 debriefing was standard and required here?

14     A.    I believe it was.

15     Q.    And were you provided with a post-incident

16 debriefing report?

17     A.    No.

18     Q.    Okay.  I'm not either.  Do you know if they

19 did one?

20     A.    I do not know.  I did not see --

21     Q.    You would agree with me that that would be in

22 violation of common police practice, generally accepted

23 police practices, to not have a post-incident debriefing

24 of an incident like this?

25     A.    Generally accepted police practice would want

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
 1   a -- a debriefing, an after-action report style report.
 2        Q.    And again, you have not received one of those?
 3        A.    I have not.
 4             MR. FANNIN:  Let's take a few minutes.  I'm
 5        getting close to the end here, Tyler.  If that's
 6        all right, we'll take a quick break.
 7             MR. CHELF:  Sounds good.  Do you want to come
 8        back in ten?
 9             MR. FANNIN:  Yeah.  Let's give it ten. Thanks.
10                  (OFF THE RECORD)
11             THE REPORTER:  We're back on record.  The time
12        is 1:16 p.m.
13   BY MR. FANNIN:
14        Q.    When I played that video earlier, for the
15   audio record mostly, of Commander Fraddosio, the today's
16   the day audio; you recall that?
17        A.    I do.
18        Q.    At one point, Officer Balltrip asks him if
19   they were going to use flash bangs.  Do you remember
20   that?
21        A.    I remember that -- I remember the discussion.
22   Not so much the specifics right now, but keep going.
23        Q.    Okay.  Do you -- were there any less lethal
24   options used that day?
25        A.    Verbal commands.  I don't believe that in this
```

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    situation flash bangs or -- or something like gas or K9

2    even would've been appropriate.  I think that would have

3    escalated the -- the situation more than just pointing

4    firearms at the house, because gas would just serve to

5    make a person angry.  Flash bangs would -- are only used

6    really as a diversionary tactic, so that's not really a

7    compliance tactic.  It's a diversionary device.  And --

8    and K9 wouldn't have any kind of applicability in this

9    situation and -- and would not look good.

10           So I -- I don't see how any of those options

11   would've been useful.  They were present.  I do remember

12   reading about that, that they had those options present,

13   but what -- that's what they carry.  Like, the SRT guys,

14   SWAT guys, they -- each one has some -- some kind of a

15   device that it's their job to deploy if needed, and --

16   and so they carry it with them, but that doesn't

17   necessarily mean that it's going to be used or is

18   appropriate in this particular situation.

19        **Q.   What evidence do you -- can you point to to**

20   **show where they even considered those options?**

21        A.   I -- I want to say I read in a deposition

22   where one of them was asked about the options and they

23   had said they weren't going to use them.  But at this

24   point, I can't point to exactly which one that was.  But

25   regardless --

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    Q.   So I -- can -- before we go on, you remember

2   at the beginning I told you I was going to ask you if

3   you mentioned something like that, I'm going to need a

4   second, right?

5    A.   Yes.  Yes, I know.  And that's why I say I

6   can't place my finger on which depo I read that in.

7    Q.   So you can't give me any evidence to show that

8   that was even considered?

9    A.   No, but by not doing it, they were correct

10   under generally accepted police practice.  None of those

11   options would have been appropriate in my opinion, for

12   the reasons --

13    Q.   Were they correct in not even considering it,

14   though?

15    A.   Well, we don't know that they -- they didn't

16   consider it.  And there's no evidence of it, because it

17   was dismissed.

18    Q.   Would you agree that many of those less lethal

19   options would involve the use of a battering ram as part

20   of the plan?

21    A.   Yes.  Many of those would be -- well, K9 and

22   flash bangs.  Gas can be deployed through -- through a

23   broken window, and often is, but there was no -- entry

24   was not one of the things that they were talking about

25   doing.  There was nothing in the record that I saw that

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  indicated that they had planned to make entry.  It was

2  hold the perimeter and negotiate.

3      Q.  I understand that, and I understand your

4  opinion on it.  My question, though, is just would you

5  agree that proper use of a battering ram would be part

6  of many of the different types of plans --

7      A.  Yes.

8      Q.  -- with less lethal -- yes?

9      A.  Yes.

10      Q.  Did you see the video of, after Desman Laduke

11  was shot, them attempting to use a battering ram to get

12  into the house?

13      A.  I believe I did.  And there was -- I mean, at

14  that point, they needed to make entry to -- to get him

15  to be able to render aid.  So entry at that point, yes.

16  After he was shot.

17      Q.  Yeah.  Did he -- did they properly use that

18  battering ram?

19      A.  It was hard to tell from the -- the -- if I

20  recall, the video was -- was distant, unless I just saw

21  a still of it, a screenshot.

22      Q.  Do you recall them using the battering ram

23  backwards and not even being able to get in the door at

24  first?

25      A.  I don't.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      Q.    I am going to share my screen with you.

2            (AUDIO RECORDING PLAYED)

3            UNIDENTIFIED SPEAKER:  They just left it like

4      this, bro.

5            (AUDIO RECORDING STOPPED)

6  BY MR. FANNIN:

7      Q.    Just give me one second here.  Sorry.  I'm

8  having trouble getting this to pull up here.

9      A.    No problem.

10     Q.    Hold one second.  I wasn't sure we -- I was

11 going to talk to you about this.  We'll just move on

12 from that.  Take too long to watch all that.  Do you

13 have any criticisms of the Nicholasville Police

14 Department's response or actions on this day?  Do you

15 have any criticisms at all?

16     A.    The -- the terminology used by Lieutenant

17 Fraddosio, in the clip that you played, doesn't sound

18 professional, is not.  And that's the -- that's the

19 primary.  The rest, there's some bits and pieces where

20 the officers could have positioned the crowd in a better

21 location out of view of that house.

22            Otherwise, as far as the portions of the

23 incident that go to their actual response, for all the

24 reasons that we've discussed, the -- the -- contacting

25 the CNT and the SRT and the perimeter and their

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    positioning, I do not have criticism of that.

2        Q.    I appreciate that.  And I appreciate your

3    candor on both of the things that you identified, one,

4    Fraddosio's unprofessional and what I'll call dangerous

5    -- you didn't say that -- but, comments.  Would you

6    agree with me that those can serve to escalate a

7    situation like this?

8        A.    I -- I would not agree with it.

9        Q.    Okay.  You don't have to, and you don't have

10   to explain yourself.  I'm just asking.  Do you agree or

11   not?

12       A.    (No verbal response.)

13       Q.    Okay.  Would you agree that having a crowd

14   within the view of the house, the way that they did,

15   could escalate a situation like this?

16       A.    That could.

17       Q.    Okay.  Would you agree with me that the

18   situation escalated after the SRT team was deployed with

19   guns trained on the house?

20       A.    It did.  But I don't believe that that was --

21   that it was because of that.  But I do agree that it

22   escalated after.

23       Q.    Are you aware that throughout, what I'll call

24   the SRT surrounding the house, that Desman Laduke, on

25   numerous occasions, expressed his discomfort, anger,

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  agitation with the guns being pointed at the house and

2  the numerous police present there?

3      A.   No.

4      Q.   You're unaware of that?

5      A.   I did not -- I did not see that in the record.

6  I saw that --

7      Q.   Okay.

8      A.   -- he initially told the officers he wanted

9  them to leave and that he wanted them to leave

10 throughout the incident.  But for the reasons we

11 discussed, the -- the leaving wasn't an option.

12     Q.   Would it be important for your opinion if

13 officers on the scene were being told that Desman Laduke

14 was agitated by the presence of the officers, their

15 positioning, and their training of rifles on the

16 residence?

17     A.   The -- I was aware that he wanted them to

18 leave, that he didn't want a police presence.

19     Q.   I understand that.

20     A.   And the -- the positioning of the officers,

21 again, that, in my opinion, was necessary positioning.

22 And the presence of the rifles was also necessary.  Even

23 that suicide-by-cop policy -- or -- or not policy, but

24 PERF thing, says that, in some situations once you

25 create distance, you should consider keeping firearms,

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    like, low ready.  But there's other situations where the

2    firearm could be more in a -- in a ready position.  So

3    to answer it succinctly, no, I don't agree.

4        **Q.   No, it would have -- I don't think that -- my**

5    **question was whether or not it would have any bearing on**

6    **your opinion that Desman Laduke was expressing agitation**

7    **at the presence of officers and their positioning of the**

8    **rifles on his residence.  Does that have any sort of**

9    **effect on your analysis?  Is it relevant at all?**

10       A.   It's something that is considered, but it is

11   not dispositive because I believe that the officers'

12   positioning and actions were in accordance with

13   generally accepted police practice, so...

14       **Q.   I'm not asking you if it's dispositive.  I'm**

15   **asking you if it's relevant.**

16           MR. CHELF:  Objection.  Asked and answered.

17   BY MR. FANNIN:

18       **Q.   Is it relevant?**

19       A.   It's not.

20       **Q.   Not?  Not relevant?**

21       A.   It's not relevant from the standpoint of it

22   doesn't change my opinion --

23       **Q.   So the policies that we saw earlier that talk**

24   **about evaluating the comfort zone, seeing if you're**

25   **agitating the subject, those types of things where**

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  Desman Laduke is articulating this to officers, that's

2  not relevant to your analysis?

3          MR. CHELF:  Objection.

4          THE WITNESS:  I've said that is considered,

5      but it is not a dispositive thing.  There is

6      relevance, but the feelings of the suspect don't

7      dictate policy. The NTOA and IACP talk about the

8      priorities on a call such as this and -- or

9      priorities of life as they're determined to be

10     sometimes.  And the priorities are listed as

11     hostages, innocent civilians, officers, and then

12     subjects or suspects.

13          So when we're looking at the things you're

14     talking about, the -- the priority is officers have

15     to ensure their safety in order to ensure the

16     safety of innocent people in the area.  So it

17     doesn't change my opinion.

18  BY MR. FANNIN:

19     Q.   Desman Laduke's -- it doesn't change your

20  opinion because Desman Laduke's life was the last on the

21  list of priorities that day, correct?

22     A.   It was a priority.  But per --

23     Q.   It was bottom of the list.

24     A.   -- per NTOA and per IACP, in the list of

25  priorities, that is correct.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1      Q.  Was there a hostage there?

2      A.  That is not meant to diminish his life.  They

3 were certainly there to help him.  And were there

4 hostages?  No.  I had said earlier there were not

5 hostages.  It wasn't -- that wasn't applicable.

6      Q.  Was he a suspect?

7      A.  No.  But it says, subject or suspect.

8      Q.  Okay.  Had he committed any crime?

9      A.  No.

10     Q.  Did the officers on scene know that he had not

11 committed a crime?

12     A.  I believe they did.

13     Q.  All of them did?

14     A.  I believe so.

15     Q.  Well, would it change your opinion to know

16 that some of the officers on the scene thought that he

17 was a suspect of a crime?

18     A.  Well, they didn't do anything otherwise.  In

19 other words, they didn't go in there to try to arrest

20 him, so...

21     Q.  Would you agree that -- with me, that's a

22 failure of communication on the part of Commander

23 Fraddosio if he had SRT members out there thinking that

24 Desman Laduke was a suspect of a crime?

25     A.  Well, that information should have been

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  relayed.

2      Q.   And that would be a failure of communication,

3  would it not?

4      A.   It -- it would be a lack of communication.  I

5  don't know that it's a failure in that it didn't change

6  their -- their response or how they -- how they acted.

7      Q.   And you know that based on your thinking about

8  it in the last 30 seconds since you just learned that

9  that's actually a fact in this case?

10     A.   Well, I know that from the standpoint of my

11  review of the case.  I saw how they performed, in that

12  they established an inner perimeter and held that

13  perimeter.  They did not go in.  They did not try to

14  arrest him.  They told him he wasn't in trouble, which

15  would be counterintuitive if they thought that he was

16  wanted, so...

17     Q.   Who's they?  Who's they that told him he's not

18  in trouble?  Who's they?

19     A.   I believe that it was heard on Balltrip's body

20  camera audio.  But I don't know the voices of who the

21  speaker was.

22     Q.   Is there -- was this situation handled any

23  different than a hostage situation would've been

24  handled?  Name for me all the differences in the way

25  that it would've been handled differently.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

 1      A.   Well, a hostage situation, there would've --
 2  there would've been an ops plan.  I don't -- they did
 3  not have enough people on scene to handle a hostage
 4  situation, from what I saw, because you would need an
 5  entry team or multiple entry teams.  And you would need
 6  the perimeter also.
 7          So you would need an ops plan for the entry.
 8  They would need the sketch of the interior of the home.
 9  They would need to determine, as best as possible, which
10  room he was likely to be in.  They would have to
11  determine --
12      **Q.   Desman Laduke's perspective, would it have**
13  **looked any different?**
14      A.   Yes.  There would have been significantly more
15  officers on the scene.
16      **Q.   So he would've had more than eight SRT**
17  **officers with AR-15s trained on his residence?**
18      A.   Yes.  At our agency, he would've.
19      **Q.   Okay.**
20      A.   I mean, it would take more -- more officers to
21  properly deal with a hostage situation.
22      **Q.   Any other difference that he would've seen**
23  **from his perspective?**
24          MR. CHELF:  Object to form.
25          THE WITNESS:  Not until they made entry, if

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
 1        they made it.
 2   BY MR. FANNIN:
 3        Q.   Okay.  All right.  Is there anything, based on
 4   our discussion today, that you want to change about your
 5   report?
 6        A.   No.
 7        Q.   Okay.  How much time have you spent reviewing
 8   this case?
 9        A.   For probably 35 hours or right around there. I
10   didn't keep -- I didn't keep track.
11        Q.   What do you mean, you didn't keep -- I mean,
12   you had to keep track.  I mean, you're getting paid to
13   be here today, right?
14        A.   I am.  It's -- and you'll see in the
15   agreement.  It's a one-time retainer agreement, so...
16        Q.   What is that agreement for?
17        A.   The dollar value?
18        Q.   Yeah.
19        A.   Okay.  It's 9,500.  And I got -- I'm paid
20   7,000 by LLRMI.
21        Q.   Okay.  And if you come to trial, are you paid
22   more?
23        A.   If I come to trial, it's the same as this.
24   It's $2,500 for a day of testimony.
25        Q.   Okay.  So I pay you for today, but they would
```

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    pay you if you come to trial?

2        A.    Yes, sir.

3        Q.    Okay.  And that would be in addition to the 25

4    -- to the 9,500?

5        A.    Yes, sir.

6        Q.    So it'd be 14,500, all in, if you go to trial?

7        A.    Yes, sir.  I don't get all of that, like I

8    said.

9        Q.    I understand.  I understand.  But that's

10   what's paid?

11       A.    Correct.

12       Q.    And you would get --

13       A.    And that's regardless of how many hours it

14   takes.

15       Q.    You would get, maybe, roughly a little over

16   10,000?

17       A.    Probably.  That's about right.

18       Q.    Okay.  And do you plan to attend trial in this

19   case?

20       A.    If I'm told to be there, absolutely.

21            MR. FANNIN:  All right.  I have no further

22       questions.

23                    CROSS-EXAMINATION

24   BY MR. CHELF:

25       Q.    I just have a few follow-ups.  We've talked

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1  about -- there's been testimony today about the

2  Nicholasville Police Department's policies, and I just

3  wanted to make sure this was cleared up.

4          Would you agree, from your review of the

5  policies, that, in particular, the persons of diminished

6  capacity and mentally ill policy, that policy has

7  different provisions?  Some of those provisions use the

8  word should.  And some of those provisions use the word

9  must or shall; is that correct?

10      A.    That's correct.

11      Q.    In your training and in your experience as a

12  law enforcement officer, is there a difference in the

13  meaning between should and shall?

14      A.    Yes.  Like we discussed earlier, shall is an

15  imperative and doesn't leave anything open to

16  discretion.  And should is different.  It -- it does

17  leave something open to discretion.  You'd -- it's like,

18  generally, you should do this.  But there could be

19  circumstances when you deviate.

20      Q.    Okay.  There was one specific question when we

21  were talking about containment involving the use of

22  Laduke's girlfriend and his aunt.  Do you recall

23  testimony regarding that?

24      A.    Yes, I do.

25      Q.    Okay.  And would you agree that officer -- I'm

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    sorry, Mr. Laduke's girlfriend and aunt, neither of them

2    were used in containment or control methods, correct?

3    They were --

4        A.    Correct.  They were not used.

5              MR. FANNIN:   Objection to form.

6    BY MR. CHELF:

7        Q.    Okay.

8        A.    Correct.  They were not used in that capacity.

9        Q.    Mr. Fannin also played for you a clip from

10   Lieutenant Fraddosio and some comments that he made.  Do

11   you know who was around and heard all of those comments?

12       A.    I don't.  But I think he said Balltrip.

13       Q.    Anybody else?

14       A.    That's the only -- and -- and I only gleaned

15   that from what plaintiff's counsel said.

16       Q.    As far as it goes with the use of a battering

17   ram, is that a tool for making entry to a residence or a

18   building?

19       A.    It is.

20       Q.    Is that a tool that you're going to use

21   generally if you're not making entry to a residence or a

22   building?

23       A.    No.  You wouldn't use it except for that.  And

24   that happened after the use of force, so I wasn't that

25   focused on that part of the incident.

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1     Q.   Now, there's been some discussion about

2  whether or not Mr. Laduke was suspected of a crime or

3  not.  In law enforcement, have you ever heard the terms

4  subject and suspect interchanged at different points in

5  your career?

6     A.   Yes.

7          MR. CHELF:  I've got no further questions at

8     this time.

9               REDIRECT EXAMINATION

10 BY MR. FANNIN:

11    Q.   Just one moment here.  What does the phrase --

12 what does the term green mean, or Liberty Green?  Do you

13 have any idea what that means?

14    A.   I have no idea.

15    Q.   Do you think it stands to reason that if

16 Fraddosio made those comments to Balltrip that he

17 probably made similar comments to his other members on

18 the SRT team?

19    A.   I don't know.

20    Q.   Do you -- did you read in Fraddosio's

21 deposition where he was asked -- I mean, if there's

22 anything special about Balltrip, why he would say that

23 to him and not other members of the team?

24    A.   I'm sure I read it.  I just don't recall that.

25    Q.   Okay.  So I mean, we just happened to capture

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1    that on Balltrip's body-worn camera that -- I mean, that

2    we know he at least told one of the SRT officers that on

3    the scene, correct?

4         A.   Correct.

5         Q.   Okay.  And we know from his testimony that he

6    went around and spoke with, basically, all the SRT

7    officers at a certain point during the incident,

8    correct?

9         A.   Correct.

10        Q.   Okay.  You're not going to show up in trial

11   and say, oh, he only said that to Balltrip?

12        A.   Yeah.  I'm -- I'm going to look at it before

13   trial and see if I can determine who he said it to.  And

14   otherwise, other than what you said, that it was said to

15   Balltrip, I don't know who it would've been said to.

16        Q.   Whoever it was said to, it should have never

17   been said at that scene.  Is that correct, sir?

18             MR. CHELF:  Objection.

19             THE WITNESS:  That verbiage, as I said before,

20        wasn't the best choice of words.  But I don't

21        believe that it influenced anybody's decision.

22        Horton said it didn't -- Horton said he didn't even

23        hear.  Oh, no, that's something else.  Disregard.

24             Horton -- Horton did say that he shot because

25        he felt threatened.  So -- and each officer is

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

```
 1        trained that they have to decide for themselves
 2        whether or not to shoot.  So I don't believe that
 3        it would influence a decision.
 4   BY MR. FANNIN:
 5        Q.   Did you make any credibility determinations as
 6   part of your evaluation here?
 7        A.   No.
 8        Q.   Would you agree with me that this should,
 9   shall, may, whatever conversation did not come up until
10   after I got you to agree to violations of Nicholasville
11   Police Department's policy on diminished capacity and
12   mentally ill?
13        A.   Well, I was looking more specifically at the
14   policy.  But we --
15        Q.   After we talked of it?
16        A.   Correct.  It came up afterwards, and I looked
17   at the policy when we took a break.  And we -- we were
18   talking about shall when we were talking about the
19   statute.  So that is part of officers training.
20        Q.   And that discussion, that got brought up by
21   the lawyer that retained you, right, during your break?
22             MR. CHELF:  Objection.
23             THE WITNESS:  I was -- I looked at the policy
24        during the break.
25   BY MR. FANNIN:
```



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

 1          Q.    On your own?

 2          A.    On my -- on my own.

 3          Q.    He didn't say anything to you about that, hey,

 4     that's not good for us.

 5          A.    I looked at the policy.

 6          Q.    He didn't say anything about that?

 7          A.    I looked at the policies.

 8          Q.    On your own, not at the behest of the lawyer

 9     who hired you?

10               MR. CHELF:  Object.

11               THE WITNESS:  Not at the behest of the lawyer

12          that hired me.  I looked at the policies.

13     BY MR. FANNIN:

14          Q.    So there was no discussion between you two at

15     a break about that?

16               MR. CHELF:  Objection.

17               MR. FANNIN:  What's the objection?  There's no

18          privilege here.

19               MR. CHELF:  There is privilege.  The only

20          thing that you can ask about in our communications

21          is about facts or assumptions about data and about

22          compensation.

23               MR. FANNIN:  If he comes in and starts

24          testifying to something different after a break,

25          I'm going to ask him about it.  You can instruct



Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

KENTUCKY
COURT REPORTERS

```
 1          him not to answer.
 2                MR. CHELF:  Well, I'm going to instruct him
 3          not to answer because that's not one of those
 4          things that you can ask about.
 5                MR. FANNIN:  Fair enough.  All right.
 6    BY MR. FANNIN:
 7          Q.    So are you going to take his advice and not
 8    answer my question?
 9          A.    I'm not going to --
10                MR. CHELF:  Asked and answered.
11                THE WITNESS:  I'm going to follow his
12          instructions.
13                MR. FANNIN:  All right.  All right.  No
14          further questions.  Thank you.
15                MR. CHELF:  No further.
16                THE REPORTER:  All right.  How would you both
17          like the order of the transcript?
18                MR. FANNIN:  I'll take e-tran and the video,
19          please.  Thank you.
20                THE REPORTER:  E-tran and the video.  Okay.
21                MR. CHELF:  I'll do both as well.  Thank you.
22                THE REPORTER:  Both as well.  Okay.  Let me
23          get us off record.  The time is 1:46 p.m.
24                      (DEPOSITION CONCLUDED AT 1:46 P.M. ET)
25
```

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201



859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com

1                    CERTIFICATE OF REPORTER

2

3   I do hereby certify that the witness in the foregoing

4   transcript was taken on the date, and at the time and

5   place set out on the Title page hereof, by me after

6   first being duly sworn to testify the truth, the whole

7   truth, and nothing but the truth; and that the said

8   matter was recorded digitally by me and then reduced to

9   typewritten form under my direction, and constitutes a

10  true record of the transcript as taken, all to the best

11  of my skill and ability. I certify that I am not a

12  relative or employee of either counsel and that I am in

13  no way interested financially, directly or indirectly,

14  in this action.

15

16

17

18

19  

20

21

22  KELLY ZUFAN,

23  COURT REPORTER/NOTARY

24  MY COMMISSION EXPIRES: 10/08/2028

25  SUBMITTED ON:  12/17/2024

Kentucky Reporters
P.O. Box 3983
Louisville, KY 40201

KENTUCKY
COURT REPORTERS

859.410.2415 Phone
859.410.2419 Fax
schedule@kyreporting.com
www.kyreporting.com