Eastern District of Kentucky
FILED

MAY 1 6 2025

AT LEXINGTON
Robert R. Carr
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON

JOHN NORMAN,
*Administrator of the Estate of* Desman
LaDuke,

      Plaintiff,

v.

JOSEPH HORTON,
*individually*, et al.

      Defendants.

CIVIL ACTION NO. 5:22-cv-300-KKC

OPINION & ORDER

\*\*\* \*\*\* \*\*\*

This matter is before the Court on the Defendants' motion for summary judgment. (DE 57.) For the following reasons, the motion is granted.

## I.    Factual Background

This case arises from an unquestionably tragic encounter between Desman LaDuke and members of the Nicholasville Police Department in October of 2022. LaDuke lived on a residential street in Nicholasville, Kentucky with his girlfriend, Kassidy Marksberry, and one other roommate. On the morning of the incident, LaDuke and Marksberry were involved in an emotionally charged argument. As a result of the argument, LaDuke began making threats to commit suicide. Alarmed, Marksberry hid a gun that LaDuke's aunt, Melissa Marks, had given him. After threatening to kill himself with a knife if Marksberry did not reveal the gun's location, Marksberry told LaDuke where it could be found.

While LaDuke searched for the gun, Marksberry called Marks—who had been a maternal figure in LaDuke's life. Marks then contacted 911, reporting LaDuke as a suicide threat, advising law enforcement that he had a gun, and requesting authorities to make sure

1

he was safe. Two patrol officers from the Nicholasville Police Department were dispatched to investigate the suicide threat. When those officers arrived at the residence, they asked LaDuke to speak with them and exit the residence. LaDuke refused, expressing that he had nothing to talk about with them and that he would not be leaving the residence. He did, however, permit Marksberry to leave.

Outside the residence, Marksberry informed the responding officers about the full nature of the situation—explaining that LaDuke's suicide threats were credible and that he had access to a gun. Given the existence of a credible suicide threat, LaDuke's unwillingness to discuss his well-being, and the presence of a gun, the patrol officers contacted the Department's upper command staff. Upper command staff (including Captain Matt Marshall, Assistant Chief Michael Fleming, and Chief Todd Justice) then decided to activate the Department's Special Response Team ("SRT"). The SRT was commanded by Lieutenant Jason Fraddosio and consisted of various officers, including Officer Joseph Horton.

Negotiators and responding SRT officers were informed about LaDuke's distressed and suicidal mental state, the presence of a gun, and other pertinent information as they made their way onto the scene. SRT officers then took position around the perimeter of the residence and trained assault rifles on the house. Fruitless dialogue between the Department's negotiators and LaDuke followed. At times, LaDuke was unresponsive. At others, LaDuke was agitated and confrontational—confirming his suicidal intentions, advising officers that no one was going inside the residence and no one was going out, asking officers to shoot him, and even threatening the officers' lives on at least one occasion.[1]

LaDuke removed the blinds from the back left window of his residence and stood behind it approximately two hours into the encounter. This gave SRT officers their first clear

---

[1] LaDuke was overheard saying "there's a 95[%] chance that I die or the police die[.]" (DE 53.)

2

view of LaDuke. When this occurred, Lieutenant Fraddosio and Officer Horton were positioned next to the corner of a neighboring house—a vantage point which gave them a clear view of the window LaDuke was standing behind. With the blinds not obstructing their view, SRT officers could see that LaDuke was holding at least one handgun[2] while he stood behind the window. Officers repeatedly instructed LaDuke to drop his gun during approximately the next four minutes of the encounter. LaDuke did not comply and instead began tapping the gun against the window (and in the direction of the officers) and moving the gun in an up-and-down motion. At the gun's apex, LaDuke aimed it at his head. When lowered, the gun pointed out the window and towards the SRT officers positioned throughout the backyard. At this time, LaDuke had ceased communications with the negotiators, but Captain Marshall was attempting to get LaDuke to reopen dialogue through a phone call.

After LaDuke engaged in the up-and-down motion with his gun several times, Lieutenant Fraddosio advised the SRT officers that they may have to shoot if LaDuke persisted in pointing his gun in their direction. The officers continued to monitor LaDuke. Then, while observing LaDuke through the magnified optic on his assault rifle, Officer Horton saw LaDuke lower his gun yet again. This time, however, Officer Horton perceived LaDuke's gun to be leveling out in a more deliberate manner than what he had done before. All told, Officer Horton believed LaDuke was leveling the gun to a position that would be pointed at either himself or other officers positioned in the backyard. In this brief moment, Officer Horton fired one shot which struck LaDuke in the chest. LaDuke was then taken to the hospital, where he died from the gunshot wound.

---

[2] The Defendants maintain that LaDuke was seen holding two handguns. This is consistent with police reports which noted that two handguns were later recovered from the scene. But because testimony from some officers at the scene support the Estate's position that LaDuke only held one gun, the Court resolves the issue in the Estate's favor for the purpose of summary judgment and proceeds on the understanding that LaDuke held only one gun.

John Norman, as the administrator of LaDuke's Estate, now brings this action. The Estate claims that Lieutenant Fraddosio, in both his individual and official capacities, and Officer Horton, in his individual capacity, violated several of LaDuke's constitutional rights during the encounter described above, all in violation of both federal and state law.

## II.    Standard of Review

A district court will grant summary judgment when the moving party shows there is no genuine dispute regarding any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party carries this burden, the burden of production shifts to the nonmoving party to "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). Summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case. *Celotex*, 477 U.S. at 322.

At the summary judgment stage, the Court does not weigh the evidence and determine the truth of the matter. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Further, the Court is not to judge the evidence or make findings of fact. *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987). Rather, this Court determines whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251-52.

## III.    Analysis

### A. The Estate's individual capacity § 1983 claims (Count I)

Count I of the Complaint alleges that Officer Horton and Lieutenant Fraddosio ("the Defendants"), in their individual capacities, subjected LaDuke to excessive force in violation of the Fourth Amendment. The Estate asserts two theories of excessive force. First, the

4

Estate argues the Defendants engaged in an "excessive show of force" by holding LaDuke at gunpoint. (DE 70 at 20–21.) Second, the Estate argues the Defendants engaged in excessive force by using deadly force on LaDuke. The Court will address each theory in turn, separating the analysis between Horton and Fraddosio when necessary. *See Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) ("[p]ersons sued in their individual capacities under Section 1983 can be held liable based only on their *own* unconstitutional behavior.").

i.    **Show of force**

The Estate claims the Defendants engaged in excessive force by pointing their guns at LaDuke's residence when they arrived at the scene. The Estate argues this "show of force" was excessive because LaDuke posed no danger at that point in time. In particular, the Estate claims LaDuke posed no danger because he "had not been seen with any guns and had made no threats prior to the SRT surrounding his home with assault rifles." (DE 70 at 21–22.)

"The Fourth Amendment's guarantee against unreasonable seizures encompasses a protection against use of excessive, or unreasonable, force 'in the context of an arrest or investigatory stop.'" *King v. City of Rockford, Michigan*, 97 F.4th 379, 393 (6th Cir. 2024) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)). "The reasonableness of a use of force is assessed from the perspective of a reasonable officer on the scene without the benefit of '20/20 vision of hindsight.'" *Id.* (quoting *Graham*, 490 U.S. at 396–97). In certain cases, the mere show of force may give rise to an excessive force claim. *See Saad v. Krause*, 472 F.App'x 403, 404 (6th Cir. 2012). The key inquiry remains whether the show of force was objectively reasonable. *Vanderhoef v. Dixon*, 938 F.3d 271, 280 (6th Cir. 2019).

Here, the Defendants argue that they cannot be held liable under the Estate's "show of force" theory because they are entitled to qualified immunity on that claim. When the issue of qualified immunity is raised by the defense at the summary judgment stage, the Court

5

must determine whether: (1) the officers violated a constitutional right; and (2) the right was clearly established. *Kovacic v. Cuyahoga Dep't of Child. & Fam. Servs.*, 724 F.3d 687, 695 (6th Cir. 2013). "In evaluating if a defendant is entitled to qualified immunity, the Court must adopt the plaintiff's version of the facts . . . unless the plaintiff's version is blatantly contradicted by the record, so that no reasonable jury could believe it." *Soudemire v. Mich. Dept. of Corr.*, 705 F.3d 560, 565 (6th Cir. 2013).

In this case, the Court need not decide whether the Defendants violated LaDuke's constitutional rights by aiming their guns at him because, regardless, they did not violate LaDuke's clearly established rights. *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (noting that courts may consider either prong of the qualified immunity analysis first). "Plaintiffs bear 'the burden of showing that a right was clearly established.'" *Brown v. City of Wyoming*, No. 23-1285, 2024 WL 5040781, at *7 (6th Cir. Dec. 9, 2024) (citation omitted). That generally requires plaintiffs to "identify a case where an officer acting under similar circumstances as [the Defendants] was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017). "The Supreme Court has recognized, especially in the Fourth Amendment excessive-force context, that 'the clearly established law must be particularized to the facts of the case.'" *Brown*, 2024 WL 5040781, at *7 (*White*, 580 U.S. at 79). Ultimately, a "defendant cannot be said to have violated a clearly established right unless . . . existing precedent [ ] placed the statutory or constitutional question confronted by the official beyond debate." *Wenk v. O'Reilly*, 783 F.3d 585, 598 (6th Cir. 2015) (citation omitted).

Here, the Estate seems to allege that an unarmed and otherwise non-threatening individual has a clearly established right not to have guns pointed at them by police. (DE 70 at 21–22.) The Court agrees with that general principle of law. *See Vanderhoef*, 938 F.3d at 280–81 (holding that an officer pointing a gun at a citizen can be objectively unreasonable if

6

the citizen was either unarmed or otherwise posed no danger). But because the facts of this case "do[ ] not fit cleanly within," the clearly established right the Estate requests be applied, the Defendants are entitled to qualified immunity. *King*, 97 F.4th at 397 ("[b]ecause King's conduct 'does not fit cleanly within' our existing excessive force case law, King cannot overcome the clearly established hurdle of qualified immunity,") (quoting *Rudlaff v. Gillispie*, 791 F.3d 638, 644 (6th Cir. 2015)).

The line of cases holding that unarmed and non-threatening individuals have a clearly established right not to be held at gunpoint involve plaintiffs who unquestionably posed no danger to law enforcement. Take the facts in *Vanderhoef*, for example, a case the Estate cites in support of the notion that LaDuke's clearly established right was violated. In *Vanderhoef*, the plaintiff was an unarmed, "nonfleeing teenager," whom the defendant officer "did not reasonably suspect of any prior crime beyond speeding and reckless driving." *Vanderhoef*, 938 F.3d at 281. There, the Sixth Circuit held that such a plaintiff had a clearly established right to not be held at gunpoint by the defendant. *Id.* Or consider the plaintiff in *Saad v. City of Dearborn*, another case the Estate cites to set the parameters of the allegedly violated right. No. 10-12635, 2011 WL 3112517 (E.D. Mich. July 26, 2011). In *Saad*, the defendant officer held the plaintiff at gunpoint to gain entry into her home on the officer's belief that a fleeing suspect, the plaintiff's son, had entered the home. *Id.* at *1. The plaintiff herself, however, was unarmed, was suspected of no crime, and otherwise posed no risk to the defendant's safety. *Id.* at *4. The Sixth Circuit affirmed the district court's decision that such conduct, if proven, violated the plaintiff's clearly established right. *Saad*, 472 F. App'x at 403.

Unlike the plaintiffs in *Vanderhoef* and *Saad*, LaDuke was certainly more than an unarmed and non-threatening subject. The uncontradicted evidence reveals that when SRT

officers arrived on the scene and aimed guns at LaDuke's house,[3] the team knew that LaDuke had access to a gun, had expressed suicidal intentions, had refused to interact with police, and had refused to comply with commands to exit his residence. *Dickerson v. McClellan*, 101 F.3d 1151, 1155 n.3 (6th Cir. 1996) (courts "consider only the facts the officers knew at the time[.]"). It is also undisputed that when SRT officers arrived, no one, besides Marksberry earlier that morning, had actually seen LaDuke holding a gun and LaDuke had not yet made threats towards law enforcement. On these facts, the Estate argues that LaDuke unquestionably posed no danger to law enforcement or others when Horton, Fraddosio, and others aimed their guns at the residence—thus placing this case squarely in the line of clearly established "unarmed and non-threatening" cases.

The Estate overstates its position. Taking the undisputed facts together, this case is ultimately distinguishable from the clearly established "unarmed and non-threatening" cases. Put plainly, unlike the plaintiffs in *Vanderhoef*, *Saad*, and other unarmed and non-threatening cases, LaDuke had immediate access to a firearm, had expressed an intent to discharge that firearm, and had not complied with law enforcement's commands. These facts make LaDuke's case materially different and thus distinguishable.

Moreover, the Estate's contention that LaDuke posed no danger simply because he had not been seen actually holding a gun is not supported by precedent. Rather, precedent supports the notion that immediate access to a gun is tantamount to being armed in the volatile and rapidly-evolving situations police often find themselves in—like the one in this

---

[3] The Court notes that the Estate has failed to explain the precise moment(s) in which each of the two named defendants aimed their weapons at the house. Nevertheless, the Court views the facts in the light most favorable to the Estate and therefore proceeds under the reasonable inference that Horton and Fraddosio aimed their weapons at the house as soon as they established their positions around the residence's perimiter. Under these facts, the analysis is identical for both Horton's and Fraddosio's alleged "show of force."

case. *See Michigan v. Long*, 463 U.S. 1032, 1048 (1983) (recognizing that individuals "may injure police officers and others by virtue of their **access** to weapons, even though they may not themselves be **armed**,") (emphasis added). And the record is clear that, when SRT officers first trained their weapons on LaDuke's residence, they knew that LaDuke had **immediate access** to a gun and had been noncompliant with law enforcement's commands. (DE 53, Marshall Depo., at 94–96). Accordingly, LaDuke was not the prototypical unarmed and non-threatening individual that officers would have known had a clearly established right not to be held at gunpoint.

Ultimately, based on the foregoing, the Court finds that the Estate fails to carry its burden to show that this case fits within the clearly established right at issue. Had LaDuke unquestionably posed no danger to law enforcement, an abundance of caselaw would have made it clear to every officer at the scene that LaDuke had a constitutional right not to be held at gunpoint. Tragically, however, Horton, Fraddosio, and the other officers were confronted with an entirely different situation that morning—one involving a suicidal individual who had immediate access to a gun, had expressed an intent to discharge that gun, and had not complied with commands.

The doctrine of qualified immunity is meant to "'give[ ] government officials breathing room to make reasonable but mistaken judgments about open legal questions,' 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Jacobs v. Alam*, 915 F.3d 1028, 1039 (6th Cir. 2019) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). Here, holding LaDuke at gunpoint may not have been absolutely necessary, but it was not a clearly established constitutional violation that existing precedent placed "beyond debate." *Wenk*, 783 F.3d at 598; *compare Leber v. Smith*, 773 F.2d 101, 105 (6th Cir. 1985) (holding that officer approaching the plaintiff's vehicle after a high-speed chase with his weapon drawn

was reasonable where the plaintiff was "possibly suicidal," and his actions were "unpredictable,"), *with Vanderhoef*, 938 F.3d at 281 (holding the plaintiff had a clearly established right not to be held at gunpoint where he "was a nonfleeing teenager," whom the officer "did not reasonably suspect of any," serious crime). Horton and Fraddosio are therefore entitled to qualified immunity on the Estate's "show of force" § 1983 claim.

ii. **Deadly force**

The Estate also claims that Horton and Fraddosio used excessive deadly force on LaDuke. The Estate argues that Horton engaged in excessive deadly force by firing the shot that killed LaDuke and that Fraddosio engaged in the same by ordering Horton to shoot.

As an initial matter, the Court notes that any alleged tactical errors or misjudgments that preceded the shooting cannot be considered in conjunction with the Estate's deadly force claims. "In this circuit, [the Court] consider[s] the officer's reasonableness under the circumstances he faced at the time he decided to use force." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (referencing the so-called "segmented analysis" this circuit uses to analyze excessive force claims). Under the segmented analysis, "the hours and minutes," leading up to the alleged use of force are disregarded and the Court focuses on the "'split-second judgments' made immediately before the officer used allegedly excessive force." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 407 (6th Cir. 2007) (quoting *Dickerson*, 101 F.3d at 1162).[4]

---

[4] A Supreme Court opinion published the day prior to this opinion being entered casts doubt on the remaining validity of the "segmented analysis." *Barnes v. Felix, et al.*, 605 U. S. ____ (2025). In *Barnes*, the Court held that the Fifth Circuit's "moment-of-threat rule," under which "a court looks only to the circumstances existing at the precise time an officer perceived the threat inducing him to shoot," "improperly narrow[s] the requisite Fourth Amendment analysis." *Id.* Without the benefit of a Sixth Circuit opinion discussing *Barnes'* effect on the segmented analysis, however, the Court will tread carefully forward. Ultimately, though, the segmented analysis is inconsequential to the Court's disposition of this case—which is based on the totality of the circumstances.

The Court will begin by evaluating Officer Horton's conduct. Ultimately, Horton's use of deadly force was not a constitutional violation if he had "'probable cause to believe that [LaDuke] pose[d] a significant threat of death or serious physical injury to the officer[s] or others.'" *Thomas*, 854 F.3d at 365 (quoting *Tennessee v. Garner*, 471 U.S. 1, 3 (1985)). "When considering whether an officer reasonably believed that a person posed an imminent threat of serious bodily harm, courts must consider the totality of the circumstances." *Palma v. Johns*, 27 F.4th 419, 432 (6th Cir. 2022).

In *Graham*, the Supreme Court highlighted certain factors courts should consider in evaluating the totality of the circumstances in excessive force cases. 490 U.S. at 396–97. The *Graham* factors, however, are tailored to criminal settings and are therefore largely inapposite in cases where police respond to non-criminal emergencies. *Estate of Hill v. Miracle*, 853 F.3d 306, 313 (6th Cir. 2017). In such scenarios, other "factual considerations [become] particularly relevant," for evaluating the totality of the circumstances. *Palma*, 27 F.4th at 432. More specifically, when determining whether an individual posed an immediate threat during a non-criminal emergency, the Court considers: (1) "why the officer was called to the scene," (2) "whether the officer knew or reasonably believed that the person was armed," (3) "whether the person verbally or physically threatened the officer or disobeyed the officer," (4) "how far the officer was from the person," (5) "the duration of the entire encounter," (6) "whether the officer knew of any ongoing mental or physical health conditions that may have affected the person's response to the officer," and (7) "whether the officer could have diffused the situation with less forceful tactics." *Id.* at 432–33 (citations omitted).

### 1. *Reason for police presence*

The "reason for police response" factor only weighs in favor of the use of deadly force when an officer is responding to a volatile and "high-risk situation." *See Palma*, 27 F.4th at

432. Typically, an officer who responds to a report of an ongoing or completed crime has good reason to fear for their safety. *Id.* In contrast, an officer who responds to a suicide threat or a request for a wellness check does not deal with the same general safety threat. *Id.*

Here, although the closing moments of LaDuke's interaction with law enforcement can be aptly characterized as a "high-risk situation," the undisputed facts show that police, including Horton, initially responded to a low-risk situation. *See Woodcock v. City of Bowling Green*, 679 F. App'x 419, 423 (6th Cir. 2017) (factor did not support use of deadly force when the individual did not engage in threatening or violent behavior before police arrived). Before Horton and other SRT officers arrived on the scene, LaDuke had threatened no one but himself and had merely refused to talk with police. This factor thus weighs against finding that LaDuke posed an immediate threat.

### 2. *Presence of a weapon*

The "presence of a weapon" factor weighs in favor of finding that an immediate threat existed when there is strong evidence that a person was armed. *Palma*, 27 F.th at 433 ("[t]he stronger the evidence showing that a person is armed, the more likely the use of lethal force is reasonable."). However, lethal force is not *per se* reasonable merely because "a person is visibly armed." *Id.* (citing *Thomas*, 854 F.3d at 366) ("an officer may [not] shoot a suspect merely because he has a gun in his hand.").

Here, the Estate cannot genuinely dispute the fact that LaDuke was visibly armed when Horton fired the lethal shot. Every officer with a clear view of LaDuke either at the moment of the shot or seconds before confirm this fact. And though the Court need not accept the officers' "self-serving account," of LaDuke's final moments, the fact that LaDuke was visibly armed is corroborated by circumstantial evidence—such as clear video audio evidence in which officers can be heard telling LaDuke to drop his weapon. *Adams v. Blount Cnty.,*

*Tennessee*, 946 F.3d 940, 949 (6th Cir. 2020) ("in cases where the witness most likely to contradict the officer's testimony is dead, 'the court may not simply accept what may be a self-serving account by the police officer. It must look at the circumstantial evidence[,]'" to determine whether genuine issues of fact exist). Accordingly, because there is "strong evidence showing that [LaDuke] was armed," this factor weighs heavily in favor of finding that he posed an immediate threat. *Palma*, 27 F.th at 433.

### 3. *Disobedience and threatening behavior*

An individual is more likely to pose an immediate threat when they engage in threatening behavior, disobey an officer's commands, or participate in a combination of the two. *Palma*, 27 F.4th at 434; *see United States v. Garner*, 108 F. Supp. 2d 796, 802 (N.D. Ohio 2000) (suspect's "act of disobedience, coupled with [his] unstable demeanor, supported [officer's] belief that [the suspect] posed a potential threat to his safety."). The Sixth Circuit has consistently held that this factor weighs in favor of finding that an individual posed an immediate threat where that individual threatened others with a gun or where that individual was visibly armed and disobeyed commands to drop their gun. *See, e.g., Thornton v. City of Columbus*, 727 F. App'x 829 (6th Cir. 2018) (holding that use of deadly force was reasonable in part because officers responded to a call about a man threatening others with a gun); *see also Tucker v. Marquette Cnty., Michigan*, No. 20-1878, 2021 WL 2828027, at *3 (6th Cir. July 7, 2021) (holding that use of deadly force was reasonable where a suicidal individual was visibly armed with a shotgun, ignored commands to drop it, and advanced towards the officer) (collecting similar cases).

Here, the first threatening behavior LaDuke engaged in took place during the beginning stages of the encounter. Captain Marshall testified that early on, LaDuke told him that "there's a 95 percent chance that I die or the -- the police die[.]" (DE 53, Marshall Depo., at 67.) Horton testified that he was not aware of the exact threat LaDuke had made to

Captain Marshall but that he was aware that LaDuke had, in fact, made threatening statements towards law enforcement at the time he used deadly force.[5] And while LaDuke's threats, without more, may not have substantiated him as a threat to the officers' safety, those threats certainly contributed to Horton's discernment of the situation. *Caie v. W. Bloomfield Twp.*, 485 Fed.Appx. 92, 94 (6th Cir.2012) (holding that a suicidal individual's verbal threats of physical violence toward officers, along with other erratic conduct, presented a strong risk to the safety of the officers).

Later on, LaDuke engaged in more threatening and defiant behavior. In the final minutes of the encounter, LaDuke was visibly armed and refused to comply with the officers' repeated command to drop his gun. (DE 62, Balltrip BWC at 12:15:13.) Instead of complying, and according to the officers' uncontradicted testimony, LaDuke began tapping his gun on the window he was standing behind and moving it in the up-and-down motion previously described. Each of those maneuvers resulted in LaDuke's gun intermittently being pointed towards the SRT officers' positions in the backyard.

Taken together, these undisputed facts confirm that LaDuke engaged in what caselaw confirms can only be described as threatening and disobedient behavior. This factor thus weighs in favor of finding that LaDuke posed an immediate threat.

The Estate argues that genuine disputes of fact exist as to whether LaDuke actually engaged in threatening behavior. Specifically, the Estate takes issue with the officers' self-serving testimony that LaDuke aimed his gun in their direction. The Estate suggests that

---

[5] Though statements made well before the use of deadly force are typically disregarded under the segmented analysis, the fact that LaDuke had made threatening statements was known by Horton at the moment in which he decided to employ deadly force and was a part of Horton's "objective assessment of the danger," LaDuke posed in that moment. *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015); *see also Barnes*, 605 U. S. ____ ("the 'totality of the circumstances' inquiry into a use of force has no time limit."). Thus, those earlier threats are a relevant and appropriate part of this analysis.

LaDuke may have been lowering his gun during the up-and-down motion sequence to answer a phone call from Captain Marshall, who was attempting to reopen dialogue with LaDuke in the moments before Horton's shot. But the Estate's theory is merely speculative. *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009) ("[t]he court's duty to view the facts in the light most favorable to the nonmovant does not require or permit the court to accept mere allegations that are not supported by factual evidence."). Moreover, the officers' testimony regarding the direction of LaDuke's gun's movement is corroborated by circumstantial evidence, such as the fact that LaDuke had repeatedly raised and lowered his gun without attending to his phone. And even accepting the Estate's speculative theory that LaDuke was not aiming his gun at Horton or any other officer, caselaw makes clear that whether an individual actually "took aim" is not vital to the immediate threat analysis. *See Thornton*, 727 F. App'x at 831, 837 (holding that a sufficient threat existed from a suspect who held, but did not aim, a shotgun while looking at and walking toward officers, ignoring their commands to drop the gun); *see also Thomas*, 854 F.3d at 366 ("a suspect could raise and fire a gun with little or no time for an officer to react.").

Accordingly, the Court finds that the Estate fails to establish a *genuine* dispute of *material* fact as to this factor, and the conclusion remains that this factor weighs in favor of finding that LaDuke posed an immediate threat.

### 4.  Distance between LaDuke and the officers

The distance between an individual and officers is not probative of what degree of threat that individual poses "when the person is armed and aiming a firearm at the officers." *Palma*, 27 F.4th at 435. In fact, discussion regarding the distance between an individual and officers in such cases is "notably absent." *DeMerrell v. City of Cheboygan*, 206 F. App'x 418, 429 (6th Cir. 2006). This case is no different, as the undisputed evidence confirms that

LaDuke was armed and periodically aimed his gun at the SRT officers in the backyard. Accordingly, this factor is neutral.

### 5. Duration of the encounter

Generally, it is more unreasonable for officers to use deadly force during longer encounters than when officers find themselves using deadly force in the context of "rapidly evolving situations." *Palma*, 27 F.4th at 436. But even during longer encounters, the use of deadly force may be reasonable if an officer has "to make a split-second decision in response to rapidly changing circumstances." *Id.*

The record is clear that law enforcement's interaction with LaDuke lasted a long time. This would typically support a finding that LaDuke posed no immediate threat. But in this case, the circumstances of LaDuke's prolonged encounter with law enforcement began to rapidly change in its final moments.

At 12:15 p.m., some two hours into the incident, officers can be heard on body camera footage confirming their first visual on LaDuke holding a gun. (DE 62, Balltrip BWC at 12:15:06.) In the minutes that followed, LaDuke refused to put the gun down, and uncontradicted testimony establishes that LaDuke periodically pointed his gun in the officers' direction. Then, in the seconds before Horton fired the fatal shot, an even more "rapidly changing circumstance," presented itself. According to Horton, in LaDuke's final moments, "he [got] a serious look on his face, and that's when he started lowering -- leveling the guns in a -- in like a -- almost a slower fashion down towards the window, towards the officers [ ]. And that's when I shot." (DE 55, Horton Depo., at 114.) Horton's shot was fired precisely four minutes and fifty-one seconds after LaDuke was first seen brandishing his gun. This gap in time is notable because Horton's *inaction* during those intervening minutes corroborates his testimony that he perceived LaDuke's conduct in that final moment as different and more threatening than what he had previously observed.

16

Ultimately, this factor weighs in favor of finding that LaDuke posed an immediate threat. Even viewing the record in the light most favorable to the Estate, it is clear that LaDuke brandished and pointed a gun erratically in those final minutes. Given those "rapidly changing circumstances," this factor supports Officer Horton. *Palma*, 27 F.4th at 436.

### 6. *Mental health conditions*

An individual may be more or less likely to pose an immediate threat when they suffer from mental illness. *Palma*, 27 F.4th at 436–38 ("mental illness may mitigate the risk in one situation and aggravate the risk in another."). An individual's mental conditions are only relevant to the immediate threat analysis, however, when the officer was aware of those conditions at the time they decided to use deadly force. *Id.* at 436. Ultimately, "only in extreme cases [has the Sixth Circuit] found that an officer reasonably used lethal force against a mentally ill person. In every case that [it has been so found], the officers used lethal force against a mentally ill person who was *armed* and *threatening* officers." *Id.* at 437 (emphasis in original).

Here, Horton was aware that LaDuke had mental health issues before he used deadly force against him. Thus, Horton had to take LaDuke's condition into account before using force. What is unclear is whether LaDuke's mental health issues "mitigate[d] the risk," or "aggrevate[d] the risk," in this situation. *Palma*, 27 F.4th at 438. Even assuming that LaDuke's mental issues mitigated the risk, this case fits into the narrow line of cases where it has been found that an officer reasonably used lethal force against a mentally ill person on account of that person being *"armed* and *threatening."* *Id.* at 437. Accordingly, while the existence of LaDuke's mental health issues may marginally weigh against finding that he posed an immediate threat, there is a clear exception for situations where a mentally ill person is armed and threatening. As such, this factor does not push the needle for the Estate.

### 7. Less intrusive alternatives

An individual is less likely to pose an immediate threat if the danger they create can be readily avoided by alternatives to force. *Palma*, 27 F.4th at 439. This factor recognizes that, "[s]ometimes, the time or space available to an officer may mean that the reasonable thing to do is monitor the suspect, issue a warning, or take cover." *Thomas*, 854 F.3d at 366–67 (citation omitted). At the same time, however, the Fourth Amendment does not require officers to use "the least intrusive means available," to respond to dangerous situations. *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005).

Here, through its expert, the Estate argues that Horton should have taken cover when LaDuke pointed his gun in the officers' direction instead of shooting him. (DE 45-1, expert report, at Page ID# 245–47.) As a matter of law, however, the Estate's position goes too far. The Estate fails to cite precedent suggesting that officers are either required or expected to "take cover," when faced with an armed and threatening individual. Likewise, the Estate cites no case suggesting that it is unreasonable to use deadly force in response to an armed and threatening individual when "taking cover" was a conceivable option. *Contra Thomas*, 854 F.3d at 366 (holding it was reasonable for an officer to use deadly force instead of taking cover when faced with an armed and threatening subject). Simply put, the Estate fails to cite such precedent because the Fourth Amendment does not require an officer to gamble with their own life when dealing with such a dangerous and unpredictable situation. *See Tucker*, 2021 WL 2828027, at *3 (holding officer did not have to wait on an armed individual to put their finger on the trigger before employing deadly force because, "[t]he Fourth Amendment [did] not require [the] officer to make that gamble.").

The Court cannot measure this factor "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Accordingly, because the Estate's argument concerning "less intrusive

alternatives" fails as a matter of law, this factor weighs in favor of finding that LaDuke posed an immediate threat.

### 8. Balancing factors

After weighing these factors, the Court concludes that Horton must prevail at the summary judgment stage because a reasonable jury could only find that LaDuke did, in fact, pose an immediate threat when Horton shot him. No one factor on its own supports this conclusion. Rather, the totality of the circumstances and applicable precedent counsel here that Horton had probable cause to believe that LaDuke—an armed individual who had aimed his weapon at police officers—posed a significant threat of death or serious physical injury to the officers at the scene. Accordingly, Horton's use of force was not a constitutional violation. *Thomas*, 854 F.3d at 365.

Notwithstanding, even if the Estate were able to establish that Horton violated LaDuke's constitutional right, Horton would be entitled to qualified immunity if that right was not clearly established at the time of the violation. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The Estate need not identify a case with the exact same fact pattern or even "fundamentally similar" or "materially similar" facts. *Id.* Rather, "the salient question ... is whether the state of the law ... gave [Horton] fair warning that [his] alleged treatment of [LaDuke] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The Estate cites *Heeter v. Bowers* as clearly establishing LaDuke's right to not have deadly force used against him under the facts of this case. 99 F.4th 900 (6th Cir. 2024).[6] In

---

[6] Though *Heeter* is a 2024 opinion, it concerned an incident which took place in 2018. Thus, the Sixth Circuit's analysis of Heeter's clearly established rights as of 2018 is relevant to the Court's inquiry here—which involves looking at LaDuke's rights as of October 2022.

that case, officers were called to the home of Bill Heeter, who was armed with a gun and threatening to shoot himself. *Id.* at 905. Officers responded and entered Heeter's home. *Id.* Once inside, officers observed Heeter standing in his kitchen with his hands in his pockets. *Id.* They commanded him to raise his hands and drop his gun (which was ostensibly either in his pocket or resting on a table within reaching distance—a disputed fact in *Heeter*). *Id.* In his final moments, Heeter took his hands out of his pockets and made a slight body movement. *Id.* An officer then shot Heeter five times in the chest at close range. *Id.* Under those facts, the Sixth Circuit held that suicidal individuals, like Heeter, had a clearly established right not to be shot when that individual "had moved slightly, even if the person held a gun in their pocket or could grab a gun within reach." *Id.* at 915.

This case is so factually different than *Heeter* that the Court cannot say as a matter of law that Horton had fair warning that his alleged treatment of LaDuke was unconstitutional. Unlike the suicidal individual in *Heeter*, LaDuke not only clearly held a gun at the moment he was shot, but he was also pointing that gun in the direction of law enforcement officers. Again, because the facts of this case "do[ ] not fit cleanly within," the clearly established right the Estate requests be applied, Horton is entitled to qualified immunity. *King*, 97 F.4th at 397. Put plainly, Horton's decision to shoot LaDuke was not a clearly established constitutional violation that existing precedent placed "beyond debate." *Wenk*, 783 F.3d at 598.

The Estate's excessive deadly force claim against Fraddosio must similarly fail. The Estate premises its deadly force claim against Fraddosio on a personal supervisory liability theory—alleging that Fraddosio ordered Horton to fire the shot that killed LaDuke and therefore encouraged and participated in Horton's constitutional violation. *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (to establish personal supervisory liability under

Section 1983, "[t]here must be a showing that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it."). Even taking the Estate's allegation as true, its personal supervisory liability claim against Fraddosio must fail because Horton, Fraddosio's "supervised employee," did not commit a constitutional violation. *Griffith v. Franklin County*, 975 F.3d 554, 579 (6th Cir. 2020) ("a plaintiff cannot establish a claim for supervisory liability without establishing an underlying constitutional violation by a supervised employee.").

### B. The Estate's official capacity § 1983 claim (Count V)

Count V of the Complaint alleges that Lieutenant Fraddosio, in his official capacity, violated LaDuke's constitutional rights. A claim against a municipal official, like Fraddosio, in their official capacity creates a *Monell* styled municipal liability claim. *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). The Estate's *Monell* claim, however, fails at the first stage of the analysis. This is because "where there has been no showing of individual constitutional violations on the part of the officers involved, there can be no municipal liability." *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019). Here, there can be no liability against Fraddosio in his official capacity because the Court has found no showing of individual constitutional violations on the part of any officer involved. Fraddosio, in his official capacity, is therefore entitled to summary judgment on Count V.

### C. The Estate's state law claims

The Estate also brings several state laws claims against Horton and Fraddosio, including claims of assault and battery (Count II), negligence and gross negligence (Count III), wrongful death (Count IV), and punitive damages (Count VI).

In the operative complaint, the Estate bases its state law claims on the alleged excessive force utilized by the Defendants. (DE 31, Second Amended Complaint, at ¶ ¶ 155–69.) In the Estate's response to the Defendants' motion for summary judgment, however, the

Estate alleges—for the first time—that its state law claims are premised not on any alleged use of force, but rather that those claims are premised on Horton's and Fraddosio's failure to comply with one internal Nicholasville Police Department policy pertaining to interactions with diminished persons. (DE 70 at 16–19.) The Defendants argue the Estate's new theory regarding its state law claims must be disregarded. For the following reasons, the Court will disregard the Estate's new theory.

It is true that "the federal rules, and the decisions construing them, evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage." *Colonial Refrigerated Transportation, Inc. v. Worsham*, 705 F.2d 821 (6th Cir. 1983). But the federal rules and the decisions construing them still place boundaries on how far outside of the pleadings a party's case may stray. "The ultimate inquiry," involves evaluating "whether the change in argument made by a party would cause a 'shift in the thrust of the case' that would prejudice the other party." *Grand Traverse Band of Ottawa & Chippewa Indians v. Blue Cross Blue Shield of Michigan*, 619 F. Supp. 3d 773, 780 (E.D. Mich. 2022) (quoting *S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013)).

Here, the Estate's change in argument materially alters the factual and legal questions presented by its state law claims. Under the Estate's original liability theory, the factual and legal questions simply revolved around whether the officers' use of force was permissible. Under the Estate's new theory, the factual and legal questions would focus on whether the officers were familiar with the Department's "diminished person policy," whether that policy was breached during law enforcement's encounter with LaDuke, whether that policy was ultimately permissible, and so on. It is thus clear to the Court that the Estate's change in argument moves the target too much and that allowing such a change at the summary judgment stage would deny Horton and Fraddosio a fair opportunity to

investigate and take discovery on the Estate's claims. Accordingly, the Court must disregard the Estate's new theory.

The Court will proceed with the Estate's state law claims now appropriately refocused on the original liability theory. In their motion for summary judgment, Horton and Fraddosio argue they are entitled to judgment on the state law claims based on the defense of qualified official immunity. For the following reasons, the Court finds that Horton and Fraddosio are entitled to that immunity.

"Under Kentucky law, qualified [official] immunity protects a police officer so long as he performed '(1) discretionary acts or functions . . . ; (2) in good faith; and (3) within the scope of [his] authority.'" *Reich v. City of Elizabethtown, Kentucky*, 945 F.3d 968, 982 (6th Cir. 2019) (quoting *Yanero v. Davis*, 65 S.W.3d 510, 521–22 (Ky. 2001)). "This doctrine applies to negligence actions and intentional torts." *Id.* (citing *Gati v. W. Ky. Univ.*, 762 F. App'x 246, 253 (6th Cir. 2019)).

Here, under the first prong, "the determination of the amount of force required, including the decision to use deadly force, is a discretionary act." *Reich*, 945 F.3d at 982 (citations omitted). And for the third prong, "the use of deadly force plainly falls within the scope of a police officer's authority." *Id.* at 983 (citing Ky. Rev. Stat. Ann. § 503.050(1)-(2)).

That leaves only the question of whether Horton and Fraddosio acted in good faith under the second prong. The good faith analysis involves an objective and subjective component. Put another way, if the Estate were able to prove that Horton or Fraddosio either objectively or subjectively acted in bad faith, then that officer would not be entitled to the protections afforded by qualified official immunity. *Bryant v. Pulaski Cty. Detention Ctr.*, 330 S.W.3d 461, 466 (Ky. 2011).

For the objective component, "a court must ask whether the officer's conduct demonstrates 'a presumptive knowledge of and respect for basic, unquestioned constitutional

23

rights.'" *Reich*, 945 F.3d at 983 (quotation omitted). Here, the Court's analysis of the Estate's underlying Fourth Amendment claims "takes care of [this] prong—the officers did not violate [LaDuke's] constitutional right to be free from excessive force and, even if they did, the unlawfulness of the officers' conduct was not clearly established at the time." *Id.*

For the subjective component, "courts ask whether the official behaved with 'permissible intentions.'" *Reich*, 945 F.3d at 983. To show that Horton or Fraddosio behaved with impermissible intentions, the Estate is required to "point[ ] to . . . evidence that an officer willfully or maliciously intended to harm [LaDuke] or acted with a corrupt motive." *Id.* (internal quotation marks and citation omitted). Here, the Estate points to no such evidence and the Court found none in its own independent review of the evidence.

Accordingly, because all qualified official immunity elements are satisfied, the Estate's claims of assault and battery, negligence and gross negligence, and wrongful death fail. *See e.g., Reich*, 945 F.3d at 983. The Estate's punitive damages claim also fails, as a claim for punitive damages is not a separate cause of action but is rather a remedy available to litigants. *Smith v. Westlake Vinyls, Inc.*, 403 F. Supp. 3d 625, 635–36 (W.D. Ky. 2019).

## IV.    Conclusion

For the foregoing reasons, it is hereby ORDERED that the Defendants' motion for summary judgment (DE 57) is GRANTED.

This 16th day of May, 2025.



Signed By:
Karen K. Caldwell
United States District Judge